ACCEPTED
03-14-00197-CV
3923343
THIRD COURT OF APPEALS
AUSTIN, TEXAS
1/27/2015 5:50:32 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00197-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
1/27/2015 5:50:32 PM
JEFFREY D. KYLE
Clerk

GRAPHIC PACKAGING CORPORATION,
*Appellant*,

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS, AND
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,
*Appellees*.

On Appeal from the 353rd Judicial District Court
Travis County, Texas

## BRIEF OF APPELLEES

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
  General

JAMES E. DAVIS
Deputy Attorney General for
  Civil Litigation

SCOTT A. KELLER
Solicitor General

RANCE CRAFT
Assistant Solicitor General
State Bar No. 24035655

CYNTHIA A. MORALES
Assistant Attorney General

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 [fax]
rance.craft@texasattorneygeneral.gov

**Oral Argument Requested**

## IDENTITY OF PARTIES AND COUNSEL

*Plaintiff/Appellant*

Graphic Packaging Corporation

*Appellate Counsel for Plaintiff/Appellant*

Amy L. Silverstein (asilverstein@sptaxlaw.com)
admitted *pro hac vice*
SILVERSTEIN & POMERANTZ LLP
12 Gough Street, Second Floor
San Francisco, California 94103
(415) 593-3502
(415) 593-3501 [fax]

*Trial and Appellate Counsel for Plaintiff/Appellant*

James F. Martens (jmartens@textaxlaw.com)
State Bar No. 13050720
Amanda G. Taylor (ataylor@textaxlaw.com)
State Bar No. 24045921
Lacy L. Leonard (lleonard@textaxlaw.com)
State Bar No. 24040561
Danielle Ahlrich (dahlrich@textaxlaw.com)
State Bar No. 24059215
MARTENS, TODD, LEONARD & TAYLOR
301 Congress Avenue, Suite 1950
Austin, Texas 78701
(512) 542-9898
(512) 542-9899 [fax]

*Defendants/Appellees*

Glenn Hegar, Comptroller of Public Accounts of the State of Texas[*]
Ken Paxton, Attorney General of the State of Texas[*]

---

[*] This suit initially named Susan Combs, then Comptroller of Public Accounts, and Greg Abbott, then Attorney General, as defendants. Glenn Hegar succeeded Combs on January 2, 2015, and Ken Paxton succeeded Abbott on January 5, 2015. *See* TEX. R. APP. P. 7.2(a).

***Appellate Counsel for Defendants/Appellees***

 Rance Craft (rance.craft@texasattorneygeneral.gov)
 Assistant Solicitor General
 State Bar No. 24035655
 OFFICE OF THE ATTORNEY GENERAL
 P.O. Box 12548 (MC 059)
 Austin, Texas 78711-2548
 (512) 936-2872
 (512) 474-2697 [fax]

***Trial and Appellate Counsel for Defendants/Appellees***

 Cynthia A. Morales (cynthia.morales@texasattorneygeneral.gov)
 Assistant Attorney General
 State Bar No. 14417420
 OFFICE OF THE ATTORNEY GENERAL
 P.O. Box 12548 (MC 017)
 Austin, Texas 78711-2548
 (512) 475-4470
 (512) 477-2348 [fax]

***Trial Counsel for Defendants/Appellees***

 Kevin D. Van Oort[*] (kevin.vanoort@tpfa.state.tx.us)
 General Counsel
 State Bar No. 20449890
 TEXAS PUBLIC FINANCE AUTHORITY
 300 West 15th Street, Suite 411
 Austin, Texas 78701
 (512) 463-5544
 (512) 463-5501 [fax]

---

\* Mr. Van Oort was an Assistant Attorney General with the Office of the Attorney General at the time that he represented the defendants in this case. He is no longer working on this case. His current contact information is listed here.

# TABLE OF CONTENTS

Identity of Parties and Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

Index of Authorities  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ix

Statement of the Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xx

Issues Presented  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xxi

Statement of Facts  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.     The Texas Franchise Tax  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        A.     The Tax Base For The Franchise Tax . . . . . . . . . . . . . . . . . 2

        B.     Apportionment Of The Tax Base For The Franchise
             Tax . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

             1.     The gross-receipts apportionment method . . . . . . . . 4

             2.     Requests for alternative apportionment (1970-
                  1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

             3.     Narrow exceptions to the gross-receipts
                  method . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

             4.     Current apportionment statute  . . . . . . . . . . . . . . . . . 7

        C.     Current Calculation Of Franchise Tax Due  . . . . . . . . . . . . 7

    II.    The Multistate Tax Compact . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

        A.     Adoption Of The Compact . . . . . . . . . . . . . . . . . . . . . . . . . 8

        B.     The Compact's Provisions . . . . . . . . . . . . . . . . . . . . . . . . . 9

1. The Compact's purposes . . . . . . . . . . . . . . . . . . . . . . 9

2. The Multistate Tax Commission . . . . . . . . . . . . . . . 9

3. The Compact's income-tax articles . . . . . . . . . . . . 10

4. Miscellaneous Compact provisions . . . . . . . . . . . 11

C. State Variations From The Compact's Income-Tax Articles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

III. The Franchise Tax And The Compact . . . . . . . . . . . . . . . . . . . 13

IV. Graphic's Tax-Refund/Tax-Protest Suit . . . . . . . . . . . . . . . . . 15

Summary of the Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

I. In Calculating Its Franchise Tax, Graphic Must Apportion Its Margin To Texas Using The Gross-Receipts Method In Section 171.106 Of The Tax Code. . . . . . . . . . . . . . . . . . . . . . . 18

A. Section 171.106 Requires Taxpayers To Apportion Their Margin Using The Gross-Receipts Method, Subject Only To Certain Exceptions Provided In That Section. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

B. The Compact's Three-Factor Income-Apportionment Method Does Not Apply To The Franchise Tax Because It Is Not An Income Tax. . . . . . . . . . . . . . . . . . . 20

1. Article III.1's "taxpayer option" and Article IV's apportionment method apply only to apportionment of "income" for a state's "income tax." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2. The Texas franchise tax is not an "income tax" and does not involve the apportionment of "income." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

3. The Compact's "income tax" definition does not expand Articles III and IV to include the franchise tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    a. Texas law establishes that the franchise tax does not meet the Compact's "income tax" definition. . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    b. The franchise tax does not meet the Compact's definition of an "income tax" on its own terms. . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4. Model Compact Regulation II.4 does not expand the Compact's "income tax" definition to cover the franchise tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

C. Section 171.106's Mandate To Use The Gross-Receipts Method Prevails Over Any Conflicting Language In The Compact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

1. As the later-enacted, more specific statute, section 171.106(a) prevails over the Compact. . . . . 32

2. Section 171.106(a) and the Compact cannot be harmonized so that both apply to the franchise tax. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3. The presumption against implied repeals does not support Graphic's reading of the Tax Code. . . 35

4.    The rule that ambiguous tax statutes must be construed in the taxpayer's favor does not apply here. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

5.    The Comptroller's reading of section 171.106 does not violate article III, section 36 of the Texas Constitution. . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

II.  Texas's Membership In The Compact Does Not Preclude The Legislature From Requiring A Taxpayer To Use The Gross-Receipts Method To Apportion Margin. . . . . . . . . . . . . 41

A.  Articles III And IV Of The Compact Do Not Apply To The Franchise Tax Because It Is Not An "Income Tax." . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

B.  The Legislature May Restrict The Compact's Application In Texas Law Because It Is Not A Binding Regulatory Compact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

1.    The term "compact" does not make this Compact binding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

2.    *U.S. Steel* did not address whether the Compact is a binding contract. . . . . . . . . . . . . . . . . . . . . . . . . . 44

3.    The Compact does not exhibit the indicia of a binding regulatory compact. . . . . . . . . . . . . . . . . . . . 45

a.    The Commission is not a joint regulatory body. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

b.    The Compact provisions do not require reciprocal action to be effective. . . . . . . . . . . 47

c.    The Compact does not prohibit unilateral repeal or modification. . . . . . . . . . . . . . . . . . . . 49

4. The Compact is an advisory compact with uniform laws. . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

C. The Compact Does Not Preclude The Legislature From Mandating Exclusive Use Of Section 171.106's Gross-Receipts Apportionment Method. . . . . . . . . . . . . . . 55

1. Article III.1 does not unambiguously bar the Legislature from enforcing an exclusive apportionment method. . . . . . . . . . . . . . . . . . . . . . 55

2. Article III.1 cannot constitutionally require Texas to allow a taxpayer to remove part of its tax base from Texas's taxing authority. . . . . . . . . . 60

D. The Compact Does Not Supersede Section 171.106 Because Any Conflict Does Not Unconstitutionally Impair Any Contractual Obligations. . . . . . . . . . . . . . . . 62

1. Binding compacts that Congress has not approved preempt state law only if the law unconstitutionally impairs contractual obligations. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

2. Section 171.106 does not unconstitutionally impair any obligations to Graphic under the Compact. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

3. Graphic waived the Contracts Clause issue. . . . . . . 67

Prayer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

Certificate of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

Appendix

# INDEX OF AUTHORITIES

**Cases**

*Alabama v. North Carolina,*
    560 U.S. 330 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 57

*Allied Stores of Ohio, Inc. v. Bowers,*
    358 U.S. 522 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Basic Capital Mgmt. v. Dynex Commercial, Inc.,*
    348 S.W.3d 894 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*City of Charleston v. Pub. Serv. Comm'n,*
    57 F.3d 385 (4th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

*City of Oak Cliff v. State,*
    97 Tex. 383, 79 S.W. 1 (1904) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Combs v. Chapal Zenray, Inc.,*
    357 S.W.3d 751 (Tex. App.—Austin 2011, pet. denied) . . . . . . 25, 38, 39

*Cuyler v. Adams,*
    449 U.S. 433 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Employees Ret. Sys. v. Duenez,*
    288 S.W.3d 905 (Tex. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

*Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,*
    459 U.S. 400 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65-67

*Escambia Cnty. v. McMillan,*
    466 U.S. 48 (1984) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

*Foster v. TDCJ,*
    344 S.W.3d 543 (Tex. App.—Austin 2011, pet. denied) . . . . . . . . . . . . 27

*Gaar, Scott & Co. v. Shannon,*
  115 S.W. 361 (Tex. Civ. App.—Austin 1908, writ denied),
  *aff'd,* 223 U.S. 468 (1912) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

*Gen. Dynamics Corp. v. Sharp,*
  919 S.W.2d 861 (Tex. App.—Austin 1996, writ denied) . . . . . . . . . . 2, 67

*Gen. Expressways, Inc. v. Iowa Reciprocity Bd.,*
  163 N.W.2d 413 (Iowa 1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63

*Gordon v. Lake,*
  163 Tex. 392, 356 S.W.2d 138 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Green v. Biddle,*
  21 U.S. (8 Wheat.) 1 (1823) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 67

*Hirsch v. State,*
  282 S.W.3d 196 (Tex. App.—Fort Worth 2009, no pet.) . . . . . . . . . . . . 40

*IBM v. Dep't of Treasury,*
  852 N.W.2d 865 (Mich. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52, 64

*In re Nestle USA, Inc.,*
  387 S.W.3d 610 (Tex. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Ingram Micro, Inc. v. Dep't of Treas.,*
  No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014) . . . . . . . . . . 52

*INOVA Diagnostics, Inc. v. Strayhorn,*
  166 S.W.3d 394 (Tex. App.—Austin 2005, pet. denied) . . . . . . . . . . 3, 22

*Jackson v. SOAH,*
  351 S.W.3d 290 (Tex. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Liberty Mut. Ins. Co. v. Tex. Dep't of Ins.,*
  187 S.W.3d 808 (Tex. App.—Austin 2006, pet. denied) . . . . . . . . . . . . 65

*McComb v. Wambaugh,*
    934 F.2d 474 (3d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

*Moorman Mfg. Co. v. Bair,*
    437 U.S. 267 (1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47, 67

*Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.,*
    470 U.S. 451 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.,*
    472 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 47, 49

*Nw. Austin MUD No. 1 v. City of Austin,*
    274 S.W.3d 820 (Tex. App.—Austin 2008, pet. denied) . . . . . . . . . . . 24

*Seattle Master Builders Ass'n v.*
    *Pac. Nw. Elec. Power & Conservation*
    *Planning Council,* 786 F.2d 1359 (9th Cir. 1986) . . . . . . . . 45, 47, 49-51

*State Bd. of Ins. v. Adams,*
    316 S.W.2d 773 (Tex. Civ. App.—Houston 1958, writ ref'd n.r.e.) . . . 40

*State v. $1,760.00 in U.S. Currency,*
    406 S.W.3d 177 (Tex. 2013) (per curiam) . . . . . . . . . . . . . . . . . . . . . . . 26

*State v. Sw. Gas & Elec. Co.,*
    145 Tex. 24, 193 S.W.2d 675 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility,*
    71 S.W.3d 846 (Tex. App.—Austin 2002, no pet.) . . . . . . . . . . . . . . . . 68

*Tarrant Reg'l Water Dist. v. Hermann,*
    133 S. Ct. 2120 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 56, 57, 62

*U.S. Steel Corp. v. Multistate Tax Comm'n,*
    434 U.S. 452 (1978) . . . . . . . . . . . . . . . . . . . . . . 8, 9, 44-47, 54, 59, 64

*U.S. Trust Co. v. New Jersey*,
    431 U.S. 1 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66, 68

*United States v. Price*,
    361 U.S. 304 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

*W. Union Tel. Co. v. Kansas*,
    216 U.S. 1 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*W. Union Tel. Co. v. State*,
    103 Tex. 306, 126 S.W. 1197 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*West Virginia ex rel. Dyer v. Sims*,
    341 U.S. 22 (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

## Constitutional Provisions, Statutes, and Rules

ALASKA CONST. art. IX, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ARK. CONST. art. 16, § 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CAL. CONST. art. XIII, § 31 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

HAW. CONST. art. VII, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

ILL. CONST. art. IX, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

MICH. CONST. art. IX, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

MINN. CONST. art. X, § 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

MO. CONST. art. X, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

MONT. CONST. art. VIII, § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

N.D. CONST. art. X, § 2 .............................................. 61

S.D. CONST. art. XI, § 3 .............................................. 61

TEX. CONST. art. I, § 16 .............................................. 63

TEX. CONST. art. III, § 36 ......................................... 39, 40

TEX. CONST. art. VIII, § 4 ......................................... 60, 61

U.S. CONST. art I, § 10, cl. 1 ......................................... 63

U.S. CONST. art. I, § 10, cl. 3 ......................................... 44

WASH. CONST. art. 7, § 1 .............................................. 61

WYO. CONST. art. 15, § 14 .............................................. 61

ALA. CODE § 40-27-1 .................................................. 13

ARK. CODE § 26-5-101 .................................................. 12

CAL. REV. & TAX CODE § 25128 ......................................... 12

COLO REV. STAT. § 24-60-1301 ......................................... 12

COLO REV. STAT. § 39-22-303.5(4)(a) .................................. 12

D.C. CODE § 47-441 .................................................. 13

FLA. STAT. § 214.71 (1971) ........................................... 11

FLA. STAT. § 220.53 (1971) ........................................... 11

IDAHO CODE § 63-3027(i) .............................................. 12

MICH. COMP. LAWS § 208.1301 .......................................... 12

MINN. STAT. § 290.171 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

MINN. STAT. § 290.191 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OR. REV. STAT § 314.606 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OR. REV. STAT § 314.650 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

OR. REV. STAT. § 305.653 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

TEX. FAM. CODE § 162.102, art. IX . . . . . . . . . . . . . . . . . . . . . . . . . . 50

TEX. FAM. CODE § 60.010, art. XII.A.2 . . . . . . . . . . . . . . . . . . . . . . . 53

TEX. GOV'T CODE § 311.005(13) . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

TEX. GOV'T CODE § 311.025(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TEX. GOV'T CODE § 311.026(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

TEX. GOV'T CODE § 510.017, art. I . . . . . . . . . . . . . . . . . . . . . . . . . . 47

TEX. GOV'T CODE § 510.017, art. XI . . . . . . . . . . . . . . . . . . . . . . . . . 50

TEX. GOV'T CODE § 510.017, art. XIII . . . . . . . . . . . . . . . . . . . . . . . . 53

TEX. HEALTH & SAFETY CODE § 612.001, art. XIII . . . . . . . . . . . . . . . . 50

TEX. TAX CODE § 141.001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. TAX CODE § 171.002 . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 8, 19, 22

TEX. TAX CODE § 171.101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22

TEX. TAX CODE § 171.101(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

TEX. TAX CODE § 171.101(a)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . 22, 27

TEX. TAX CODE § 171.101(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

TEX. TAX CODE § 171.101(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. TAX CODE § 171.101(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 26

TEX. TAX CODE § 171.1011 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 28

TEX. TAX CODE § 171.1011(e)-(x) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. TAX CODE § 171.1012 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. TAX CODE § 171.1013 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

TEX. TAX CODE § 171.1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 24, 36, 38

TEX. TAX CODE § 171.1014(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 38

TEX. TAX CODE § 171.1016 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 23

TEX. TAX CODE § 171.1016(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8

TEX. TAX CODE § 171.1016(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

TEX. TAX CODE § 171.1016(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 27

TEX. TAX CODE § 171.103 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. TAX CODE § 171.105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

TEX. TAX CODE § 171.106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

TEX. TAX CODE § 171.106(a) . . . . . . . . . . . . . . . . xx, 7, 18, 19, 32, 34, 35, 39, 56

TEX. TAX CODE § 171.106(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

TEX. TAX CODE § 171.106(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 19

TEX. TAX CODE § 171.106(d)-(g) ................................. 7, 19

TEX. TAX CODE § 171.112 ....................................... 14

TEX. TAX CODE § 171.112(g) ................................ 14, 36, 37

TEX. TRANSP. CODE § 523.007 ................................... 53

15 U.S.C. § 383 ............................................. 25

UTAH CODE § 59-1-801 ....................................... 13

UTAH CODE § 59-1-801.5 ..................................... 13

TEX. R. APP. P. 7.2(a) ........................................ i

## Other Authorities

Act approved Apr. 30, 1897, 25th Leg., R.S., ch. 104,
    1897 Tex. Gen. Laws 140 ................................. 2-3

Act approved Mar. 17, 1917, 35th Leg., R.S., ch. 84,
    1917 Tex. Gen. Laws 168 ................................... 5

Act of Mar. 18, 1919, 36th Leg., R.S., ch. 60,
    1919 Tex. Gen. Laws 100 .................................. 5

Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1,
    1959 Tex. Gen. Laws 187 ................................. 3, 5

Act of May 17, 1967, 60th Leg., R.S., ch. 566,
    1967 Tex. Gen. Laws 1254 ................................. 8

Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1,
    1969 Tex. Gen. Laws 61 ................................. 6, 37

Act of May 31, 1981, 67th Leg., R.S., ch. 389,
 1981 Tex. Gen. Laws 1490 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5

Act of Mar. 19, 1987, 70th Leg., R.S., ch. 10,
 1987 Tex. Gen. Laws 27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3,
 1989 Tex. Gen. Laws 200 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5,
 1991 Tex. Gen. Laws 134 . . . . . . . . . . . . . . . . . . . . . . . . . 3, 7, 14, 32, 36

Act of May 30, 1997, 75th Leg., R.S., ch. 1185,
 1997 Tex. Gen. Laws 4569 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1,
 2006 Tex. Gen. Laws 1 . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5, 14, 21, 24, 36

Act of Sept. 14, 1959, Pub. L. 86-272, 73 Stat. 555 . . . . . . . . . . . . . . . . . . . . 25

BLACK'S LAW DICTIONARY (6th ed. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

BLACK'S LAW DICTIONARY (9th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

GEORGE D. BRADEN, ET AL.,
 THE CONSTITUTION OF THE STATE OF TEXAS:
 AN ANNOTATED AND COMPARATIVE ANALYSIS (1977) . . . . . . . . . . . . 40

CAROLINE N. BROUN, ET AL., THE EVOLVING USE
 AND THE CHANGING ROLE OF INTERSTATE
 COMPACTS: A PRACTITIONER'S GUIDE (2006) . . 43, 45, 46, 52, 54, 55, 63

COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011) . . . . . . . . . . . . . 39

1971 Fla. Laws ch. 71-980 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

WILLIAM FLETCHER,
FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS (2014)  . . . 28

WALTER HELLERSTEIN, STATE TAXATION (3d ed. 2014)  . . . . . . . . . . . . 28-29

2014 Mich. Pub. Acts 282  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

1987 Minn. Law ch. 268  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Annual Reports*, MULTISTATE TAX COMM'N,
http://www.mtc.gov/The-Commission/Annual-Report . . . . . . . . . . . . . 13

*Member States*, MULTISTATE TAX COMM'N,
http://www.mtc.gov/The-Commission/Member-States  . . . . . . . . . . . . . 8

MULTISTATE TAX COMM'N, Model Reg. II.4 (1968) . . . . . . . . . . . . . . . . . . 29

SELECT COMM. ON TAX EQUITY, RETHINKING TEXAS
TAXES (Jan. 1989)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 37

NORMAN J. SINGER & J.D. SHAMBIE SINGER,
SUTHERLAND STATUTES AND STATUTORY
CONSTRUCTION (7th ed. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63, 64

Kearns B. Taylor, *Texas' Exciting Answer in the Battle With
Proponents of Federal Control Over State Taxation of
Interstate Commerce*, 30 TEX. B.J. 773 (Oct. 1967)  . . . . . . . . . . . . . . 13

Texas Business Corporation Act, 54th Leg., R.S., ch. 64,
1955 Tex. Gen. Laws 239  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

TEX. JUR. 3d *Statutes* § 62 (2015)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

UNIF. DIV. OF INCOME FOR TAX PURPOSES ACT,
7A U.L.A. 155 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

2010 Utah Laws ch. 155  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

David A. Vanderhider, Comment, *A Marginal Tax: The New Franchise Tax in Texas*, 39 ST. MARY'S L.J. 615 (2008) . . . . . . . . . . . . . . . . . . . . . . 22

## STATEMENT OF THE CASE

*Nature of the Case*:

Graphic Packaging Corporation filed this combined tax-refund and tax-protest suit to recover franchise taxes, penalties, and interest that it paid to the State for report years 2008-2010. CR.4-51.[1] Graphic primarily claimed that it was entitled to reduce its franchise-tax liability for those years by electing the three-factor method for apportioning a multistate taxpayer's "business income" to a state under the Multistate Tax Compact, TEX. TAX CODE § 141.001, rather than using the single-factor gross-receipts method for apportioning margin to Texas required by the franchise-tax statutes, *id.* § 171.106(a). CR.10-13.

*Trial Court*:

353rd Judicial District Court, Travis County
The Honorable Darlene Byrne (presiding)
The Honorable Stephen Yelenosky (presiding)

*Course of Proceedings*:

The parties filed cross-motions for partial summary judgment on Graphic's claim that it could reduce its franchise-tax liability by applying the Compact's three-factor method for apportioning business income. CR.55-384, 431-604; SuppCR.16-177.

*Trial Court Disposition*:

The trial court granted the Comptroller's summary-judgment motion and denied Graphic's summary-judgment motion. CR.607. After Graphic non-suited its remaining claims, CR.608-17, the trial court rendered final judgment for the Comptroller, CR.618-19.

---

1. Citations of the appellate record will appear as follows: clerk's record = "CR.[page number]"; supplemental clerk's record = "SuppCR.[page number]." Citations of the appendix to this brief will appear as "App'x [tab letter]."

## ISSUES PRESENTED

Chapter 171 of the Texas Tax Code imposes a franchise tax on most entities that do business in Texas. The tax due for a given year is a percentage of the taxpayer's taxable "margin," a tax base unique to Texas. Generally, a taxpayer's margin is the smallest of four amounts: (1) 70% of its total revenue, (2) its total revenue minus $ 1 million, (3) its total revenue minus its costs of acquiring or producing goods for sale, or (4) its total revenue minus compensation it paid to employees.

A taxpayer that does business in multiple states must "apportion" a part of its total margin to Texas to reflect the share of the taxpayer's business activity that occurred in Texas, and the franchise tax is assessed only on that Texas portion of its total margin. Subject to two exceptions not applicable to this case, section 171.106 of the Tax Code requires that a multistate taxpayer apportion its "Texas margin" using the following method: total margin multiplied by a fraction—the taxpayer's gross receipts from its business conducted in Texas divided by its gross receipts from its entire business.

Chapter 141 of the Tax Code adopts the Multistate Tax Compact, which contains an apportionment method for an "income tax." Article III.1 of the Compact provides that a multistate taxpayer subject to a state "income tax"

may elect to apportion its "income" to that state either "in the manner provided by the laws of such state" or "in accordance with Article IV" of the Compact. Under Article IV, a taxpayer apportions its "business income" to a state as follows: total income multiplied by the average of three fractions—(1) the value of the taxpayer's property in the state divided by the value of all of its property, (2) the amount of compensation the taxpayer paid in the state divided by the amount of all compensation it paid, and (3) the taxpayer's sales in the state divided by its sales everywhere.

This appeal concerns whether a taxpayer may reduce its franchise-tax liability by choosing to apportion its margin to Texas using the Compact's three-factor method for apportioning business income for a state income tax, rather than using section 171.106's gross-receipts method for apportioning margin for the Texas franchise tax. That question presents the following issues:

1. Does the Compact's three-factor method for apportioning business income for a state income tax also apply to apportioning margin for the franchise tax?

2. Does section 171.106 prohibit a taxpayer from electing the Compact's three-factor method to apportion its margin?

3. Does Texas's membership in the Compact prevent the Legislature from making section 171.106's gross-receipts method the exclusive method for apportioning margin?

No. 03-14-00197-CV

# In the Court of Appeals
# for the Third Judicial District
# Austin, Texas

GRAPHIC PACKAGING CORPORATION,
*Appellant,*

v.

GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS, AND
KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,
*Appellees.*

On Appeal from the 353rd Judicial District Court
Travis County, Texas

**BRIEF OF APPELLEES**

TO THE HONORABLE THIRD COURT OF APPEALS:

To accept Graphic's view that it may compute its franchise tax using the Compact's three-factor income-apportionment method, the Court would have to disregard (1) the Tax Code's command that the only exceptions to the gross-receipts apportionment method are provided in section 171.106, (2) the Legislature's directive that the franchise tax is not an income tax, and (3) the Compact states' contrary construction of their agreement over the past 42 years. The Court should reject Graphic's position and affirm the judgment.

## I.   THE TEXAS FRANCHISE TAX

Since 1893, Texas has imposed a franchise tax on certain business entities that are organized under Texas law or that operate in Texas.  *See In re Nestle USA, Inc.*, 387 S.W.3d 610, 612-14 (Tex. 2012).  Those entities pay the franchise tax for the privilege of doing business here.  *Id.* at 622.

The franchise-tax calculation has frequently changed.  *See id.* at 612-16.  Generally, though, it starts with the taxpayer's "tax base," which is some measure of the value of the taxpayer's entire business during the year.  *See Gen. Dynamics Corp. v. Sharp*, 919 S.W.2d 861, 863 (Tex. App.—Austin 1996, writ denied).  If the taxpayer transacted business both within and outside Texas, its tax base must be "apportioned" to Texas to determine the share that may fairly be attributed to its Texas business and thus taxed by Texas.  *See id.*  Finally, the taxpayer multiplies that Texas portion of its tax base by the tax rate to compute its tax due.  *See id.* at 864.  These components are discussed below.

### A.   The Tax Base For The Franchise Tax

From 1897 to 1991, the franchise tax base was exclusively some measure of "capital."   At first, the tax was assessed on the value of a taxpayer's "authorized capital stock." Act approved Apr. 30, 1897, 25th Leg., R.S., ch. 104,

§ 1, 1897 Tex. Gen. Laws 140, 141. In 1959, the tax base was renamed "taxable capital," defined as the sum of "stated capital, surplus and undivided profits, and outstanding bonds, notes, and debentures." Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1, § 1, 1959 Tex. Gen. Laws 187, 306.[2] The 1981 enactment of the Tax Code defined "taxable capital" as the sum of stated capital and surplus. Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1697.

In 1991, the Legislature added "earned surplus" as an alternate tax base. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.09, 1991 Tex. Gen. Laws 134, 159-60. Earned surplus was an adjusted version of "reportable federal taxable income." *Id.* Different tax rates applied to capital and earned surplus, and the taxpayer used the tax base that yielded the higher tax. *See id.* § 8.03, 1991 Tex. Gen. Laws 153; *INOVA Diagnostics, Inc. v. Strayhorn*, 166 S.W.3d 394, 398 (Tex. App.—Austin 2005, pet. denied).

In 2008, "margin" replaced both capital and earned surplus as the franchise tax's main tax base. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 2, 2006 Tex. Gen. Laws 1, 6-7 (eff. Jan. 1, 2008) (codified at TEX. TAX CODE § 171.002). The margin calculation begins with "total revenue," which is derived

2. "Surplus" meant net assets minus stated capital. Texas Business Corporation Act, 54th Leg., R.S., ch. 64, Pt. 1, art. 1.02.A(12), 1955 Tex. Gen. Laws 239, 240.

by adding together certain income reportable on a federal tax return, then subtracting bad debts and other items included on the federal return. TEX. TAX CODE §§ 171.101, .1011. Also excluded are receipts associated with various transactions. *See id.* § 171.1011(e)-(x). Based on the resulting total revenue, the taxpayer's margin is the smallest of four amounts: (1) 70% of total revenue; (2) total revenue minus $1 million; (3) total revenue minus "costs of goods sold"; or (4) total revenue minus a capped amount of wages and compensation paid and costs of benefits provided. *Id.* §§ 171.101, .1012, .1013.

Also beginning in 2008, a taxpayer whose total revenue does not exceed $10 million may use total revenue instead of margin as its tax base. *Id.* § 171.1016. Taxpayers using this option—named the "E-Z Computation"—pay a different tax rate and forgo credits and deductions. *Id.*

### B. Apportionment Of The Tax Base For The Franchise Tax

#### 1. The gross-receipts apportionment method

In 1910, the Texas Supreme Court ruled that the franchise tax was unconstitutional as applied to foreign corporations because it was based on a corporation's capital from its *entire* business, both within and outside Texas. *See W. Union Tel. Co. v. State*, 103 Tex. 306, 309-10, 126 S.W. 1197, 1197 (1910)

4

(citing *W. Union Tel. Co. v. Kansas*, 216 U.S. 1 (1910) (holding that a similar privilege fee violated the Due Process and Commerce Clauses)).

In response, the Legislature amended the franchise tax to require both Texas and foreign corporations to "apportion" their capital and to use only the portion attributable to their Texas business in computing the tax. To do this, a corporation multiplied its capital by a fraction: the "gross receipts" from its Texas business divided by the gross receipts from its entire business. Act approved Mar. 17, 1917, 35th Leg., R.S., ch. 84, § 1, 1917 Tex. Gen. Laws 168 (foreign corporations); Act of Mar. 18, 1919, 36th Leg., R.S., ch. 60, § 1, 1919 Tex. Gen. Laws 100 (Texas corporations).

Although the franchise tax's tax base has changed several times, the gross-receipts apportionment method has remained constant. The Legislature retained the gross-receipts fraction as the required method in the 1959 revision, the 1981 codification, and the 2006 restructuring of the franchise tax. Act of July 30, 1959, 56th Leg., 3d C.S., ch. 1, § 1, 1959 Tex. Gen. Laws 187, 307-08; Act of May 31, 1981, 67th Leg., R.S., ch. 389, § 1, 1981 Tex. Gen. Laws 1490, 1698; Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 21 (codified at TEX. TAX CODE § 171.106).

## 2. Requests for alternative apportionment (1970-1989)

From 1970 to 1989, a taxpayer could ask the Comptroller to allow it to use a different apportionment method that would more "fairly represent" its Texas business. Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1, art. 7, § 1, 1969 Tex. Gen. Laws 61, 96. Among the options, the taxpayer could request "inclusion of one or more additional factors [with the gross-receipts fraction]." *Id.*

This provision was later analyzed by the Select Committee on Tax Equity, a body created in 1987 to study the Texas tax system and its impact on the state economy. Act of Mar. 19, 1987, 70th Leg., R.S., ch. 10, §§ 1-2, 1987 Tex. Gen. Laws 27. The Committee recommended eliminating this option because it gave foreign corporations a tax advantage over Texas businesses:

> At the taxpayer's request, additional factors such as property and payroll can be included in the calculation. . . . [T]here is no incentive to use additional factors unless they result in reduced tax liability. . . . [B]usinesses that profit from the use of additional factors tend to be out-of-state corporations with substantial sales into Texas but more property and payroll in other states. *The Committee recommends that the use of additional factors be eliminated.*

1 SELECT COMM. ON TAX EQUITY, RETHINKING TEXAS TAXES 49 (Jan. 1989).

In 1989, the Legislature adopted this proposal and repealed the provision, leaving the gross-receipts fraction as the exclusive apportionment method. Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3, § 2, 1989 Tex. Gen. Laws 200.

### 3. Narrow exceptions to the gross-receipts method

Since 1989, the Legislature has carved out only two exceptions to the gross-receipts fraction. A tax base derived from sales of services to or for a regulated investment company is apportioned with a fraction based on company shares. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.07, 1991 Tex. Gen. Laws 134, 157-58. And a tax base derived from sales of services to an employee retirement plan is apportioned with a fraction based on plan beneficiaries. Act of May 30, 1997, 75th Leg., R.S., ch. 1185, § 7, 1997 Tex. Gen. Laws 4569, 4571.

### 4. Current apportionment statute

Since the tax base changed to margin in 2008, section 171.106 of the Tax Code has continued to require use of the gross-receipts apportionment method. TEX. TAX CODE § 171.106(a). The only exceptions are: (1) the different methods related to investment companies and retirement plans discussed above, *id.* § 171.106(b), (c); and (2) adjustments to the gross-receipts figure for a few specific entities and transactions, *id.* § 171.106(d)-(g). An "E-Z Computation" filer also uses this section to apportion total revenue. *Id.* § 171.1016(b)(2).

### C. Current Calculation Of Franchise Tax Due

To calculate its franchise tax, a taxpayer first multiplies its margin by the gross-receipts fraction to determine "apportioned margin." *Id.* § 171.101(a)(2).

7

From apportioned margin, the taxpayer subtracts any allowable deductions to obtain "taxable margin." *Id.* § 171.101(a)(3). Finally, taxable margin is multiplied by the tax rate to compute the tax due. *Id.* § 171.002.

An "E-Z Computation" filer multiplies its total revenue by the gross-receipts fraction to obtain its "apportioned total revenue." *Id.* § 171.1016(b)(2). That "apportioned total revenue" is multiplied by 0.575% to compute the tax due. *Id.* § 171.1016(b)(3).

## II. THE MULTISTATE TAX COMPACT

### A. Adoption Of The Compact

In 1967, Texas adopted the Multistate Tax Compact, an interstate agreement concerning certain issues in the taxation of multistate taxpayers. Act of May 17, 1967, 60th Leg., R.S., ch. 566, § 1, 1967 Tex. Gen. Laws 1254, 1254-65. The Compact is codified in section 141.001 of the Tax Code. App'x A.

By its terms, the Compact became effective in August 1967, after seven states had enacted it in their state laws. TEX. TAX CODE § 141.001, art. X.1; SuppCR.31. By 1972, a total of 21 states had joined. *U.S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 454 (1978). Currently, 15 states and the District of Columbia are members. *Member States*, MULTISTATE TAX COMM'N, http://www.mtc.gov/The-Commission/Member-States (last visited Jan. 26, 2015).

8

Congress never has consented to this Compact under the Constitution's Compact Clause. *See U.S. Steel*, 434 U.S. at 458 n.8.

## B. The Compact's Provisions

### 1. The Compact's purposes

The Compact's stated purposes are to: (1) "[f]acilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes"; (2) "[p]romote uniformity or compatibility in significant components of tax systems"; (3) "[f]acilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration"; and (4) "[a]void duplicative taxation." TEX. TAX CODE § 141.001, art. I.

### 2. The Multistate Tax Commission

The Compact creates the Multistate Tax Commission, which is composed of the member states' tax administrators. *Id.*, art. VI.1. The Compact authorizes the Commission to study state and local tax systems, to develop proposals for increasing uniformity or compatibility of tax laws, and to publish information to help states implement the Compact and to aid compliance with tax laws. *Id.*, art. VI.3. The Commission also may draft model tax regulations, which have no force in a state unless the state adopts them. *Id.*, art. VII. A

state may ask the Commission to audit a taxpayer on its behalf. *Id.*, art. VIII. Still, the Compact grants the Commission no regulatory authority over the member states. *See id.*, arts. I-XII.

### 3.     The Compact's income-tax articles

Article IV, titled "Division of Income," reproduces nearly verbatim the Uniform Division of Income for Tax Purposes Act  ("UDITPA"), a model law promulgated in 1957. *Compare id.*, art. IV, *with* UNIF. DIV. OF INCOME FOR TAX PURPOSES ACT, 7A U.L.A. 155 (2002).  Article IV.2 states that, subject to a few exceptions, a taxpayer "shall allocate and apportion his net income as provided in this article." TEX. TAX CODE § 141.001, art. IV.2.  Article IV.9 provides that method, which uses the equally weighted average of three factors:

> All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

*Id.*, art. IV.9.  The three factors are fractions representing the proportion of certain aspects of the taxpayer's business located in the taxing state: (1) value of in-state property divided by value of all property, (2) compensation paid in the state divided by all compensation paid, and (3) gross receipts from in-state sales divided by gross receipts from all sales. *Id.*, art.IV.1(g), 10-17.

10

Article III, "Elements of Income Tax Laws," sets forth two "Taxpayer Option[s]." *Id.*, art. III.1-2. Article III.1 states that a taxpayer subject to a Compact state's income tax may elect to apportion its "income" "in the manner provided by the laws of such state" (other than the Compact) or using Article IV's three-factor apportionment method. *Id.*, art. III.1. Article III.2 prescribes an alternate income-tax computation for small taxpayers. *Id.*, art. III.2. These options do not apply to "any tax other than an income tax." *Id.*, art. III.3.

### 4. Miscellaneous Compact provisions

A state joins the Compact by enacting it into state law. *Id.*, art. X. A Compact provision held to violate a state constitution is severable. *Id.*, art. XII.

A state withdraws from the Compact "by enacting a statute repealing the same." *Id.*, art. X.2. Nothing in the Compact limits when a state may withdraw or requires notice of the withdrawal. *See id.*, art. X.

### C. State Variations From The Compact's Income-Tax Articles

In 1971, Florida repealed Articles III and IV of the Compact, 1971 Fla. Laws ch. 71-980, § 1; CR.487, and enacted a mandatory three-factor apportionment method placing double weight on the sales factor, FLA. STAT. §§ 214.71, 220.53 (1971). At the following Commission meeting, Florida expressed its view that the repeal was "fully consistent with the principles of the

11

Multistate Tax Compact." CR.487. In response, the other 17 member states unanimously approved a resolution recognizing Florida "as a regular member in good standing" of the Compact. *Id.*

Many Compact members followed Florida's example in some respect, enacting apportionment laws that disallowed use of Article IV's equally-weighted three-factor method and Article III.1's option to elect that method:

- In 1987, Minnesota repealed Articles III and IV and required apportionment based on a three-factor method that placed greater weight on the sales factor. 1987 Minn. Law ch. 268, art. I, §§ 74-75 (codified at MINN. STAT. §§ 290.171, .191).

- In 1993, California and Oregon disallowed application of Articles III and IV and required apportionment based on a three-factor method that placed greater weight on the sales factor. CAL. REV. & TAX CODE § 25128; OR. REV. STAT §§ 314.606, .650. In 2013, Oregon re-enacted the Compact without Articles III and IV. OR. REV. STAT. § 305.653.

- In 1995, Arkansas amended Article IV to double-weight the sales factor. ARK. CODE § 26-5-101.

- In 1996, Idaho disallowed application of Article III.1 and required apportionment based on a three-factor method that double-weighted the sales factor. IDAHO CODE § 63-3027(i).

- In 2008, Michigan required apportionment based only on the sales factor. MICH. COMP. LAWS § 208.1301.

- In 2009, Colorado repealed Article III.1, COLO REV. STAT. § 24-60-1301, and required apportionment based only on the sales factor, *id.* § 39-22-303.5(4)(a).

12

- In 2010, Utah amended Article IV to increase the weight of the sales factor for most taxpayers. 2010 Utah Laws ch. 155 (formerly codified at UTAH CODE § 59-1-801). In 2013, Utah re-enacted the Compact without Articles III and IV. UTAH CODE § 59-1-801.5.

- In 2011, Alabama amended Article IV to double-weight the sales factor. ALA. CODE § 40-27-1.

- In 2013, the District of Columbia re-enacted the Compact without Articles III and IV. D.C. CODE § 47-441.

Consistent with the Commission's 1972 Florida resolution, there is no record of any state ever objecting to these variations. *See Annual Reports*, MULTISTATE TAX COMM'N, http://www.mtc.gov/The-Commission/Annual-Report.

## III. THE FRANCHISE TAX AND THE COMPACT

When Texas adopted the Compact in 1967, the franchise tax was assessed only on capital. Thus, although the Compact's income-tax articles (III and IV) became part of Texas law, *see* TEX. TAX CODE § 141.001, they did not apply to any Texas tax. *See* Kearns B. Taylor, *Texas' Exciting Answer in the Battle With Proponents of Federal Control Over State Taxation of Interstate Commerce*, 30 TEX. B.J. 773, 821 (Oct. 1967) ("Texas, of course, not having an income tax is not affected by the Compact allocation formula.").

The introduction of the "earned surplus" tax base in 1991 might have implicated Articles III and IV because it was an adjusted version of a taxpayer's

federal taxable income. But in that same act, the Legislature enacted former section 171.112(g), which stated: "Chapter 141 does not apply to this chapter." Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.10, 1991 Tex. Gen. Laws 134, 162. That is, the Compact does not apply to the franchise tax. *Id.*

When the Legislature changed the tax base to "margin," it removed the obsolete references to capital and earned surplus. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, §§ 2-7, 2006 Tex. Gen. Laws 1, 1-35. Among those deletions was the repeal of all of section 171.112 ("Gross Receipts for Taxable Capital"), including subsection (g)'s proviso that "Chapter 141 does not apply to this chapter." *Id.* § 5, 2006 Tex. Gen. Laws 28. The same act specified, though, that "[t]he franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is *not an income tax*." *Id.* § 21, 2006 Tex. Gen. Laws 38 (emphasis added).

The 2006 legislation also added a reference to the Compact. Under new section 171.1014, taxpayers in an affiliated group must file a combined report. TEX. TAX CODE § 171.1014(a). But a combined group may not include a taxable entity that conducts business outside the United States "if 80 percent or more of the taxable entity's property and payroll, as determined by factoring under Chapter 141, are assigned to locations outside the United States." *Id.* Chapter 171 otherwise does not refer to the Compact.

14

## IV. GRAPHIC'S TAX-REFUND/TAX-PROTEST SUIT

For 2008 and 2009, Graphic calculated its franchise tax using the gross-receipts apportionment method required by section 171.106. CR.87, 102, 136. Graphic later filed amended reports for 2008 and 2009 that re-apportioned its margin using the Compact's three-factor income-apportionment method. CR.87, 91, 99-100, 113, 127-28. Based on those amended reports, Graphic filed refund claims of $145,463 (2008) and $328,767 (2009). CR.87, 98, 126, 171, 173. The Comptroller denied those claims, reasoning that section 171.106 required Graphic to use the gross-receipts method to apportion its margin. CR.88, 357.

For 2010, Graphic computed its tax using the Compact's three-factor income-apportionment method. CR.88, 151-52. Based on that report, Graphic sought a refund of $67,533 from a prior payment toward its 2010 tax. CR.88, 160, 171. The Comptroller rejected that report and assessed a deficiency using the gross-receipts method, plus penalties and interest. CR.88, 341, 357.

Graphic appealed the Comptroller's denial of its refund claims and sought redetermination of its 2010 tax. CR.342-55. Following a SOAH hearing, the Comptroller upheld the denial of the refund claims and the assessed deficiency. CR.358-60. After the Comptroller denied Graphic's motion for rehearing, CR.364-84, Graphic paid the 2010 assessment under protest, CR.40-51.

Graphic then filed this combined tax-refund/tax-protest suit. CR.4-51. Graphic sought to recover $821,961—the sum of its refund claims and protest payment—on the ground that it was entitled to apportion its margin using the Compact's three-factor income-apportionment method. CR.10-13. Graphic also asserted three other challenges to its franchise-tax bill. CR.13-17.

The parties filed cross-motions for summary judgment on Graphic's claim that it could use the Compact's three-factor income-apportionment method. CR.55-384, 431-604. The trial court granted the Comptroller's motion and denied Graphic's motion, without assigning reasons. CR.607.

After Graphic non-suited its other claims, CR.608-17, the court rendered final judgment for the Comptroller, CR.618-19. This appeal followed. CR.620.

## SUMMARY OF THE ARGUMENT

As a matter of Texas law, Graphic may not compute its franchise tax by invoking the "taxpayer option" in Article III.1 of the Compact and applying Article IV's income-apportionment method. Section 171.106 of the Tax Code compels Graphic to apportion its margin to Texas using that statute's gross-receipts method. But even if Graphic could venture outside of section 171.106 for an apportionment method, the Compact would not be an option because, as the Legislature has explicitly stated, the franchise tax is not an income tax. And

16

to the extent that section 171.106 conflicts with the Compact's application, the former provision prevails as the later-enacted, more specific statute.

The Compact's status as an interstate compact does not mean that it trumps section 171.106 here. The Compact's structure and terms show that it is only an advisory agreement that contains uniform laws, not a regulatory compact that binds its member states. Indeed, those states have expressly and consistently treated the Compact as a non-binding instrument. At least 12 (including Texas) have enacted laws that disable Article III.1's taxpayer option.

Even if the Compact were binding, Article III.1 would not preclude the Legislature from requiring taxpayers to use the gross-receipts apportionment method. That article purports to incorporate state law as an apportionment option, but it does not account for a law like section 171.106 that by its very terms is not optional. Nor can Article III.1 surmount the Texas Constitution's prohibition against contractual suspensions of the state's taxing authority.

Finally, any conflict with the Compact would not automatically render section 171.106 invalid. That statute would yield only to the extent that it qualified as an unconstitutional impairment of contractual obligations under the Compact—a standard that Graphic cannot meet here. The Court should affirm the trial court's judgment.

**I.** **IN CALCULATING ITS FRANCHISE TAX, GRAPHIC MUST APPORTION ITS MARGIN TO TEXAS USING THE GROSS-RECEIPTS METHOD IN SECTION 171.106 OF THE TAX CODE.**

Graphic claims that, in computing its franchise tax, it may apportion its margin to Texas pursuant to the Compact, as codified in section 141.001 of the Tax Code. Graphic Br. 21-24. Specifically, Graphic contends it may exercise the "option" in Article III.1 of the Compact to use Article IV's three-factor method for apportioning "income." *Id.* As a matter of Texas law, that argument fails because (1) section 171.106 of the Tax Code requires taxpayers to apportion margin using the gross-receipts method, subject only to a limited set of exceptions that does not include the Compact; (2) Articles III and IV of the Compact do not apply to the franchise tax because it is not an income tax; and (3) section 171.106's mandatory language prevails over any conflicting provision outside of the franchise-tax statutes.

**A.** **Section 171.106 Requires Taxpayers To Apportion Their Margin Using The Gross-Receipts Method, Subject Only To Certain Exceptions Provided In That Section.**

Section 171.106(a) of the Tax Code requires taxpayers to apportion their margin to Texas using the gross-receipts method, unless one of the exceptions *in section 171.106* applies:

18

> *Except as provided by this section*, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

TEX. TAX CODE § 171.106(a) (emphasis added). The only "[e]xcept[ions]" "provided by this section" are: (1) different apportionment fractions related to investment companies and retirement plans, *id.* § 171.106(b), (c); and (2) changes to the gross-receipts figure for banks, defense readjustment projects, sellers of loans or securities, and internet hosts, *id.* § 171.106(d)-(g).

This statute—which Graphic concedes is "unambiguous," Graphic Br. 23—prohibits taxpayers from using the Compact's income-apportionment method to apportion their margin for the franchise tax. It permits exceptions to the gross-receipts method only as "provided by *this* section," TEX. TAX CODE § 171.106(a) (emphasis added), whereas the Compact is located in *another* section of the Tax Code, *id.* § 141.001. And nothing in section 171.106 refers to or incorporates section 141.001 as one of the allowed exceptions. *Id.* § 171.106. Thus, section 171.106(a) forecloses Graphic's attempt to use the Compact's income-apportionment method.

19

**B.    The Compact's Three-Factor Income-Apportionment Method Does Not Apply To The Franchise Tax Because It Is Not An Income Tax.**

Graphic may not use the Compact's three-factor apportionment method for a second reason.  That method applies only to the apportionment of "income" for an "income tax," *id.* § 141.001, arts. III, IV, not the apportionment of margin for the franchise tax.

**1.    Article III.1's "taxpayer option" and Article IV's apportionment method apply only to apportionment of "income" for a state's "income tax."**

Articles III and IV of the Compact apply only to a member state's "income tax." The Compact provides that those articles "shall apply only to the taxes specifically designated therein."  *Id.*, art. II.9.  Article III, captioned "Elements of Income Tax Laws," states that "[n]othing in this article relates to the reporting or payment of any tax other than an income tax." *Id.*, art. III.3. Article III.1's "taxpayer option" thus extends only to a "taxpayer subject to an income tax." *Id.*, art. III.1.  Similarly, Article IV, titled "Division of Income," covers only a "taxpayer having *income* from business activity which is *taxable* both within and without this state." *Id.*, art. IV.2 (emphases added).

Predictably, then, the apportionment methods in Articles III and IV address only the apportionment of "income." The Article III.1 option pertains

20

only to taxpayers "whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state." *Id.*, art. III.1. And the option itself states that a taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of such state" or "in accordance with Article IV." *Id.* Article IV directs that a taxpayer "shall allocate and apportion his net income as provided in this article." *Id.*, art. IV.2. The Article IV method provides that "business income shall be apportioned to this state by multiplying the income by a fraction"—the equally weighted average of the property, payroll, and sales factors. *Id.*, art. IV.9.

### 2. The Texas franchise tax is not an "income tax" and does not involve the apportionment of "income."

Article III.1's "taxpayer option" and Article IV's apportionment method do not apply to the franchise tax because it does not impose an "income tax" or involve apportioning a tax base of "income," "net income," or "business income."

The Legislature made this distinction clear when it revised the franchise tax to its current form: "The franchise tax imposed by Chapter 171, Tax Code, as amended by this Act, is *not an income tax*." Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws 1, 38 (emphasis added). Given that plain statement, the Legislature could not possibly have intended that the

21

franchise tax would be subject to the Compact articles in section 141.001 of the Tax Code that relate exclusively to an "income tax."

Moreover, the franchise tax is assessed on and requires apportionment of "margin," which differs from the "net income" covered by Article IV's apportionment method. *Compare* TEX. TAX CODE §§ 171.002, .101, .106, *with id.* § 141.001, art. IV.2. This Court has defined "net income" as the "'excess of all revenues and gains for a period over all expenses and losses of the period.'" *INOVA Diagnostics*, 166 S.W.3d at 401 n.7 (quoting BLACK'S LAW DICTIONARY 1040 (6th ed. 1990)). By contrast, "margin" never involves deducting "all expenses and losses." Some taxpayers do not deduct their expenses to compute margin; they calculate margin as 70% of total revenue or subtract $1 million from total revenue, regardless of their expenses. TEX. TAX CODE § 171.101(a)(1)(A), (B)(i). And those taxpayers that deduct some expenses to compute margin still do not deduct "all" expenses; they deduct only select expenses—"costs of goods sold" or "compensation." *Id.* § 171.101(a)(1)(B)(ii). For that reason, a taxpayer may have a positive margin, and thus owe franchise tax, even though it has no net income. *See* David A. Vanderhider, Comment, *A Marginal Tax: The New Franchise Tax in Texas*, 39 ST. MARY'S L.J. 615, 646-47 (2008) (observing that "[t]he fact that the margin tax could apply to a

22

company without profits, therefore, undermines the argument that it is an income tax in disguise").

Similarly, the "total revenue" tax base used for the alternate "E-Z Computation" also differs from the "net income" covered by Article IV. *Compare* TEX. TAX CODE § 171.1016, *with id.* § 141.001, art. IV.2. In contrast to a net-income calculation, an E-Z filer may not make deductions from total revenue. *Id.* § 171.1016(c).

### 3. The Compact's "income tax" definition does not expand Articles III and IV to include the franchise tax.

Graphic counters that the Compact defines "income tax" broadly enough to cover the franchise tax. Graphic Br. 48-57. That definition states:

> "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

TEX. TAX CODE § 141.001, art. II.4. Based on this definition alone, Graphic urges, Articles III and IV apply to the franchise tax, Graphic Br. 48, and (presumably) we should read those articles' references to apportionment of "income," "net income," and "business income" to mean "margin" or "total revenue" to make them fit. Graphic is wrong.

23

### a. Texas law establishes that the franchise tax does not meet the Compact's "income tax" definition.

The Legislature already has determined that the franchise tax falls outside the Compact's "income tax" definition by decreeing that "[t]he franchise tax . . . is not an income tax." Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws 1, 38. In enacting that law, the Legislature is presumed to have been aware of the Compact's definitions. *Nw. Austin MUD No. 1 v. City of Austin*, 274 S.W.3d 820, 828 (Tex. App.—Austin 2008, pet. denied). That presumption cannot be rebutted because the Legislature referred to the Compact in the *same* act, adapting two of Article IV's "factors" to classify taxpayers for combined-reporting purposes. Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 5, 2006 Tex. Gen. Laws 1, 17 (codified at TEX. TAX CODE § 171.1014). By legislating that the franchise tax "is not an income tax," without qualification, the Legislature foreclosed the possibility that a Tax Code provision could define that tax as an "income tax."

The Legislature also signaled that the Compact's "income tax" definition does not cover the franchise tax by providing that "Pub. L. No. 86-272 does not apply to the [franchise] tax." Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, § 21, 2006 Tex. Gen. Laws 1, 38. Public Law No. 86-272 governs a "net income tax,"

24

which it defines in the *same* terms as the main clause of the Compact's "income tax" definition. Act of Sept. 14, 1959, Pub. L. 86-272, § 103, 73 Stat. 555, 556 (codified at 15 U.S.C. § 383) ("[T]he term 'net income tax' means any tax imposed on, or measured by, net income."). The Legislature thus could not have meant that the franchise tax simultaneously falls outside the scope of Public Law No. 86-272 but within the Compact's "income tax" definition.

Graphic overlooks the Legislature's definitive statements, relying instead on remarks by then-Comptroller Strayhorn that the restructured franchise tax would qualify as an "income tax" under the Compact. Graphic Br. 56. The relative weight due these competing assessments is clear. The Legislature's conclusion that the franchise tax is not an income tax is Texas *law*. By contrast, Comptroller Strayhorn's comments appeared in a letter requesting an Attorney General Opinion, a communication that receives no deference. *See Combs v. Chapal Zenray, Inc.*, 357 S.W.3d 751, 756 (Tex. App.—Austin 2011, pet. denied).

> **b.** **The franchise tax does not meet the Compact's definition of an "income tax" on its own terms.**

Even apart from the Legislature's conclusive statement, the franchise tax does not satisfy the Compact's "income tax" definition on its own terms. The Compact defines "income tax" principally as "a tax imposed on or measured by

net income." TEX. TAX CODE § 141.001, art. II.4. Because the Compact does not define "net income," that phrase takes its ordinary meaning. *State v. $1,760.00 in U.S. Currency*, 406 S.W.3d 177, 180 (Tex. 2013) (per curiam). As discussed above, the franchise tax is not imposed on or measured by "net income," as that phrase is commonly understood. *See supra* Part I.B.2.

Graphic apparently concedes that point and instead argues that the definition's "including" clause captures the franchise tax. Graphic Br. 51. Under that clause, an "income tax" includes "any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions." TEX. TAX CODE § 141.001, art. II.4. That language does not help Graphic.

Again, some taxpayers do not deduct *any* expenses to arrive at margin: those that compute margin as (1) 70% of total revenue or (2) total revenue minus $1 million. *Id.* § 171.101(a)(1)(A), (B)(i). Graphic tries to dodge that problem by reframing the first calculation as a "deduction" of 30% of total revenue, which is "an *amount* unrelated to any particular transaction," and the second as "a flat one million dollar deduction." Graphic Br. 56 (emphasis

added). But the Compact's "income tax" definition requires deduction of "expenses," not "amounts" or "dollars." TEX. TAX CODE § 141.001, art. II.4.

The other taxpayers who use margin do not arrive at that figure "by deducting expenses from gross income." They calculate margin by deducting *one type* of expense from total revenue: either "costs of goods sold" or "compensation." *Id.* § 171.101(a)(1)(B)(ii). The Compact's "income tax" definition would cover those taxpayers only if it could be rewritten to include "an amount arrived at by deducting [any] expense[] from gross income." *See Foster v. TDCJ*, 344 S.W.3d 543, 548 (Tex. App.—Austin 2011, pet. denied) ("We are not free to rewrite the statute in the guise of construing it."). That rewrite also would warp the definition's main clause that defines an "income tax" as one imposed on "net income." The definition's "including" clause may "enlarge" the meaning of "net income," not transmogrify it. *See* TEX. GOV'T CODE § 311.005(13) (noting that "including" is a "term[] of enlargement").

Finally, an "E-Z" taxpayer computes its franchise tax based on "total revenue," from which no deductions of expenses are permitted. TEX. TAX CODE § 171.1016(c). If anything, this calculation fits the Compact's definition of a "gross receipts tax," which is not subject to Articles III and IV. *Id.* § 141.001, art. II.6 (defining "[g]ross receipts tax" as a tax "measured by the gross volume

27

of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax"). Graphic tries to shoehorn this computation into the Compact's "income tax" definition by arguing that the exclusion of certain items from "total revenue" should count as "deductions [that] are not specifically and directly related to any particular transaction." Graphic Br. 56 n.16. But many of those exclusions are receipts, not "expenses." *See generally* TEX. TAX CODE § 171.1011. And the expense exclusions tend to be industry-specific items for which taxpayers are not generally eligible, as Graphic implies, or flow-through funds that count as another taxpayer's total revenue. *See generally id.*

Respected treatises agree that the Compact's "income tax" definition does not include the franchise tax. One adopts the Compact definition and notes that, although "[t]he majority of states have statutes imposing an income tax on corporations," "[t]he states *without* a corporate income tax are Nevada, *Texas*, and Washington." 14A WILLIAM FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 6904.50 & nn.1-2 (2014) (emphases added). Another observes that "there is considerable doubt as to whether the Texas margins tax constitutes a tax on 'income' under the Compact." WALTER HELLERSTEIN,

28

STATE TAXATION ¶ 9.01 (3d ed. 2014). In sum, the franchise tax is a unique tax that does not qualify as an "income tax," even as defined by the Compact.

> **4. Model Compact Regulation II.4 does not expand the Compact's "income tax" definition to cover the franchise tax.**

Graphic leans heavily on Model Compact Regulation II.4 to expand the Compact's "income tax" definition beyond its text to reach the franchise tax. Graphic Br. 49-50. That model regulation states that the Compact's definitions of "income tax" and "gross receipts tax" must be read together, and that any doubt about a tax's classification should be resolved in favor of construing it as an income tax. MULTISTATE TAX COMM'N, Model Reg. II.4 (1968). In Graphic's view, that means any business tax constitutes an "income tax" under the Compact unless the tax strictly meets the Compact's "gross receipts tax" definition. *See* Graphic Br. 50. Graphic is mistaken.

Model Regulation II.4 does not inform the Compact's meaning in Texas law because, as Graphic concedes, *id.* at 10, Texas never has adopted it. *See* TEX. TAX CODE § 141.001, art. VII.3 (stating that each member must consider model regulations for adoption "in accordance with its own laws"). Also, the Commission drafted the regulation decades before Texas enacted a franchise tax based on "margin," and thus did not account for that unique tax base.

29

More importantly, the Compact itself does not demand that a tax be classified as either a "gross receipts tax" or an "income tax," with a presumption favoring the latter. The Compact defines "tax" as "an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and *any other tax which has a multistate impact*." *Id.*, art. II.9 (emphasis added). The franchise tax falls into this last, catch-all category because generally it does not satisfy the Compact's definitions of "income tax" or "gross receipts tax," but instead is a hybrid of both (except the E-Z computation, which resembles a gross-receipts tax).

The Compact's drafters thus anticipated that some taxes would not fit within a defined category. And they knew how to craft provisions that would sweep in those taxes where desired, as Article IV shows. Again, Article IV's apportionment method applies only to apportioning a taxpayer's "net income" to a member state for that state's income tax. *Id.*, art. IV.2. But the Compact's drafters wanted to ensure that method was available regardless of how *other* states taxed the taxpayer's business. To that end, the Compact broadly defines a taxpayer as "taxable in *another* state" if:

> (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

*Id.*, art. IV.3 (emphasis added). Under this provision, a taxpayer that does business only in Texas and New Mexico (a Compact state) and is subject to New Mexico's income tax would be eligible to apportion its "net income" to New Mexico under Article IV. That is so because in Texas that taxpayer "is subject to . . . a franchise tax for the privilege of doing business," *see id.*, even though the Texas franchise tax is not itself an income tax.

The Compact does not similarly extend the scope of Articles III.1 and IV *within* a member state; there, those articles apply only to apportionment of "income" for an "income tax." Because Texas's franchise tax is not an "income tax," under either the Compact or other Texas law, Graphic could not apportion its margin to Texas using the Compact's income-apportionment method.

### C. Section 171.106's Mandate To Use The Gross-Receipts Method Prevails Over Any Conflicting Language In The Compact.

Graphic's arguments that the Compact's "taxpayer option" and income-apportionment method apply to the franchise tax do not help its cause in any event. Under Texas law, section 171.106's specific mandate to use the gross-receipts method prevails over any conflicting text in the Compact.

## 1. As the later-enacted, more specific statute, section 171.106(a) prevails over the Compact.

Reading Articles III and IV of the Compact to provide another method of apportioning margin creates an irreconcilable conflict with section 171.106(a) of the Tax Code. If a taxpayer may elect under Article III.1 to apportion its margin using Article IV's three-factor income-apportionment method, as Graphic urges, that would negate section 171.106(a)'s directive to apportion margin using the gross-receipts method "*[e]xcept as provided by this section.*" *See* TEX. TAX CODE § 171.106(a) (emphasis added).

The Code Construction Act resolves this conflict in favor of section 171.106(a), in two respects. First, "if statutes enacted at the same or different sessions of the legislature are irreconcilable, the statute latest in date of enactment prevails." TEX. GOV'T CODE § 311.025(a). The Legislature adopted the Compact in 1967, but added the "except as provided" clause to section 171.106 in 1991.[3] Second, if a general provision irreconcilably conflicts with a special provision, "the special or local provision prevails as an exception to the general provision." TEX. GOV'T CODE § 311.026(b); *see also Jackson v. SOAH*, 351 S.W.3d 290, 297 (Tex. 2011). Section 171.106 specifically concerns the

---

3. Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, § 8.07, 1991 Tex. Gen. Laws 134, 157-58 (codified at TEX. TAX CODE § 171.106(a)).

apportionment of margin for the franchise tax. TEX. TAX CODE § 171.106. By contrast, Articles III and IV of the Compact concern a category of taxes that qualify as "income taxes." *Id.* § 141.001, arts. III-IV.

### 2. Section 171.106(a) and the Compact cannot be harmonized so that both apply to the franchise tax.

Graphic counters that the Court need not reach the construction rules just discussed because section 171.106(a) and the Compact do not irreconcilably conflict and "can be readily harmonized so that neither is rendered meaningless." Graphic Br. 23. Of course, the Legislature already has harmonized the statutes by declaring that the franchise tax is not an income tax. *See supra* Part I.B.2. But even assuming that Article III.1's "taxpayer option" and Article IV's income-apportionment method could apply to the franchise tax, those provisions cannot be reconciled with section 171.106(a).

Graphic's harmonizing argument hinges on semantic games. First, Graphic heralds that "[n]othing in Section 171.106(a) . . . mandates that the Texas Formula is the sole apportionment formula available to Texas taxpayers." Graphic Br. 23. That is true only in the sense that section 171.106(a) requires all taxpayers to use the gross-receipts method "[e]xcept as provided by this section"—but the Compact is not one of the provided

33

exceptions.  TEX. TAX CODE § 171.106(a).  Graphic then offers that using the Compact's method would not constitute an "exception" to section 171.106(a)'s gross-receipts method, but an "equally enforceable alternative[]." Graphic Br. 24.  That is no distinction at all.  If a taxpayer can apportion its margin using the Compact's three-factor income-apportionment method, then its "margin is *[not]* apportioned to this state . . . by multiplying the margin by [the gross-receipts] fraction," TEX. TAX CODE § 171.106(a), creating an unrecognized "exception" to that section's general rule.

Graphic further claims that Article III.1's "taxpayer option" "harmonizes these different formulas" by incorporating section 171.106's gross-receipts fraction as an "alternate path."  Graphic Br. 23-24.  But the issue is not harmonizing the "formulas"; it is harmonizing the *statutes*, and Article III.1 does not do the job.  Article III.1 presumes that a state's tax laws (outside the Compact) merely "provide[]" a different "manner" of apportioning income. TEX. TAX CODE § 141.001, art. III.1.  Article III.1 does not address the situation in which a state's tax law expressly makes an apportionment method exclusive, as section 171.106(a) does.  And neither Article III.1 nor any other Compact provision contains language that resolves that conflict.  There is no way to read the Tax Code as allowing taxpayers to elect to apportion margin using the

34

Compact's income-apportionment method and still give full meaning to the words "[e]xcept as provided in this section" in section 171.106(a).

### 3. The presumption against implied repeals does not support Graphic's reading of the Tax Code.

Graphic next asserts that "the only way" the Court can agree with the Comptroller is to hold that section 171.106(a) impliedly repealed section 141.001 of the Tax Code, at least as applied to the franchise tax, and that the presumption against implied repeals should discourage the Court from doing so. Graphic Br. 24-25. That argument fails on several fronts.

As an initial matter, the Court *also* can agree with the Comptroller by concluding that the franchise tax is not an income tax. *See supra* Part I.B. That holding would render Compact Articles III and IV in section 141.001 inapplicable to the franchise tax, not impliedly repealed.

Regardless, Graphic admits that implied repeals are merely "disfavored," not forbidden. Graphic Br. 25. "Where a later enactment is intended to embrace all the law upon the subject with which it deals, it repeals all former laws relating to the same subject." *Gordon v. Lake*, 163 Tex. 392, 394, 356 S.W.2d 138, 139 (1962). To the extent Articles III and IV of the Compact ever applied to the franchise tax, section 171.106's later-enacted "except as provided"

clause embraces all apportionment options for the franchise tax, and thus necessarily repeals those articles' application.

More importantly, whether an implied repeal occurred ultimately "is a matter of legislative intent." TEX. JUR. 3d *Statutes* § 62 (2015). The Legislature *never* has intended to apply Article III.1's "taxpayer option" or Article IV's income-apportionment method to the franchise tax. When Texas adopted the Compact, Articles III and IV did not apply to the franchise tax because it was then imposed on capital, not income. When the Legislature added a tax base resembling income—"earned surplus"—it simultaneously enacted former section 171.112(g), which provided that "Chapter 141 [the Compact] does not apply to this chapter." Act of Aug. 13, 1991, 72d Leg., 1st C.S., ch. 5, §§ 8.09, .10, 1991 Tex. Gen. Laws 134, 159-60, 162. And when the Legislature replaced "earned surplus" with a tax base (margin) that rendered the tax "not an income tax," it sensibly repealed former section 171.112(g). Act of May 2, 2006, 79th Leg., 3d C.S., ch. 1, §§ 5, 21, 2006 Tex. Gen. Laws 1, 28, 38. After all, if the franchise tax no longer taxed income, Articles III and IV did not apply by their own terms. Also, removing the bar against chapter 141's application paved the way for the same legislation to borrow two of Article IV's factors to classify a taxpayer for combined-reporting purposes. *See* TEX. TAX CODE § 171.1014.

36

When the Legislature wanted to provide a generally available alternative to the gross-receipts method, it did so expressly in the franchise-tax statutes. From 1970 to 1989, the Legislature allowed taxpayers to ask the Comptroller to include factors other than gross receipts in the apportionment fraction. Act of Sept. 6, 1969, 61st Leg., 2d C.S., ch. 1, art. 7, § 1, 1969 Tex. Gen. Laws 61, 96, *repealed by* Act of Mar. 1, 1989, 71st Leg., R.S., ch. 3, § 2, 1989 Tex. Gen. Laws 200, 200. The Legislature revoked that option at the urging of the Select Committee on Tax Equity, which recommended that taxpayers not be allowed to reduce their tax by requesting the addition of property and payroll factors to the apportionment method. 1 SELECT COMM. ON TAX EQUITY, RETHINKING TEXAS TAXES 49 (Jan. 1989). Nothing in the franchise-tax statutes suggests that the Legislature has since reversed that policy and once again permits taxpayers to use a method with property and payroll factors, such as the Compact's, and now *at their option* without Comptroller approval.

Graphic implausibly reads this same history as evincing legislative intent to *allow* the use of Articles III and IV of the Compact to apportion margin. Graphic Br. 27. For example, Graphic touts the 2006 repeal of former section 171.112(g) as proof that the Legislature "must not have intended to override" application of Articles III and IV to the revised franchise tax. *Id.* That

37

conclusion wholly ignores the provision *in the same act* that the franchise tax "is not an income tax"—the only kind of tax to which Articles III and IV apply.

Graphic also wrongly asserts that section 171.1014 "cross-referenced and thereby incorporated the Compact Formula into Chapter 171." Graphic Br. 27. Again, that section adapts two of the formula's three *components* for a purpose unrelated to apportionment—determining taxpayer eligibility for combined reporting. TEX. TAX CODE § 171.1014(a). It does not incorporate the formula itself into Chapter 171. *Id.*

### 4. The rule that ambiguous tax statutes must be construed in the taxpayer's favor does not apply here.

Graphic next argues that, to the extent section 171.106's effect on the Compact's application is ambiguous, the Court must resolve that ambiguity in Graphic's favor by applying the rule that tax statutes "must be strictly construed in favor of the taxpayer." Graphic Br. 27. That is incorrect.

The rule Graphic invokes comes into play "only when doubt about a statute's application remains after the dominant rules of construction have been applied." *Chapal Zenray*, 357 S.W.3d at 756. One such "dominant rule" requires deference to the Comptroller's construction of an ambiguous tax statute if that construction appears in a "formal opinion[] adopted after formal

proceedings," is "reasonable," and does not contradict the statute's plain language. *Id.* (internal quotation marks and citation omitted).

The conditions for agency deference are all met here. The Comptroller resolved this specific issue in a formal decision issued after a formal hearing, concluding that a taxpayer "may not elect the MTC three-factor apportionment formula and is required to use the single-factor method" in section 171.106. COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011) (App'x B). That conclusion is reasonable—it comports with the Legislature's express understanding that the franchise tax is not an income tax and the longstanding policy against allowing taxpayers to use an alternate apportionment method. *See supra* Parts I.B.2, C.3. And the Comptroller's position does not contradict the Tax Code's plain text. To the contrary, his reading enforces section 171.106's directive that any exceptions to the gross-receipts apportionment method must be provided by that section. TEX. TAX CODE § 171.106(a).

### 5. The Comptroller's reading of section 171.106 does not violate article III, section 36 of the Texas Constitution.

Finally, Graphic urges that the Comptroller's reading of section 171.106 would "amend" section 141.001 in violation of article III, section 36 of the Texas Constitution. Graphic Br. 28-29. That constitutional provision forbids the

Legislature to amend a law "by reference to its title" and requires instead that amended laws be "re-enacted and published at length." TEX. CONST. art. III, § 36. Graphic misunderstands that mandate.

Article III, section 36 prohibits "the practice of amending a statute by referring to its title and then providing that it should be amended by striking out or deleting certain words and phrases and then inserting new words and phrases." *Hirsch v. State*, 282 S.W.3d 196, 204 (Tex. App.—Fort Worth 2009, no pet.) (internal quotation marks and citation omitted); *accord* 1 GEORGE D. BRADEN, ET AL., THE CONSTITUTION OF THE STATE OF TEXAS: AN ANNOTATED AND COMPARATIVE ANALYSIS 174 (1977). But this provision "does not apply to legislative enactments which are complete within themselves, even though their effect may be to amend some other law." *State v. Sw. Gas & Elec. Co.*, 145 Tex. 24, 30, 193 S.W.2d 675, 679 (1946). Nor does it apply to the implied repeal of a "conflicting" statute, *State Bd. of Ins. v. Adams*, 316 S.W.2d 773, 778 (Tex. Civ. App.—Houston 1958, writ ref'd n.r.e.), or a law that "restricts the operation of the former statutes upon the same subject," *City of Oak Cliff v. State,* 97 Tex. 383, 390, 79 S.W. 1, 3 (1904).

To the extent the Compact's income-apportionment provisions ever applied to the franchise tax, section 171.106 is a complete legislative enactment

40

that at most impliedly repeals those provisions or restricts their operation. *See supra* Part I.C.3. That construction does not violate the Texas Constitution.

## II. TEXAS'S MEMBERSHIP IN THE COMPACT DOES NOT PRECLUDE THE LEGISLATURE FROM REQUIRING A TAXPAYER TO USE THE GROSS-RECEIPTS METHOD TO APPORTION MARGIN.

In the alternative, Graphic urges that any Texas law that forbids it to invoke Article III.1's "taxpayer option" and use Article IV's income-apportionment method is invalid under "compact law" and the Contracts Clauses of the United States and Texas Constitutions. Graphic Br. 29-48. Specifically, Graphic contends that the Compact is a contract that bars the Legislature from altering its terms or application until Texas withdraws from the Compact, and that any alteration unconstitutionally impairs the obligations of that contract. *Id.* The Court should reject that argument, for several reasons: (1) regardless of the Compact's legal status, Articles III and IV do not apply to the franchise tax because it is not an "income tax" under the Compact; (2) the Compact is an advisory agreement, not a binding regulatory compact; (3) Article III.1 does not clearly and validly preclude the Legislature from mandating exclusive use of the gross-receipts apportionment method; and (4) any conflict between Texas law and Articles III and IV would not satisfy the standard for an unconstitutional impairment of contracts.

41

**A. Articles III And IV Of The Compact Do Not Apply To The Franchise Tax Because It Is Not An "Income Tax."**

As an initial matter, this appeal does not hinge on whether Texas's enactment of the Compact in 1967 contractually bound all future Legislatures to maintain Articles III and IV as Texas law, because those articles do not apply to the franchise tax in any event. As discussed above, the franchise tax does not involve the apportionment of "income," nor does it meet the Compact's "income tax" definition. *See supra* Part I.B. Regardless of the Compact's legal force, then, Articles III and IV do not apply to the franchise tax by their own terms. For that reason alone, Graphic's compact-related arguments fail.

**B. The Legislature May Restrict The Compact's Application In Texas Law Because It Is Not A Binding Regulatory Compact.**

Even if Articles III and IV somehow could be construed to apply to the franchise tax, the Compact does not contractually bar Texas from restricting those articles' operation elsewhere in Texas law. This Compact is an advisory compact containing model laws, not a binding regulatory compact that carries the preemptive force that Graphic assigns to it.

**1. The term "compact" does not make this Compact binding.**

Contrary to Graphic's assertions, Graphic Br. 38-39, the label "compact" does not resolve whether the Compact contractually obligates Texas to maintain

the application of Articles III and IV in state law. Only "in *some* contexts" is a compact "a contract between the participating states" *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991) (emphasis added).

Of the three types of interstate compacts—"boundary," "regulatory," and "advisory"—only the first two potentially create a binding contract. CAROLINE N. BROUN, ET AL., THE EVOLVING USE AND THE CHANGING ROLE OF INTERSTATE COMPACTS: A PRACTITIONER'S GUIDE 12-15 (2006). Boundary compacts "establish official borders between states" "with a high degree of finality." *Id.* at 12, 13. And in many "regulatory" compacts, "the member states have collectively and contractually agreed to reallocate governing authority away from individual states to a multilateral relationship." *Id.* at 21-22.

By contrast, "nonbinding" "advisory" compacts "are more akin to administrative agreements between states," which "lack formal enforcement mechanisms." *Id.* at 13, 14. "[A]dvisory compacts cede no state sovereignty nor delegate any governing power to a compact-created agency." *Id.* at 14. And they "generally do not require congressional consent." *Id.* As discussed below the Compact fits this advisory-compact category.

### 2. *U.S. Steel* did not address whether the Compact is a binding contract.

Graphic repeatedly asserts that the Supreme Court already "recognized" or "determined" the Compact's "binding" nature in *U.S. Steel*. Graphic Br. 36, 38, 41. Not so. Neither the word "binding" nor "contract," nor any variation thereof, appears in the majority opinion. *See* 434 U.S. at 454-79. That is unsurprising because whether the Compact constitutes a binding contract was not at issue in that case.

In *U.S. Steel*, corporations facing audits by the Commission filed suit to declare the Compact unconstitutional on the ground that the Compact's lack of congressional consent violated the Compact Clause. *Id.* at 458 & n.7; *see* U.S. CONST. art. I, § 10, cl. 3 ("No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State . . . ."). The Court rejected that challenge, holding that the Compact Clause does not apply to this Compact because it does not "enhance the political power of the member States in a way that encroaches upon the supremacy of the United States." 434 U.S. at 472. The Court also rejected claims that the Compact violated the Commerce Clause and the Fourteenth Amendment. *Id.* at 478-79. Thus, while the Court decided that the Compact was "valid" (at least under the provisions at issue), *see*

44

*id.* at 454, it did not address or resolve what type of compact the Compact is or whether it contractually binds its member states.

### 3. The Compact does not exhibit the indicia of a binding regulatory compact.

Since *U.S. Steel*, the Supreme Court has identified three "classic indicia" of a binding regulatory compact: (1) the establishment of a joint regulatory body; (2) state enactments that require reciprocal action to be effective; and (3) the prohibition of unilateral repeal or modification of its terms. *See Ne. Bancorp, Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 472 U.S. 159, 175 (1985); *see also Seattle Master Builders Ass'n v. Pac. Nw. Elec. Power & Conservation Planning Council*, 786 F.2d 1359, 1363 (9th Cir. 1986). The Compact does not exhibit any of these characteristics.

### a. The Commission is not a joint regulatory body.

The first trait of a binding regulatory compact is creation of a "joint organization for *regulatory* purposes," *Seattle Master Builders*, 786 F.2d at 1363 (emphasis added); *see also Ne. Bancorp*, 472 U.S. at 175. By contrast, an advisory compact "cede[s] no state *sovereignty* nor delegate[s] any *governing* power to a compact-created agency." BROUN, *supra*, at 14 (emphases added).

The Compact does not create a joint regulatory body. It forms the Multistate Tax Commission, TEX. TAX CODE § 141.001, art. VI, but that agency does not qualify. As the Court noted in *U.S. Steel:* "Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission." 434 U.S. at 473; *see also* TEX. TAX CODE § 141.001, art. VII.3. Aside from drafting non-binding rules, the Commission's other powers also evince an advisory compact. *Compare* TEX. TAX CODE § 141.001, art. VI.3 (granting the Commission power to "[s]tudy state and local tax systems," "[d]evelop and recommend proposals," and "[c]ompile and publish information"), *with* BROUN, *supra*, at 13 (explaining that advisory compacts "are designed not to actually resolve an interstate matter, but simply to study such matters"). The Commission conducts audits only upon request. TEX. TAX CODE § 141.001, art. VIII.2. And its arbitration functions are inoperative. *U.S. Steel*, 434 U.S. at 493 (White, J., dissenting).

Graphic counters with only the cursory statement that the Compact's creation of a "joint Compact agency . . . with delineated powers" suffices here. Graphic Br. 41. For the reasons discussed, it does not.

### b. The Compact provisions do not require reciprocal action to be effective.

The second feature of a binding regulatory compact is the inclusion of "state enactments which require reciprocal action for their effectiveness." *Seattle Master Builders*, 786 F.2d at 1363; *see also Ne. Bancorp*, 472 U.S. at 175. For example, the Interstate Compact for Adult Offender Supervision provides a mechanism for Texas parolees to serve their parole in other compact states, and vice-versa. *See* TEX. GOV'T CODE § 510.017, art. I. That agreement requires reciprocal action to be effective because, among other things, a "sending" state "transfer[s] supervision authority" over a parolee to a "receiving" state, which in turn must allow a sending state's officials to enter the receiving state to "retake" an offender for a parole violation. *See id.*

The Multistate Tax Compact does not similarly require reciprocal action to effect its substantive terms. The Compact "does not purport to authorize the member States to exercise any powers they could not exercise in its absence." *U.S. Steel*, 434 U.S. at 473. Without the Compact, each state administers its tax laws, including the apportionment of its business tax base, without reference to or consideration of other states' laws. *See Moorman Mfg. Co. v. Bair*, 437 U.S. 267, 278-79 (1978) (noting that states enact differing apportionment formulas

47

"based on political and economic considerations that vary from State to State"). The Compact does nothing to change that. A Compact state can allow a taxpayer to exercise Article III.1's option and use Article IV to apportion its business income *regardless* of how other states tax or apportion that income or whether those states are even Compact members. TEX. TAX CODE § 141.001, art. IV.2-3 (noting that the only condition on Article IV's application is that the taxpayer's income be "taxable" in another state).[4]

Graphic fails to rebut this point by arguing that the Compact required enactment by seven states to become effective. Graphic Br. 39. Because Texas adopted the Compact as a statute, its substantive provisions became effective as state law then—at least insofar as they were applicable—regardless of whether other states ever followed suit. Enactment by seven states allowed the Compact to "enter into force," TEX. TAX CODE § 141.001, art. X.1, which, for example, authorized the Commission's creation and funding, *id.*, art. VI. But the Supreme Court could not have meant that the joint action necessary to establish an advisory body with no regulatory power is evidence of a binding regulatory compact. For the same reason, Graphic's reliance on the recital that

---

4. Likewise, Article V's "tax credit" and "exemption certificate" provisions do not depend on whether the other state imposing a sales or use tax or authorizing an exemption has similar provisions in its laws or is a Compact

48

states "entered into" the Compact proves nothing.  Graphic Br. 39.  Even advisory compacts must be "entered into" by their members.

### c.     The Compact does not prohibit unilateral repeal or modification.

The third characteristic of a binding regulatory compact is "conditional consent" that prohibits a member state from unilaterally repealing or modifying its participation.  *Seattle Master Builders*, 786 F.2d at 1363; *see also Ne. Bancorp*, 472 U.S. at 175.  This Compact contains neither condition.

The Compact expressly provides that a state "may withdraw from this compact by enacting a statute repealing the same."  TEX. TAX CODE § 141.001, art. X.2.  Withdrawal does not affect any previously incurred liability—*e.g.*, dues, payments for audits, *id.*, art. VI.4, VIII.2—but even the existence or non-payment of those liabilities does not prevent or delay withdrawal.  *Id*, art. X.2.

Graphic tries to side-step this provision in two ways.  First, it misstates the *Seattle Master Builders* test as merely requiring "terms for withdrawal."  Graphic Br. 41.  The relevant inquiry is whether a state "is not free" to "repeal its participation unilaterally," 786 F.2d at 1363, something this Compact explicitly allows.  Second, Graphic observes that "[o]ther Texas compacts also have similar withdrawal provisions."  Graphic Br. 40 n.6.  But those provisions

49

are neither so similar nor so unilateral. They all require a state to provide significant advance notice to other states before it may withdraw, and to perform obligations to other states that extend beyond the date of withdrawal.[5]

The Compact also does not prohibit a state from unilaterally modifying its participation. While no provision explicitly *allows* a state to unilaterally modify its participation, that silence favors a construction that states may do so. The "well-established" presumption is that, "absent some clear indication that the legislature intends to bind itself contractually," an enacted law does not create contractual rights. *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry.*, 470 U.S. 451, 465-66 (1985). That presumption surely informs *Seattle Master Builders*' framing of this inquiry: the issue is whether a compact renders a state "*not free* to modify . . . its participation unilaterally," not

---

5. TEX. GOV'T CODE § 510.017, art. XI (Interstate Compact for Adult Offender Supervision) (requiring, upon *introduction* of repealing legislation, immediate notice to compact agency, which notifies all compact states within 60 days; and requiring performance of all obligations that extend beyond withdrawal); TEX. FAM. CODE § 162.102, art. IX (Interstate Compact on the Placement of Children) (conditioning withdrawal on notifying all party states' governors, delaying withdrawal's effective date for two years, and requiring continuing performance of obligations related to a placement made before withdrawal); TEX. HEALTH & SAFETY CODE § 612.001, art. XIII (Interstate Compact on Mental Health) (conditioning withdrawal on notifying all party states' governors and compact administrators, delaying withdrawal's effective date for one year, and providing that withdrawal does not affect status of patients transferred to or from the state under the compact).

whether a compact affirmatively allows modification.  786 F.2d at 1363 (emphasis added).

And because the Compact concerns taxation, its silence on modification weighs even more strongly against construing it as a binding contract.  States "have the attribute of sovereign powers in devising their fiscal systems to ensure revenue." *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 526 (1959).  Since "States rarely relinquish their sovereign powers," such as taxation, "when they do we would expect a clear indication of such devolution, not inscrutable silence." *Tarrant Reg'l Water Dist. v. Hermann*, 133 S. Ct. 2120, 2133 (2013).  The Compact's silence on modification thus indicates that its members did not intend to contract away their sovereign right to amend their state tax laws in a way that varies from the Compact's substantive provisions.

To the contrary, the Compact states consistently have construed that silence to mean that members *may* unilaterally change or restrict the Compact's terms in their own laws.  In 1972, the Compact states unanimously ratified Florida's decision to repeal Articles III and IV of the Compact in its law and to mandate a different apportionment method, recognizing that it remained a "regular" Compact member "in good standing."  CR.487.  And, as discussed above, 11 more former and current Compact members (including Texas) have

51

since taken similar steps to remove or limit the operation of Articles III and IV in their jurisdictions, all without objection from other states. *See supra* Statement of Facts, Parts II.C, III.[6] Because "the parties' course of performance under the Compact is highly significant" in interpreting its meaning, *see Alabama v. North Carolina*, 560 U.S. 330, 346 (2010), the Court should not construe the Compact to be a binding regulatory compact.

Graphic invites the Court to read the term "compact" itself to prohibit unilateral modification, but that begs the question. *See* Graphic Br. 39. "Once entered, the terms of the compact and any rules and regulations authorized by the compact can, *to the extent provided in the agreement*, supersede any substantive state laws that may be in conflict . . . ." BROUN, *supra*, at 22

---

6. Taxpayers, on the other hand, have challenged some of those departures from Articles III and IV in suits like this one. The Michigan Supreme Court recently held, in a 4-3 decision, that its legislature did not restrict application of Articles III.1 and IV as a matter of Michigan statutory law. *IBM v. Dep't of Treasury*, 852 N.W.2d 865, 871-77 (Mich. 2014) (plurality op.) (holding no implied repeal); *id.* at 881-82 (Zahra, J., concurring) (finding that the Compact was re-enacted). The Comptroller submits that the dissenting justices had the better view, reasoning that Article III.1's taxpayer option could not be reconciled with the mandatory language of Michigan's apportionment statute and that the Compact is not a binding contract. *Id.* at 882-89 (McCormack, J., dissenting). Michigan has since retroactively repealed the Compact, 2014 Mich. Pub. Acts 282, an enactment recently upheld by the Michigan Court of Claims in part on the ground that the Compact is *not* a binding contract. *Ingram Micro, Inc. v. Dep't of Treas.*, No. 11-000035-MT, slip op. at 7-13 (Mich. Ct. Cl. Dec. 19, 2014) (App'x C). Similar challenges are pending in California, *Gillette Co. v. Calif. Franchise Tax Bd.*, No. S206587 (Cal.) (fully briefed; argument date pending); Minnesota, *Kimberly-Clark Corp. v. Comm'r of Revenue*, No. 8670-R (Minn. Tax Ct.) (to be argued Mar. 19, 2015); and Oregon, *Health Net, Inc. v. Dep't of Revenue*, No. 5127 (Or. Tax Ct.) (argued July 23, 2014).

(emphasis added).  Unlike other compacts, this Compact does not provide that it supersedes conflicting state law,[7] nor does it expressly prohibit changes to the Compact's text or application in a member state's law.

Graphic also tries to conjure a general prohibition against modification from the Compact's audit article.  Graphic Br. 40.  Because that article is "in force only in those party states that specifically provide therefor by statute," TEX. TAX CODE § 141.001, art. VIII.1, Graphic infers that every other article is not optional.  Graphic Br. 40.  No such inference is due.  Requiring member states to "opt in" to the Commission's audit program through an additional affirmative enactment says nothing about whether those states may "opt out" of other Compact provisions by changing their own laws.[8]

---

7. *Cf.* TEX. FAM. CODE § 60.010, art. XII.A.2 (Uniform Interstate Compact on Juveniles) ("All compacting states' laws other than state constitutions and other interstate compacts conflicting with this compact are superseded to the extent of the conflict."); TEX. GOV'T CODE § 510.017, art. XIII (Interstate Compact for Adult Offender Supervision) ("Nothing in this compact prevents the enforcement of any other law of a compacting state that is not inconsistent with this compact."); TEX. TRANSP. CODE § 523.007 (Driver's License Compact of 1993) ("Except as expressly required by provisions of this compact, nothing contained herein shall be construed to affect the right of any state to apply any of its other laws relating to licenses to drive to any person or circumstance . . . .").

8. Graphic tellingly does not cite the only Compact provision that *might* be construed to prohibit a modification.  Article XI states that "Nothing in this compact shall be construed to . . . [a]ffect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III.2 of this compact."  TEX. TAX CODE § 141.001, art. XI(a).  No similar provision obligates a state to implement the articles that Graphic relies on here (III.1 and IV).

53

### 4. The Compact is an advisory compact with uniform laws.

Because the Compact lacks the indicia of a binding regulatory compact, it must be an advisory compact. The usual traits of advisory compacts are all present: it "lack[s] formal enforcement mechanisms"; it aims to "study" state tax systems, not "resolve" conflicts among them; it "cede[s] no state sovereignty nor delegate[s] any governing power to a compact-created agency"; and it "do[es] not require congressional consent." BROUN, *supra*, at 13-14.

The Compact's structure and terms show that Article II through V's tax-law "elements" constitute uniform laws contained within that advisory compact. The Compact simply inserts those articles into its text, without any prefatory language requiring members to maintain those provisions unchanged in their laws or any means of compelling them to do so. *See* TEX. TAX CODE § 141.001, arts. II-V. What prefaces those provisions instead is the "Purposes" article, which describes the Compact as "[f]acilitat[ing]" the determination of multistate taxpayers' tax liability and "[p]romot[ing]" uniformity in tax systems—words that are hortatory, not mandatory. *Id.*, art. I. Indeed, the Compact's sole method of implementing those tax-law elements is through the Commission's draft regulations, which are "advisory only." *U.S Steel*, 434 U.S. at 457. Moreover, Article IV's text *is* a uniform law—UDITPA. *See supra* Statement

54

of Facts, Part II.B.3.  And the Commission's first annual report recounted that the Compact had "been enacted as a uniform law" by 15 states.  SuppCR.31.  Because "[u]niform acts do not constitute a contract between the states," the Compact members "may make changes to fit individual state needs."  BROUN, *supra*, at 16.  Accordingly, Texas was free to restrict the operation of Articles III.1 and IV in Texas law to the extent they would otherwise apply.

## C. The Compact Does Not Preclude The Legislature From Mandating Exclusive Use Of Section 171.106's Gross-Receipts Apportionment Method.

Regardless of whether the Compact as a whole is a binding contract, the provisions that Graphic relies on—Articles III.1 and IV—still do not compel its desired outcome, for two reasons.  First, applying Article III.1 to the franchise tax creates a latent ambiguity that must be resolved in favor of section 171.106's exclusive apportionment method.  And second, under the Texas Constitution, Article III.1 may not suspend Texas's authority to tax the part of a taxpayer's margin that would elude taxation under Article IV's apportionment method.

### 1. Article III.1 does not unambiguously bar the Legislature from enforcing an exclusive apportionment method.

Article III.1 states that a taxpayer "may elect to apportion and allocate his income in the manner provided by the laws of [a Compact] State . . . without

55

reference to this compact, or may elect to apportion and allocate in accordance with [the three-factor income-apportionment method in] Article IV." TEX. TAX CODE § 141.001, art. III.1. Again, this language presumes that a state's laws do no more than "provide[]" a "manner" of apportioning income; it does not address the circumstance in which that state-law manner mandates exclusive use of one apportionment method, as section 171.106(a) does. *See supra* Part I.C.2. Nor does the Compact preclude a state from adding that sort of exclusive condition to the laws that Article III.1 incorporates by reference. For all that Article III.1 reveals, the taxpayer takes the state laws as it finds them. So what happens when the state law that Article III.1 incorporates as an option is by its very terms not optional? The Compact doesn't say.

Applying Article III.1 to section 171.106's exclusive apportionment method thus creates a latent ambiguity. *See* BLACK'S LAW DICTIONARY 93 (9th ed. 2009) (defining "latent ambiguity" as an "ambiguity that does not readily appear in the language of a document, but instead arises from a collateral matter when the document's terms are applied"). That ambiguity warrants recourse to "other interpretive tools" to discern the Compact's meaning in this scenario. *See Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2132.

Three construction aids already discussed support the Comptroller's view that the Compact does not prevent member states from enforcing exclusive apportionment provisions such as section 171.106. First, courts will not construe a compact to cede a sovereign power like tax apportionment without a "clear indication" of that purpose. *Id.* at 2133. Again, Article III.1 does not address the conflict that arises when it purports to incorporate a non-optional state law as an option, much less clearly indicate an intent to allow taxpayers to override a legislative command. *See supra* Part II.B.3.c. Second, "[t]he parties' conduct under the Compact" provides "'highly significant' evidence of [their] understanding of the [C]ompact's terms." *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2135 (quoting *Alabama*, 560 U.S. at 346). Both the 1972 Florida resolution and the unopposed disabling of Article III.1's taxpayer option by 12 Compact members reflect the parties' common, long-held view that the Compact does not preclude them from imposing an exclusive apportionment method. *See supra* Part II.B.3.c. And third, comparisons to other compacts' text can shed light on the parties' intent here. *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2133. Unlike this Compact, other compacts to which Texas belongs explicitly state that the compact supersedes any conflicting state statute. *See supra* p. 53, n.7.

Graphic elides the latent ambiguity in Article III.1 by rewriting it. According to Graphic, Article III.1 "require[s] that all party states must provide taxpayers with the Compact Election." Graphic Br. 43. But that is not what it says. As noted above, the Compact inserts Article III.1 in its text without any prefatory directive to states whatsoever. *See supra* Part II.B.4. Article III.1 is directed at "taxpayer[s]," not states, and incorrectly presumes that state law always may be incorporated as optional. TEX. TAX CODE § 141.001, art. III.1.

Graphic also ignores the Compact states' course of performance in favor of comments by the Council of State Governments (CSG) distributed with the Compact in 1967. Graphic Br. 43-44. Regardless of how CSG understood Article III.1, though, it failed to draft language that unambiguously required members to keep that article in their laws without modification or restriction. Moreover, Graphic's focus on what CSG said in 1967 overlooks the fact that an interstate compact is unlike an ordinary contract in that multiple parties enter into and withdraw from the agreement throughout its existence. The states that joined the Compact *after* the 1972 Florida resolution necessarily did not intend to agree that Article III.1 requires them to allow taxpayers to choose an apportionment method. That intent must be deemed shared by *all* members, regardless of when they joined; otherwise, the Compact is no agreement at all.

58

Finally, Graphic surmises that the Compact must have "guarantee[d]" availability of Article III.1's option because that level of state commitment was needed to stave off Congress's efforts to impose a uniform apportionment method through federal law. Graphic Br. 44-45. But the neat narrative Graphic constructs does not withstand scrutiny.

No one disputes that the Compact was developed in response to proposed federal legislation that threatened to encroach upon states' traditional sovereign authority over taxation, including apportionment of business income. *See* SuppCR.20-21. But Graphic makes an unsupported leap in asserting that Congress's failure to act in this area after the Compact's effective date meant that "the federal government was satisfied that a baseline level of uniformity had been achieved" in state income-tax apportionment. Graphic Br. 14. Setting aside the fallacy of ascribing intent to "the federal government," Graphic cites *no* authority or evidence for this proposition and does not mention, much less explain, the consistent introduction of bills on this topic in Congress both before *and* after the Compact's effective date. *See U.S. Steel*, 434 U.S. at 456 n.4. Likewise, Graphic does not account for Congress's inaction in the face of the Compact's failure to attract even a majority of states as members or the Compact members' enactments that treat the Compact as non-binding. In any

59

case, because "non-action by Congress affords the most dubious foundation for drawing positive inferences," *United States v. Price*, 361 U.S. 304, 310-11 (1960), the Court should not credit Graphic's effort to divine the Compact's meaning through speculation about congressional motives.

      **2.**      **Article III.1 cannot constitutionally require Texas to allow a taxpayer to remove part of its tax base from Texas's taxing authority.**

Construing Article III.1 to preclude Texas from enacting an exclusive apportionment method also would impermissibly conflict with the Texas Constitution's prohibition against contractual suspensions of the sovereign power of taxation—a conflict that the Compact itself aims to avoid.

By its terms, the Compact operates within a member state only to the extent that the state enacts the Compact as a statute. TEX. TAX CODE § 141.001, art. X.1. Thus, the Compact's drafters understood that its provisions could not conflict with any Compact state's constitution. To address that constraint, the Compact decrees that if any provision or part thereof is declared to be contrary to a state constitution, it is severable, and the Compact otherwise remains in effect. *Id.*, art. XII.

Article VIII, section 4 of the Texas Constitution provides that the Legislature may not surrender or suspend the power to tax corporations "by

60

any contract or grant to which the State shall be a party." TEX. CONST. art. VIII, § 4. Thirteen other former and current Compact states' constitutions contain similar prohibitions.[9] Yet Graphic construes Article III.1 to effect such a contractual suspension. Under Graphic's reasoning, Texas contracted away the power to tax that portion of a taxpayer's tax base that the taxpayer removes from Texas's taxing authority by electing Article IV's income-apportionment method over section 171.106's exclusive apportionment method. Here, for example, Graphic claims a contractual right to withdraw part of its margin from Texas's taxing power to the tune of over $540,000 in forgone revenue. CR.5. That is precisely the sort of claim that Texas courts have rejected in light of the constitutional prohibition against contractual suspensions of the taxing power. *See, e.g., Gaar, Scott & Co. v. Shannon*, 115 S.W. 361, 362 (Tex. Civ. App.—Austin 1908, writ denied) (holding that business permit under which taxpayer paid franchise tax for 10-year term could not foreclose state from amending franchise tax to impose additional tax burdens during that term), *aff'd*, 223 U.S. 468 (1912).

---

9. ALASKA CONST. art. IX, § 1; ARK. CONST. art. 16, § 7; CAL. CONST. art. XIII, § 31; HAW. CONST. art. VII, § 1; ILL. CONST. art. IX, § 1; MICH. CONST. art. IX, § 2; MINN. CONST. art. X, § 1; MO. CONST. art. X, § 2; MONT. CONST. art. VIII, § 2; N.D. CONST. art. X, § 2; S.D. CONST. art. XI, § 3; WASH. CONST. art. 7, § 1; WYO. CONST. art. 15, § 14.

Because Graphic's reading of Article III.1 cannot be squared with the constitutions of most Compact states (including Texas), it is not one that the Compact states could have intended or that the Court should embrace. *Employees Ret. Sys. v. Duenez*, 288 S.W.3d 905, 910 (Tex. 2009) (noting that courts "must avoid constitutionally suspect constructions" of statutes).

## D. The Compact Does Not Supersede Section 171.106 Because Any Conflict Does Not Unconstitutionally Impair Any Contractual Obligations.

A holding that the Compact obligates its members to provide Article III.1's "taxpayer option" still would not win this appeal for Graphic. Section 171.106's mandate to use the gross-receipts method would yield only to the extent that disabling Article III.1 would violate the Contracts Clauses of the United States and Texas Constitutions. Graphic has not shown a violation here.

### 1. Binding compacts that Congress has not approved preempt state law only if the law unconstitutionally impairs contractual obligations.

When Congress approves an interstate compact, it "transforms" the compact into federal law. *Cuyler v. Adams*, 449 U.S. 433, 440 (1981). Under the Supremacy Clause, then, an approved compact "pre-empts any state law that conflicts with the Compact." *Tarrant Reg'l Water Dist.*, 133 S. Ct. at 2130 n.8.

By contrast, a non-approved compact operates only as a state statute and, in some cases, a binding contract among states. *See* 1A NORMAN J. SINGER & J.D. SHAMBIE SINGER, SUTHERLAND STATUTES AND STATUTORY CONSTRUCTION § 32:5, at 723 (7th ed. 2009). As a statute, the compact may be trumped by other state law under "the doctrine of implied repeal" or rules that "give effect to the latest in time." *Id.* § 32:6, at 727. But when the compact also creates a binding contract, it *may* supersede a conflicting statute if the statute's effect on the compact violates the Contracts Clauses, U.S. CONST. art I, § 10, cl. 1; TEX. CONST. art. I, § 16, which prohibit laws impairing contractual obligations. *Green v. Biddle*, 21 U.S. (8 Wheat.) 1, 92 (1823) (holding that a statute abrogating a compact violated Contracts Clause); *Gen. Expressways, Inc. v. Iowa Reciprocity Bd.*, 163 N.W.2d 413, 419-21 (Iowa 1968) (evaluating conflicts between a statute and a compact under contracts-clause principles); SINGER, *supra*, § 32:3, at 719 (describing compacts as "deriv[ing] binding force" from the Contracts Clause); BROUN, *supra*, at 22 (explaining that "[a] compact controls over a state's application of its own law through the Supremacy Clause [in the case of approved compacts] and the Contracts Clause").

Graphic agrees that a non-approved compact's preeminence over other state law arises from its status as a contract. *See* Graphic Br. 32-36. But in lieu

of explaining *why* that status elevates a compact over state law, Graphic assembles various cases (most involving congressionally approved compacts), mines them for statements that states may not unilaterally amend compacts, and pronounces that a tenet of "compact law." *Id.* Graphic touts that "compact law" as a common-law rule that provides grounds for preempting section 171.106 independent of the Contracts Clauses. *Id.*

Graphic is wrong. Neither Graphic nor its cases articulate any principled reason why a state law could not abrogate a non-approved compact absent the Contracts Clauses' "binding force." *See* SINGER, *supra*, § 32:3, at 719; *see also IBM*, 852 N.W.2d at 885-87 (McCormack, J., dissenting) (rejecting this "compact law" argument).[10] Indeed, if compacts always supersede state statutes under "compact law," one wonders why a court or commentator ever would mention or reach the controlling effect of the Contracts Clause and Supremacy Clause. *Cf. Escambia Cnty. v. McMillan*, 466 U.S. 48, 51 (1984) (per curiam) (noting that "normally" courts "will not decide a constitutional question if there is some other ground upon which to dispose of the case").

---

10. In particular, *West Virginia ex rel. Dyer v. Sims* held that a state's *courts* may not nullify compacts adopted by its legislature. 341 U.S. 22, 28 (1951). *Dyer* has since been cabined to compacts requiring congressional approval. *U.S. Steel*, 434 U.S. at 471 n.23.

## 2. Section 171.106 does not unconstitutionally impair any obligations to Graphic under the Compact.

Whether a state law violates the federal Contracts Clause involves a three-part inquiry: (1) whether the state law substantially impairs a contractual relationship; (2) whether a significant, legitimate public purpose motivated the state law; and (3) whether the adjustment to the contracting parties' rights is based on reasonable conditions and appropriate to the law's purpose. *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-13 (1983). The Texas Constitution's Contracts Clause requires "[a] similar analysis." *Liberty Mut. Ins. Co. v. Tex. Dep't of Ins.*, 187 S.W.3d 808, 825 (Tex. App.—Austin 2006, pet. denied). Under this test, section 171.106 validly overrides any possible application of Article III.1 's "taxpayer option" to the franchise tax.

Graphic cannot establish the first requirement because it is not a party to the Compact. Nor is Graphic a third-party beneficiary. *See Basic Capital Mgmt. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 900 (Tex. 2011) (holding that a third party may not recover on a contract unless the contracting parties intended to secure benefits to that third party and entered into the contract directly for the third party's benefit).

But even if Graphic were an intended Compact beneficiary, disabling Article III.1's option would not constitute a "substantial" impairment. "In determining whether an impairment is substantial and so not 'permitted under the Constitution,' of *greatest* concern appears to be the contracting parties' *actual* reliance on the abridged contractual term." *City of Charleston v. Pub. Serv. Comm'n*, 57 F.3d 385, 392 (4th Cir. 1995) (quoting *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 21 (1977)). Graphic patently did not rely on Article III.1 because it calculated its franchise tax using the gross-receipts method until March 2011. Nor could Graphic have reasonably relied on that option because the Compact permits states to withdraw at will. *See id.* at 392-93 (noting that the reliance analysis turns in part on whether the contract "indicated that the abridged term was subject to impairment by the legislature"). By contrast, since at least 1991 Texas has significantly relied on the Compact states' shared interpretation that Article III.1 does not preclude them from adopting exclusive apportionment methods.

And even if Graphic could demonstrate the threshold substantial impairment, that still would not establish a constitutional violation because section 171.106 serves a significant and legitimate purpose. *See Energy Reserves*, 459 U.S. at 411-12. States enjoy "wide latitude in the selection of

apportionment formulas." *Moorman*, 437 U.S. at 274. Texas once allowed taxpayers to request a multi-factor apportionment method, but later changed that policy because it disproportionately favored foreign corporations. *See supra* Statement of Facts, Part I.B.2. In imposing a single-factor method, and disallowing any option under the Compact, section 171.106 "treats both local and foreign concerns with an even hand." *Moorman*, 437 U.S. at 277 n.12.

Finally, to the extent section 171.106 adjusts any taxpayer rights under the Compact, it does so under reasonable and appropriate conditions. The Supreme Court has repeatedly held that single-factor apportionment methods are "presumptively valid." *Id.* at 273. Indeed, this Court has specifically upheld Texas's gross-receipts method as constitutional. *Gen. Dynamics*, 919 S.W.2d at 867-69.

### 3. Graphic waived the Contracts Clause issue.

Graphic makes no effort to apply the *Energy Reserves* analysis. Graphic Br. 46-48. Instead, Graphic relies principally on an 1823 case to suggest that *any* conflict between a statute and a compact violates the Contracts Clause. *Id.* at 46-47 (discussing *Green*, 21 U.S. (8 Wheat) at 91-93). *Green* applied the then-applicable rule that "any deviation" from a contract, "however minute, or apparently immaterial," violated the Contracts Clause. 21 U.S. (8 Wheat) at 84.

But since then, the Court has adopted the more relaxed standard described above, and confirmed that "[t]he Contract[s] Clause is not an absolute bar to subsequent modification of a State's own financial obligations" under a compact, *U.S. Trust*, 431 U.S. at 25. Having failed to brief the proper test, Graphic has waived its Contracts Clause issue. *See Sunbeam Envtl. Servs. v. Tex. Workers' Comp. Ins. Facility*, 71 S.W.3d 846, 851 (Tex. App.—Austin 2002, no pet.).

## PRAYER

The district court's judgment should be affirmed.

Respectfully submitted.

KEN PAXTON
Attorney General of Texas

CHARLES E. ROY
First Assistant Attorney
   General

JAMES E. DAVIS
Deputy Attorney General for
   Civil Litigation

SCOTT A. KELLER
Solicitor General

/s/ Rance Craft
RANCE CRAFT
Assistant Solicitor General
State Bar No. 24035655

CYNTHIA A. MORALES
Assistant Attorney General
State Bar No. 14417420

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
(512) 936-2872
(512) 474-2697 [fax]
rance.craft@texasattorneygeneral.gov

68

## CERTIFICATE OF COMPLIANCE

According to WordPerfect 12, this brief contains 14,993 words, excluding the portions of the brief exempted by Texas Rule of Appellate Procedure 9.4(i)(1).

/s/ Rance Craft
Rance Craft

## CERTIFICATE OF SERVICE

On January 27, 2015, this **Brief of Appellees** was served by File & Serve Xpress on:

James F. Martens
   jmartens@textaxlaw.com
Amanda G. Taylor
   ataylor@textaxlaw.com
Lacy L. Leonard
   lleonard@textaxlaw.com
Danielle Ahlrich
   dahlrich@textaxlaw.com
MARTENS, TODD, LEONARD & TAYLOR
301 Congress Avenue, Suite 1950
Austin, Texas 78701

*Counsel for Appellant*

Amy L. Silverstein
   asilverstein@sptaxlaw.com
SILVERSTEIN & POMERANTZ LLP
12 Gough Street, Second Floor
San Francisco, California 94103

*Counsel for Appellant*

/s/ Rance Craft
Rance Craft

# APPENDIX

# APPENDIX TABLE OF CONTENTS

A.  TEX. TAX CODE § 141.001

B.  COMPTROLLER'S DECISION NOS. 104,752 & 104,753 (2011)

C.  *Ingram Micro, Inc. v. Dep't of Treas.*, No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014)




**Effective:[See Text Amendments]**

Vernon's Texas Statutes and Codes Annotated Currentness
  Tax Code (Refs & Annos)
    Title 2. State Taxation (Refs & Annos)
      Subtitle D. Compacts and Uniform Laws
        Chapter 141. Multistate Tax Compact (Refs & Annos)
          →→ **§ 141.001. Adoption of Multistate Tax Compact**

The Multistate Tax Compact is adopted and entered into with all jurisdictions legally adopting it to read as follows:

## MULTISTATE TAX COMPACT

## ARTICLE I. PURPOSES

The purposes of this compact are to:

1. Facilitate proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes.

2. Promote uniformity or compatibility in significant components of tax systems.

3. Facilitate taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration.

4. Avoid duplicative taxation.

## ARTICLE II. DEFINITIONS

As used in this compact:

1. "State" means a state of the United States, the District of Columbia, the Commonwealth of Puerto Rico,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or any territory or possession of the United States.

2. "Subdivision" means any governmental unit or special district of a state.

3. "Taxpayer" means any corporation, partnership, firm, association, governmental unit or agency or person acting as a business entity in more than one state.

4. "Income tax" means a tax imposed on or measured by net income including any tax imposed on or measured by an amount arrived at by deducting expenses from gross income, one or more forms of which expenses are not specifically and directly related to particular transactions.

5. "Capital stock tax" means a tax measured in any way by the capital of a corporation considered in its entirety.

6. "Gross receipts tax" means a tax, other than a sales tax, which is imposed on or measured by the gross volume of business, in terms of gross receipts or in other terms, and in the determination of which no deduction is allowed which would constitute the tax an income tax.

7. "Sales tax" means a tax imposed with respect to the transfer for a consideration of ownership, possession or custody of tangible personal property or the rendering of services measured by the price of the tangible personal property transferred or services rendered and which is required by state or local law to be separately stated from the sales price by the seller, or which is customarily separately stated from the sales price, but does not include a tax imposed exclusively on the sale of a specifically identified commodity or article or class of commodities or articles.

8. "Use tax" means a nonrecurring tax, other than a sales tax, which (a) is imposed on or with respect to the exercise or enjoyment of any right or power over tangible personal property incident to the ownership, possession or custody of that property or the leasing of that property from another including any consumption, keeping, retention, or other use of tangible personal property and (b) is complementary to a sales tax.

9. "Tax" means an income tax, capital stock tax, gross receipts tax, sales tax, use tax, and any other tax which has a multistate impact, except that the provisions of Articles III, IV and V of this compact shall apply only to the taxes specifically designated therein and the provisions of Article IX of this compact shall apply only in respect to determinations pursuant to Article IV.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

## ARTICLE III. ELEMENTS OF INCOME TAX LAWS

### Taxpayer Option, State and Local Taxes

1. Any taxpayer subject to an income tax whose income is subject to apportionment and allocation for tax purposes pursuant to the laws of a party state or pursuant to the laws of subdivisions in two or more party states may elect to apportion and allocate his income in the manner provided by the laws of such state or by the laws of such states and subdivisions without reference to this compact, or may elect to apportion and allocate in accordance with Article IV. This election for any tax year may be made in all party states or subdivisions thereof or in any one or more of the party states or subdivisions thereof without reference to the election made in the others. For the purposes of this paragraph, taxes imposed by subdivisions shall be considered separately from state taxes and the apportionment and allocation also may be applied to the entire tax base. In no instance wherein Article IV is employed for all subdivisions of a state may the sum of all apportionments and allocations to subdivisions within a state be greater than the apportionment and allocation that would be assignable to that state if the apportionment or allocation were being made with respect to a state income tax.

### Taxpayer Option, Short Form

2. Each party state or any subdivision thereof which imposes an income tax shall provide by law that any taxpayer required to file a return, whose only activities within the taxing jurisdiction consist of sales and do not include owning or renting real estate or tangible personal property, and whose dollar volume of gross sales made during the tax year within the state or subdivision, as the case may be, is not in excess of $100,000 may elect to report and pay any tax due on the basis of a percentage of such volume, and shall adopt rates which shall produce a tax which reasonably approximates the tax otherwise due. The Multi-state Tax Commission, not more than once in five years, may adjust the $100,000 figure in order to reflect such changes as may occur in the real value of the dollar, and such adjusted figure, upon adoption by the commission, shall replace the $100,000 figure specifically provided herein. Each party state and subdivision thereof may make the same election available to taxpayers additional to those specified in this paragraph.

### Coverage

3. Nothing in this article relates to the reporting or payment of any tax other than an income tax.

## ARTICLE IV. DIVISION OF INCOME

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1. As used in this article, unless the context otherwise requires:

(a) "Business income" means income arising from transactions and activity in the regular course of the taxpayer's trade or business and includes income from tangible and intangible property if the acquisition, management, and disposition of the property constitute integral parts of the taxpayer's regular trade or business operations.

(b) "Commercial domicile" means the principal place from which the trade or business of the taxpayer is directed or managed.

(c) "Compensation" means wages, salaries, commissions and any other form of remuneration paid to employees for personal services.

(d) "Financial organization" means any bank, trust company, savings bank, industrial bank, land bank, safe deposit company, private banker, savings and loan association, credit union, cooperative bank, small loan company, sales finance company, investment company, or any type of insurance company.

(e) "Nonbusiness income" means all income other than business income.

(f) "Public utility" means any business entity (1) which owns or operates any plant, equipment, property, franchise, or license for the transmission of communications, transportation of goods or persons, except by pipe line, or the production, transmission, sale, delivery, or furnishing of electricity, water or steam; and (2) whose rates of charges for goods or services have been established or approved by a federal, state or local government or governmental agency.

(g) "Sales" means all gross receipts of the taxpayer not allocated under paragraphs of this article.

(h) "State" means any state of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, and any foreign country or political subdivision thereof.

(i) "This state" means the state in which the relevant tax return is filed or, in the case of application of this article to the apportionment and allocation of income for local tax purposes, the subdivision or local taxing district in which the relevant tax return is filed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2. Any taxpayer having income from business activity which is taxable both within and without this state, other than activity as a financial organization or public utility or the rendering of purely personal services by an individual, shall allocate and apportion his net income as provided in this article. If a taxpayer has income from business activity as a public utility but derives the greater percentage of his income from activities subject to this article, the taxpayer may elect to allocate and apportion his entire net income as provided in this article.

3. For purposes of allocation and apportionment of income under this article, a taxpayer is taxable in another state if (1) in that state he is subject to a net income tax, a franchise tax measured by net income, a franchise tax for the privilege of doing business, or a corporate stock tax, or (2) that state has jurisdiction to subject the taxpayer to a net income tax regardless of whether, in fact, the state does or does not.

4. Rents and royalties from real or tangible personal property, capital gains, interest, dividends or patent or copyright royalties, to the extent that they constitute nonbusiness income, shall be allocated as provided in paragraphs 5 through 8 of this article.

5. (a) Net rents and royalties from real property located in this state are allocable to this state.

(b) Net rents and royalties from tangible personal property are allocable to this state: (1) if and to the extent that the property is utilized in this state, or (2) in their entirety if the taxpayer's commercial domicile is in this state and the taxpayer is not organized under the laws of or taxable in the state in which the property is utilized.

(c) The extent of utilization of tangible personal property in a state is determined by multiplying the rents and royalties by a fraction, the numerator of which is the number of days of physical location of the property in the state during the rental or royalty period in the taxable year and the denominator of which is the number of days of physical location of the property everywhere during all rental or royalty periods in the taxable year. If the physical location of the property during the rental or royalty period is unknown or unascertainable by the taxpayer, tangible personal property is utilized in the state in which the property was located at the time the rental or royalty payer obtained possession.

6. (a) Capital gains and losses from sales of real property located in this state are allocable to this state.

(b) Capital gains and losses from sales of tangible personal property are allocable to this state if (1) the property had a situs in this state at the time of the sale, or (2) the taxpayer's commercial domicile is in this state and the taxpayer is not taxable in the state in which the property had a situs.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(c) Capital gains and losses from sales of intangible personal property are allocable to this state if the taxpayer's commercial domicile is in this state.

7. Interest and dividends are allocable to this state if the taxpayer's commercial domicile is in this state.

8. (a) Patent and copyright royalties are allocable to this state: (1) if and to the extent that the patent or copyright is utilized by the payer in this state, or (2) if and to the extent that the patent or copyright is utilized by the payer in a state in which the taxpayer is not taxable and the taxpayer's commercial domicile is in this state.

(b) A patent is utilized in a state to the extent that it is employed in production, fabrication, manufacturing, or other processing in the state or to the extent that a patented product is produced in the state. If the basis of receipts from patent royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the patent is utilized in the state in which the taxpayer's commercial domicile is located.

(c) A copyright is utilized in a state to the extent that printing or other publication originates in the state. If the basis of receipts from copyright royalties does not permit allocation to states or if the accounting procedures do not reflect states of utilization, the copyright is utilized in the state in which the taxpayer's commercial domicile is located.

9. All business income shall be apportioned to this state by multiplying the income by a fraction, the numerator of which is the property factor plus the payroll factor plus the sales factor, and the denominator of which is three.

10. The property factor is a fraction, the numerator of which is the average value of the taxpayer's real and tangible personal property owned or rented and used in this state during the tax period and the denominator of which is the average value of all the taxpayer's real and tangible personal property owned or rented and used during the tax period.

11. Property owned by the taxpayer is valued at its original cost. Property rented by the taxpayer is valued at eight times the net annual rental rate. Net annual rental rate is the annual rental rate paid by the taxpayer less any annual rental rate received by the taxpayer from subrentals.

12. The average value of property shall be determined by averaging the values at the beginning and ending

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

of the tax period but the tax administrator may require the averaging of monthly values during the tax period if reasonably required to reflect properly the average value of the taxpayer's property.

13. The payroll factor is a fraction, the numerator of which is the total amount paid in this state during the tax period by the taxpayer for compensation and the denominator of which is the total compensation paid everywhere during the tax period.

14. Compensation is paid in this state if:

   (a) the individual's service is performed entirely within the state;

   (b) the individual's service is performed both within and without the state, but the service performed without the state is incidental to the individual's service within the state; or

   (c) some of the service is performed in the state and (1) the base of operations or, if there is no base of operations, the place from which the service is directed or controlled is in the state, or (2) the base of operations or the place from which the service is directed or controlled is not in any state in which some part of the service is performed, but the individual's residence is in this state.

15. The sales factor is a fraction, the numerator of which is the total sales of the taxpayer in this state during the tax period, and the denominator of which is the total sales of the taxpayer everywhere during the tax period.

16. Sales of tangible personal property are in this state if:

   (a) the property is delivered or shipped to a purchaser, other than the United States government, within this state regardless of the f. o. b. point or other conditions of the sale; or

   (b) the property is shipped from an office, store, warehouse, factory, or other place of storage in this state and (1) the purchaser is the United States government or (2) the taxpayer is not taxable in the state of the purchaser.

17. Sales, other than sales of tangible personal property, are in this state if:

   (a) the income-producing activity is performed in this state; or

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(b) the income-producing activity is performed both in and outside this state and a greater proportion of the income-producing activity is performed in this state than in any other state, based on costs of performance.

18. If the allocation and apportionment provisions of this article do not fairly represent the extent of the taxpayer's business activity in this state, the taxpayer may petition for or the tax administrator may require, in respect to all or any part of the taxpayer's business activity, if reasonable:

(a) separate accounting;

(b) the exclusion of any one or more of the factors;

(c) the inclusion of one or more additional factors which will fairly represent the taxpayer's business activity in this state; or

(d) the employment of any other method to effectuate an equitable allocation and apportionment of the taxpayer's income.

## ARTICLE V. ELEMENTS OF SALES AND USE TAX LAWS

### Tax Credit

1. Each purchaser liable for a use tax on tangible personal property shall be entitled to full credit for the combined amount or amounts of legally imposed sales or use taxes paid by him with respect to the same property to another state and any subdivision thereof. The credit shall be applied first against the amount of any use tax due the state, and any unused portion of the credit shall then be applied against the amount of any use tax due a subdivision.

### Exemption Certificates, Vendors May Rely

2. Whenever a vendor receives and accepts in good faith from a purchaser a resale or other exemption certificate or other written evidence of exemption authorized by the appropriate state or subdivision taxing authority, the vendor shall be relieved of liability for a sales or use tax with respect to the transaction.

## ARTICLE VI. THE COMMISSION

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Organization and Management

1. (a) The Multistate Tax Commission is hereby established. It shall be composed of one "member" from each party state who shall be the head of the state agency charged with the administration of the types of taxes to which this compact applies. If there is more than one such agency the state shall provide by law for the selection of the commission member from the heads of the relevant agencies. State law may provide that a member of the commission be represented by an alternate but only if there is on file with the commission written notification of the designation and identity of the alternate. The attorney general of each party state or his designee, or other counsel if the laws of the party state specifically provide, shall be entitled to attend the meetings of the commission, but shall not vote. Such attorneys general, designees, or other counsel shall receive all notices of meetings required under paragraph 1(e) of this article.

(b) Each party state shall provide by law for the selection of representatives from its subdivisions affected by this compact to consult with the commission member from that state.

(c) Each member shall be entitled to one vote. The commission shall not act unless a majority of the members are present, and no action shall be binding unless approved by a majority of the total number of members.

(d) The commission shall adopt an official seal to be used as it may provide.

(e) The commission shall hold an annual meeting and such other regular meetings as its bylaws may provide and such special meetings as its executive committee may determine. The commission bylaws shall specify the dates of the annual and any other regular meetings, and shall provide for the giving of notice of annual, regular and special meetings. Notices of special meetings shall include the reasons therefor and an agenda of the items to be considered.

(f) The commission shall elect annually, from among its members, a chairman, a vice-chairman and a treasurer. The commission shall appoint an executive director who shall serve at its pleasure, and it shall fix his duties and compensation. The executive director shall be secretary of the commission. The commission shall make provision for the bonding of such of its officers and employees as it may deem appropriate.

(g) Irrespective of the civil service, personnel or other merit system laws of any party state, the executive director shall appoint or discharge such personnel as may be necessary for the performance of the functions of the commission and shall fix their duties and compensation. The commission bylaws shall

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

provide for personnel policies and programs.

(h) The commission may borrow, accept or contract for the services of personnel from any state, the United States, or any other governmental entity.

(i) The commission may accept for any of its purposes and functions any and all donations and grants of money, equipment, supplies, materials and services, conditional or otherwise, from any governmental entity, and may utilize and dispose of the same.

(j) The commission may establish one or more offices for the transacting of its business.

(k) The commission shall adopt bylaws for the conduct of its business. The commission shall publish its bylaws in convenient form, and shall file a copy of the bylaws and any amendments thereto with the appropriate agency or officer in each of the party states.

(l) The commission annually shall make to the governor and legislature of each party state a report covering its activities for the preceding year. Any donation or grant accepted by the commission or services borrowed shall be reported in the annual report of the commission, and shall include the nature, amount and conditions, if any, of the donation, gift, grant or services borrowed and the identity of the donor or lender. The commission may make additional reports as it may deem desirable.

Committees

2. (a) To assist in the conduct of its business when the full commission is not meeting, the commission shall have an executive committee of seven members, including the chairman, vice-chairman, treasurer and four other members elected annually by the commission. The executive committee, subject to the provisions of this compact and consistent with the policies of the commission, shall function as provided in the bylaws of the commission.

(b) The commission may establish advisory and technical committees, membership on which may include private persons and public officials, in furthering any of its activities. Such committees may consider any matter of concern to the commission, including problems of special interest to any party state and problems dealing with particular types of taxes.

(c) The commission may establish such additional committees as its bylaws may provide.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Powers

3. In addition to powers conferred elsewhere in this compact, the commission shall have power to:

(a) Study state and local tax systems and particular types of state and local taxes.

(b) Develop and recommend proposals for an increase in uniformity or compatibility of state and local tax laws with a view toward encouraging the simplification and improvement of state and local tax law and administration.

(c) Compile and publish information as in its judgment would assist the party states in implementation of the compact and taxpayers in complying with state and local tax laws.

(d) Do all things necessary and incidental to the administration of its functions pursuant to this compact.

Finance

4. (a) The commission shall submit to the governor or designated officer or officers of each party state a budget of its estimated expenditures for such period as may be required by the laws of that state for presentation to the legislature thereof.

(b) Each of the commission's budgets of estimated expenditures shall contain specific recommendations of the amounts to be appropriated by each of the party states. The total amount of appropriations requested under any such budget shall be apportioned among the party states as follows: one-tenth in equal shares; and the remainder in proportion to the amount of revenue collected by each party state and its subdivisions from income taxes, capital stock taxes, gross receipts taxes, sales and use taxes. In determining such amounts, the commission shall employ such available public sources of information as, in its judgment, present the most equitable and accurate comparisons among the party states. Each of the commission's budgets of estimated expenditures and requests for appropriations shall indicate the sources used in obtaining information employed in applying the formula contained in this paragraph.

(c) The commission shall not pledge the credit of any party state. The commission may meet any of its obligations in whole or in part with funds available to it under paragraph 1(i) of this article: provided that the commission takes specific action setting aside such funds prior to incurring any obligation to be met in whole or in part in such manner. Except where the commission makes use of funds available to it under paragraph 1(i), the commission shall not incur any obligation prior to the allotment of funds by the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

party states adequate to meet the same.

(d) The commission shall keep accurate accounts of all receipts and disbursements. The receipts and disbursements of the commission shall be subject to the audit and accounting procedures established under its bylaws. All receipts and disbursements of funds handled by the commission shall be audited yearly by a certified or licensed public accountant and the report of the audit shall be included in and become part of the annual report of the commission.

(e) The accounts of the commission shall be open at any reasonable time for inspection by duly constituted officers of the party states and by any persons authorized by the commission.

(f) Nothing contained in this article shall be construed to prevent commission compliance with laws relating to audit or inspection of accounts by or on behalf of any government contributing to the support of the commission.

## ARTICLE VII. UNIFORM REGULATIONS AND FORMS

1. Whenever any two or more party states, or subdivisions of party states, have uniform or similar provisions of law relating to an income tax, capital stock tax, gross receipts tax, sales or use tax, the commission may adopt uniform regulations for any phase of the administration of such law, including assertion of jurisdiction to tax, or prescribing uniform tax forms. The commission may also act with respect to the provisions of Article IV of this compact.

2. Prior to the adoption of any regulation, the commission shall:

(a) As provided in its bylaws, hold at least one public hearing on due notice to all affected party states and subdivisions thereof and to all taxpayers and other persons who have made timely request of the commission for advance notice of its regulation-making proceedings.

(b) Afford all affected party states and subdivisions and interested persons an opportunity to submit relevant written data and views, which shall be considered fully by the commission.

3. The commission shall submit any regulations adopted by it to the appropriate officials of all party states and subdivisions to which they might apply. Each such state and subdivision shall consider any such regulation for adoption in accordance with its own laws and procedures.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

ARTICLE VIII. INTERSTATE AUDITS

1. This article shall be in force only in those party states that specifically provide therefor by statute.

2. Any party state or subdivision thereof desiring to make or participate in an audit of any accounts, books, papers, records or other documents may request the commission to perform the audit on its behalf. In responding to the request, the commission shall have access to and may examine, at any reasonable time, such accounts, books, papers, records, and other documents and any relevant property or stock of merchandise. The commission may enter into agreements with party states or their subdivisions for assistance in performance of the audit. The commission shall make charges, to be paid by the state or local government or governments for which it performs the service, for any audits performed by it in order to reimburse itself for the actual costs incurred in making the audit.

3. The commission may require the attendance of any person within the state where it is conducting an audit or part thereof at a time and place fixed by it within such state for the purpose of giving testimony with respect to any account, book, paper, document, other record, property or stock of merchandise being examined in connection with the audit. If the person is not within the jurisdiction, he may be required to attend for such purpose at any time and place fixed by the commission within the state of which he is a resident: provided that such state has adopted this article.

4. The commission may apply to any court having power to issue compulsory process for orders in aid of its powers and responsibilities pursuant to this article and any and all such courts shall have jurisdiction to issue such orders. Failure of any person to obey any such order shall be punishable as contempt of the issuing court. If the party or subject matter on account of which the commission seeks an order is within the jurisdiction of the court to which application is made, such application may be to a court in the state or subdivision on behalf of which the audit is being made or a court in the state in which the object of the order being sought is situated. The provisions of this paragraph apply only to courts in a state that has adopted this article.

5. The commission may decline to perform any audit requested if it finds that its available personnel or other resources are insufficient for the purpose or that, in the terms requested, the audit is impracticable of satisfactory performance. If the commission, on the basis of its experience, has reason to believe that an audit of a particular taxpayer, either at a particular time or on a particular schedule, would be of interest to a number of party states or their subdivisions, it may offer to make the audit or audits, the offer to be contingent on sufficient participation therein as determined by the commission.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

6. Information obtained by any audit pursuant to this article shall be confidential and available only for tax purposes to party states, their subdivisions or the United States. Availability of information shall be in accordance with the laws of the states or subdivisions on whose account the commission performs the audit, and only through the appropriate agencies or officers of such states or subdivisions. Nothing in this article shall be construed to require any taxpayer to keep records for any period not otherwise required by law.

7. Other arrangements made or authorized pursuant to law for cooperative audit by or on behalf of the party states or any of their subdivisions are not superseded or invalidated by this article.

8. In no event shall the commission make any charge against a taxpayer for an audit.

9. As used in this article, "tax," in addition to the meaning ascribed to it in Article II, means any tax or license fee imposed in whole or in part for revenue purposes.

## ARTICLE IX. ARBITRATION

1. Whenever the commission finds a need for settling disputes concerning apportionments and allocations by arbitration, it may adopt a regulation placing this article in effect, notwithstanding the provisions of Article VII.

2. The commission shall select and maintain an arbitration panel composed of officers and employees of state and local governments and private persons who shall be knowledgeable and experienced in matters of tax law and administration.

3. Whenever a taxpayer who has elected to employ Article IV, or whenever the laws of the party state or subdivision thereof are substantially identical with the relevant provisions of Article IV, the taxpayer, by written notice to the commission and to each party state or subdivision thereof that would be affected, may secure arbitration of an apportionment or allocation, if he is dissatisfied with the final administrative determination of the tax agency of the state or subdivision with respect thereto on the ground that it would subject him to double or multiple taxation by two or more party states or subdivisions thereof. Each party state and subdivision thereof hereby consents to the arbitration as provided herein, and agrees to be bound thereby.

4. The arbitration board shall be composed of one person selected by the taxpayer, one by the agency or agencies involved, and one member of the commission's arbitration panel. If the agencies involved are

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

unable to agree on the person to be selected by them, such person shall be selected by lot from the total membership of the arbitration panel. The two persons selected for the board in the manner provided by the foregoing provisions of this paragraph shall jointly select the third member of the board. If they are unable to agree on the selection, the third member shall be selected by lot from among the total membership of the arbitration panel. No member of a board selected by lot shall be qualified to serve if he is an officer or employee or is otherwise affiliated with any party to the arbitration proceeding. Residence within the jurisdiction of a party to the arbitration proceeding shall not constitute affiliation within the meaning of this paragraph.

5. The board may sit in any state or subdivision party to the proceeding, in the state of the taxpayer's incorporation, residence or domicile, in any state where the taxpayer does business, or in any place that it finds most appropriate for gaining access to evidence relevant to the matter before it.

6. The board shall give due notice of the times and places of its hearings. The parties shall be entitled to be heard, to present evidence, and to examine and cross-examine witnesses. The board shall act by majority vote.

7. The board shall have power to administer oaths, take testimony, subpoena and require the attendance of witnesses and the production of accounts, books, papers, records, and other documents, and issue commissions to take testimony. Subpoenas may be signed by any member of the board. In case of failure to obey a subpoena, and upon application by the board, any judge of a court of competent jurisdiction of the state in which the board is sitting or in which the person to whom the subpoena is directed may be found may make an order requiring compliance with the subpoena, and the court may punish failure to obey the order as a contempt. The provisions of this paragraph apply only in states that have adopted this article.

8. Unless the parties otherwise agree the expenses and other costs of the arbitration shall be assessed and allocated among the parties by the board in such manner as it may determine. The commission shall fix a schedule of compensation for members of arbitration boards and of other allowable expenses and costs. No officer or employee of a state or local government who serves as a member of a board shall be entitled to compensation therefor unless he is required on account of his service to forego the regular compensation attaching to his public employment, but any such board member shall be entitled to expenses.

9. The board shall determine the disputed apportionment or allocation and any matters necessary thereto. The determinations of the board shall be final for purposes of making the apportionment or allocation, but for no other purpose.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

10. The board shall file with the commission and with each tax agency represented in the proceeding: the determination of the board; the board's written statement of its reasons therefor; the record of the board's proceedings; and any other documents required by the arbitration rules of the commission to be filed.

11. The commission shall publish the determinations of boards together with the statements of the reasons therefor.

12. The commission shall adopt and publish rules of procedure and practice and shall file a copy of such rules and of any amendment thereto with the appropriate agency or officer in each of the party states.

13. Nothing contained herein shall prevent at any time a written compromise of any matter or matters in dispute, if otherwise lawful, by the parties to the arbitration proceeding.

## ARTICLE X. ENTRY INTO FORCE AND WITHDRAWAL

1. This compact shall enter into force when enacted into law by any seven states. Thereafter, this compact shall become effective as to any other state upon its enactment thereof. The commission shall arrange for notification of all party states whenever there is a new enactment of the compact.

2. Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal.

3. No proceeding commenced before an arbitration board prior to the withdrawal of a state and to which the withdrawing state or any subdivision thereof is a party shall be discontinued or terminated by the withdrawal, nor shall the board thereby lose jurisdiction over any of the parties to the proceeding necessary to make a binding determination therein.

## ARTICLE XI. EFFECT ON OTHER LAWS AND JURISDICTION

Nothing in this compact shall be construed to:

(a) Affect the power of any state or subdivision thereof to fix rates of taxation, except that a party state shall be obligated to implement Article III 2 of this compact.

(b) Apply to any tax or fixed fee imposed for the registration of a motor vehicle or any tax on motor fuel,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

other than a sales tax; provided that the definition of "tax" in Article VIII 9 may apply for the purposes of that article and the commission's powers of study and recommendation pursuant to Article VI 3 may apply.

(c) Withdraw or limit the jurisdiction of any state or local court or administrative officer or body with respect to any person, corporation or other entity or subject matter, except to the extent that such jurisdiction is expressly conferred by or pursuant to this compact upon another agency or body.

(d) Supersede or limit the jurisdiction of any court of the United States.

ARTICLE XII. CONSTRUCTION AND SEVERABILITY

This compact shall be liberally construed so as to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of any state or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of any state participating therein, the compact shall remain in full force and effect as to the remaining party states and in full force and effect as to the state affected as to all severable matters.

CREDIT(S)

Acts 1981, 67th Leg., p. 1528, ch. 389, § 1, eff. Jan. 1, 1982.

Current through the end of the 2013 Third Called Session of the 83rd Legislature

(C) 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

END OF DOCUMENT

**B**

**201108230H [Tax Type: Franchise] [Document Type: Hearing]**

STAR System Disclaimer - Important information for STAR System users!

**Highlighted:** 104752 (1)

*http://aixtcp.cpa.state.tx.us/opendocs/open32/201108230h.html*

**Texas Comptroller of Public Accounts STAR System**

201108230H


SOAH DOCKET NO.  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.13
CPA HEARING NO.  104,752

RE:  *************
TAXPAYER NO.:  *************
AUDIT OFFICE:  *************
AUDIT PERIOD:  January 1, 2009 THROUGH December 31, 2009

Franchise Tax/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS
Texas Comptroller of Public Accounts

JAMES ARBOGAST
Representing Tax Division

*************
Representing Claimant


SOAH DOCKET NO.  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.13
CPA HEARING NO.  104,753

RE:  *************
TAXPAYER NO.:  *************
AUDIT OFFICE:  *************
AUDIT PERIOD:  January 1, 2008 THROUGH December 31, 2008

Franchise Tax/RFD

BEFORE THE COMPTROLLER
OF PUBLIC ACCOUNTS
OF THE STATE OF TEXAS

SUSAN COMBS
Texas Comptroller of Public Accounts

JAMES ARBOGAST
Representing Tax Division

*************
Representing Claimant


COMPTROLLER'S DECISION

************* (Claimant) filed amended Texas Franchise Tax Reports for the 2008
and 2009 report years claiming a refund on franchise tax paid in error.
Claimant filed the amended reports using the three-factor apportionment method
under the Multistate Tax Compact (MTC), rather than the single-factor
apportionment method permitted under the Texas Franchise Tax Act, which was
used in filing its original franchise tax reports.  The Texas Comptroller of
Public Accounts (Comptroller) denied the refund claims on the grounds that
Chapter 141 of the Texas Tax Code (TEX. TAX CODE ANN. Section 141.001 –
141.006), which adopted the MTC, does not apply to the Texas franchise tax.
Claimant requested a refund hearing, contending that the current version of the
franchise tax, which is based on a taxable entity's taxable margin, is an
income tax and therefore subject to the MTC.  Comptroller Staff (Staff) asserts
that the Texas Franchise Tax Act requires use of the single gross receipts
factor mandated by TEX. TAX CODE ANN. (Tax Code) Section 171.106, which does
not provide for an alternative apportionment method.  In his Proposal for
Decision (PFD), the Administrative Law Judge (ALJ) concludes that Claimant may
not elect the MTC three-factor apportionment formula and is required to use the
single-factor method, and therefore recommends that the refund claims be
denied.

I.  PROCEDURAL HISTORY, NOTICE & JURISDICTION

On April 5, 2011, Staff referred the cases to the State Office of
Administrative Hearings (SOAH) for hearings based on the parties' written
submissions.  The parties subsequently requested that the cases be joined for
purposes of conducting the hearing and issuing a PFD. The ALJ issued an order
granting the joinder.  The Comptroller was represented by Assistant General
Counsel James Arbogast.  Claimant was represented by *************, Claimant's
Vice President of Finances.  ALJ Peter Brooks closed the record on June 15,
2011.  There are no issues of notice or jurisdiction in this proceeding.
Therefore, these matters are set out in the Findings of Fact and Conclusions of
Law without further discussion here.

II.  REASONS FOR DECISION

A.  Evidence Presented

Claimant provided the Amended Texas Franchise Tax Reports for report year 2008.
Staff filed for each hearing the 60-day Letter, the refund denial letter, and
the refund audit plan.  Staff also submitted the pleadings filed by the parties
while these matters were pending before the Comptroller.  The documents have
been admitted into the record without objection.

B.  Adjustments

Staff has not agreed to any adjustments.

C.  ALJ's Analysis

Resolution of the issue presented by these contested cases turns on whether Claimant is required to use the single gross receipts factor in apportioning a taxable entity's margin to Texas as provided for under Tax Code Section 171.106(a) or may elect to use the alternate three-factor apportionment authorized under Article IV the MTC.  The ALJ concludes that Claimant was required to use the single-factor method and therefore finds that Staff did not err in denying the refund claims.

Tax Code Section 171.106(a) provides for a taxable entity's margin to be apportioned as follows:

Except as provided by this section, a taxable entity's margin is apportioned to this state to determine the amount of tax imposed under Section 171.002 by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

The exceptions provided for in Tax Code Section 171.106, which do not apply to Claimant, still require a single factor in apportioning the taxable entity's margin to Texas.  The rules adopted by the Comptroller in implementing Tax Code Section 171.106 apply the statutory directive without any modification.  SEE 34 TEX. ADMIN. CODE Section 3.591(c), which tracks Section 171.106(a) and directs that a "taxable entity's margin is apportioned to this state to determine the amount of franchise tax due by multiplying the taxable entity's margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state and the denominator of which is the taxable entity's gross receipts from its entire business."  The rule was effective January 1, 2008, and applied to Claimant's 2008 and 2009 franchise tax reports. The Comptroller clearly did not contemplate that an alternative method was available for apportioning a taxable entity's margin. This is further reflected in the Frequently Asked Questions (FAQ) that were issued to advise taxable entities in filing their Texas Franchise Tax Reports.  In FAQ 2 issued under the topic heading Apportionment, the Comptroller advised taxable entities that there were no changes to how receipts are apportioned:

The apportionment factor is generally the same as under previous law; however, the throw-back provisions were repealed. Also see exceptions for Texas gross receipts for transactions between members of a combined group under TTC 171.1055. [ENDNOTE: (1)]

This advice was subsequently reaffirmed in a more detailed policy statement that was adopted and issued in 2010 as State Tax Automated Research System (STAR) Accession No. 201007003L (July 1, 2010).  The policy statement addresses the question whether a taxable entity may elect to use the MTC's three-factor apportionment formula and explicitly provides that taxable entities are required to use the single-factor apportionment factor:

Use of the Multistate Tax Compact (MTC) Apportionment Formula is Prohibited for Texas Franchise Tax:

The Texas franchise tax is apportioned to Texas using a single-factor apportionment formula based on gross receipts as specifically provided in Texas Tax Code Section 171.105. The apportionment provision in Texas Tax Code Chapter 141, related to the Multistate Tax Compact (MTC), does not apply to the revised Texas franchise tax and entities may not elect to use the MTC's three -factor apportionment formula in lieu of the formula specified in Texas Tax Code Chapter 171.

This policy statement was added to the Apportionment FAQs as FAQ 3 on January 26, 2011.

The Comptroller's determination that the single-factor apportionment continues to apply unchanged to the franchise tax, even after the extensive revisions adopted in 2006 by the Legislature (HB 3), [ENDNOTE: (2)] is also reflected in the Legislature's own assessment of the proposed changes.  In the House Research Organization's Bill Analysis, the proposed apportionment provisions are described as applying a single gross receipts factor, and no reference is made directly or indirectly to the three-factor formula available under the MTC. [ENDNOTE: (3)]

Claimant's contention that it could elect to use the MTC's three-factor formula relies principally on the fact that TEX. TAX CODE ANN. Section 171.112(g), which provided that Chapter 141 did not apply to Chapter 171 (i.e., Franchise Tax), was repealed by HB 3, and not reenacted by the Legislature.  Claimant argues that, as the specific bar against applying the MTC to the Franchise Tax Act was repealed, the MTC's three-factor formula may be used in apportioning its margin to Texas.  However, notwithstanding the absence of the repealed statutory prohibition, the specific and unqualified requirement in Tax Code Section 171.106(a) to use a single-factor formula, buttressed by the Comptroller's rule and policy statements, is more than sufficient to preclude a taxable entity from electing to use the MTC three-factor formula.

The Comptroller's interpretation of the revised Franchise Tax Act is entitled to due deference as the agency entrusted with implementing the statute, as long as its statutory construction is reasonable and does not contradict the plain language of the statute.  SEE TENNESSEE GAS PIPELINE CO. V. RYLANDER, 80 S.W.3d 200, 203 (Tex. App.--Austin 2002, pet. denied).  The Comptroller's interpretation as stated in both its rules and policy statements is consistent with the plain language of Section 171.106 and with the intent of the Legislature.  Moreover, Article IV of the MTC was adopted by the 60th Legislature in Tax Code Section 141.001, effective June 13, 1967.  Section 141.001 has not been reenacted or amended since its adoption.  In contrast, the single-factor sales formula has survived numerous amendments, most recently the 2006 adoption of a franchise tax based on a taxable margin, which lends further weight to the Comptroller's position that no substantive changes to the single-factor apportionment provisions were intended with the latest changes.  As noted by Staff the specific rule in Tax Code Section 171.106(a) addressing apportionment controls over the general provisions of Tax Code Section 141.001.

In summary, the ALJ concludes that Claimant was required to follow the single-factor apportionment formula under Section 171.106, and therefore its amended franchise tax reports and the attendant refund claims were properly

rejected by Staff.

III. FINDINGS OF FACT

1.   ************** (Claimant) filed amended Texas Franchise Tax Reports for the 2008 and 2009 report years claiming a refund on franchise tax paid in error.

2.   Claimant filed the amended reports using the three-factor apportionment method under the Multistate Tax Compact (MTC).  TEX. TAX CODE ANN. Section 141.001.

3.   Claimant had used the single-factor apportionment method set out in TEX. TAX CODE ANN. Section 171.106(a) in filing its original franchise tax reports.

4.   The Texas Comptroller of Public Accounts (Comptroller) denied the refund claims on the grounds that Chapter 141 of the Texas Tax Code (TEX. TAX CODE ANN.  SectionSection141.001 – 141.006), which adopted the MTC, does not apply to the Texas franchise tax.

5.   Claimant requested a refund hearing contesting the denial.

6.   On April 5, 2011, Comptroller Staff (Staff) referred the cases to the State Office of Administrative Hearings (SOAH) for hearings based on the parties' written submissions.

7.   Staff issued Notices of Hearing by Written Submission.  The Notices of Hearing contained a statement of the nature of the hearing; a statement of the legal authority and jurisdiction under which the hearing was to be held; a reference to the particular sections of the statutes and rules involved; and a short, plain statement of the matters asserted.

8.   The parties subsequently requested that the cases be joined for purposes of conducting the hearing and issuing a proposal for decision.  The Administrative Law Judge (ALJ) issued an order granting the joinder.

9.   ALJ Peter Brooks closed the record on June 15, 2011.

IV.   CONCLUSIONS OF LAW

1.  The Comptroller has jurisdiction over this matter pursuant to TEX. TAX CODE ANN. ch. 111.

2.  SOAH has jurisdiction over matters related to the hearing in this matter, including the authority to issue a proposal for decision with findings of fact and conclusions of law pursuant to TEX. GOV'T CODE ANN. ch. 2003.

3.  The Comptroller provided proper and timely notice of the hearing pursuant to TEX. GOV'T CODE ANN. ch. 2001.

4.  TEX. TAX CODE ANN. Section 171.106(a) provides for a taxable entity's margin to be apportioned by multiplying the margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state, as determined under Section 171.103, and the denominator of which is the taxable entity's gross receipts from its entire business, as determined under Section 171.105.

5.  Rule 3.591, 34 TEX. ADMIN. CODE Section 3.591(c), tracks Section 171.106(a) and directs that a "taxable entity's margin is apportioned to this state to determine the amount of franchise tax due by multiplying the taxable entity's margin by a fraction, the numerator of which is the taxable entity's gross receipts from business done in this state and the denominator of which is the taxable entity's gross receipts from its entire business."  The rule was effective January 1, 2008, and applied to Claimant's 2008 and 2009 franchise tax reports.

6.  In Frequently Asked Question (FAQ) 2 that was issued to advise taxable entities in filing their Texas Franchise Tax Reports, the Comptroller advised taxable entities that there were no changes to how receipts are apportioned. SEE,  http://www.window.state.tx.us/taxinfo/franchise/faq_apport.html#apport3.

7.  The Comptroller issued and adopted a policy statement affirming that taxable entities were to use the single-factor apportionment formula and not the MTC's three-factor formula.  State Tax Automated Research System (STAR) Accession No. 201007003L (July 1, 2010).  This policy statement was also added to the Apportionment FAQs as FAQ 3.

8.  The House Research Organization's Bill Analysis of the proposed apportionment provisions are described as applying a single gross receipts factor, and no reference is made directly or indirectly to the three-factor formula available under the MTC.  SEE, http://www.legis.state.tx.us/BillLookup/Text.aspx?LegSess=793&Bill=HB3#.

9.  TEX. TAX CODE ANN. Section 171.112(g), which provided that TEX. TAX CODE ANN. ch. 141 did not apply to TEX. TAX CODE ANN. ch.  171 (i.e., the Texas franchise tax), was repealed in 2006 by the Legislature, and not reenacted. Tex. H.B. 3, 79th Leg., 3rd C. S. (2006).

10.  The Comptroller's interpretation of the revised Franchise Tax Act is due deference as the agency entrusted with implementing the statute, as long as its statutory construction is reasonable and does not contradict the plain language of the statute.  SEE TENNESSEE GAS PIPELINE CO. V. RYLANDER, 80 S.W.3d 200, 203 (Tex. App.--Austin 2002, pet. denied).  The Comptroller's interpretation as stated in both its rules and policy statements is consistent with the plain language of Section 171.106 and with the intent of the Legislature.

11.  Based on the foregoing Findings of Fact and Conclusions of Law, Claimant was required to use the single gross receipts factor in apportioning its margin to Texas, and consequently the amended reports and attendant refund claims were properly rejected by Staff.

Hearing Nos. **104752** and 104753

ORDER OF THE COMPTROLLER

On June 16, 2011, the State Office of Administrative Hearings' (SOAH) Administrative Law Judge (ALJ), Peter Brooks, issued a Proposal for Decision in the above referenced matter.  The parties were given fifteen days from the date of the Decision to file exceptions with SOAH.  No exceptions were filed, and the Comptroller has determined that the ALJ's Proposal for Decision, except for

minor changes to correct typographical or clerical errors, should be adopted as written.

The above Decision is approved and adopted in all respects.  This Decision becomes final twenty days after the date Claimant receives notice of this Decision.  If either party desires a rehearing, that party must file a motion for rehearing, which must state the grounds for rehearing, no later than twenty days after the date Claimant receives notice of this Decision.  Notice of this Decision is presumed to occur on the third day after the date of this Decision.

Signed on this 18th day of August 2011.


SUSAN COMBS
Texas Comptroller of Public Accounts

by: Martin A. Hubert
Deputy Comptroller

ENDNOTE(S)
(1)  See,
http://www.window.state.tx.us/taxinfo/franchise/faq_apport.html#apport3.
(2)  Tex. H.B. 3, 79th Leg., 3rd C. S. (2006).
(3)  http://www.legis.state.tx.us/BillLookup/Text.aspx?LegSess=793&Bill=HB3#.




ACCESSION NUMBER: 201108230H
SUPERSEDED: N
DOCUMENT TYPE: H
DATE: 08/18/2011
TAX TYPE: FRANCHISE

C

INGRAM MICRO, INC. & SUBSIDIARIES,

Plaintiff,

v

DEPARTMENT OF TREASURY,

Defendant.

**OPINION AND ORDER**

Case No. 11-000035-MT

Hon. Michael J. Talbot

This matter comes before the Court pursuant to its sua sponte order issued to plaintiff Ingram Micro, Inc. to show cause why judgment should not be entered in favor of defendant Department of Treasury (Department) in light of the retroactive effect of 2014 PA 282 (PA 282). In addition, plaintiff has filed a motion for summary disposition pursuant to MCR 2.116(C)(10). The Court concludes that the Department is entitled to judgment as a matter of law and so DENIES plaintiff's motion and instead GRANTS summary disposition in favor of the Department pursuant to MCR 2.116(I)(2).

## INTRODUCTION

This case is one of many cases currently pending in the Court of Claims involving taxpayers that have claimed refunds of tax under the Michigan Business Tax (MBT) Act, MCL 208.1101 *et seq*., based on an election to utilize a three-factor apportionment formula under the

Multistate Tax Compact (Compact) provisions, MCL 205.581 *et seq.*[1]  The underlying premise

of these claims is that the elective three-factor apportionment provision of the Compact, as

adopted by 1969 PA 343, remained viable under the MBT Act, as enacted by 2007 PA 36.  Use

of the single-factor apportionment formula under the MBT Act, it is argued, is not mandated

because the Compact provisions, including the three-factor apportionment election provisions,

remain in effect.[2]

The validity of this argument was addressed on July 14, 2014, by the Michigan Supreme

Court in *Int'l Business Machines Corp v Dep't of Treasury*, 496 Mich 642; 852 NW 2d 865

("*IBM*").  Finding that the Legislature, in adopting the MBT Act, did not repeal by

implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, the

Court concluded that the taxpayer was entitled to use the Compact's three-factor apportionment

formula in calculating its 2008 taxes.

On September 11, 2014, in response to *IBM*, the Legislature enacted PA 282, which

retroactively repealed the Compact provisions under MCL 205.581 *et seq.*, to January 1, 2008,

and mandated the use of a single-factor apportionment formula for purposes of calculating MBT.

The Court now considers the retroactive application of PA 282.  Having considered the

arguments made in response to the Court's show cause order, and for the reasons stated below,

the Court concludes that PA 282 retroactively applies to this case, and all pending MBT refund

---

[1] Section 1 of 1969 PA 343, codified under MCL 205.581 *et seq.*, includes the provisions of the Compact originally enacted by parties to the Compact (Member States).

[2] Taxpayers in some of these cases have also argued that the Compact provisions remain in effect with regard to the Income Tax Act, MCL 206.1 *et seq.*

actions filed in reliance on the Compact's elective, three-factor apportionment formula under the former MCL 205.581 *et seq*.

## BACKGROUND

**History of the Compact**

The Compact is an interstate tax agreement that was originally enacted in 1967 by the legislatures of seven states. The Compact was initially drafted out of concerns of state sovereignty in reaction to the introduction of federal legislation that sought to regulate various areas of state taxation.[3] The original purposes of the Compact included:

> (1) facilitating proper determination of state and local tax liability of multistate taxpayers, including the equitable apportionment of tax bases and settlement of apportionment disputes; (2) promoting uniformity and compatibility in state tax systems; (3) facilitating taxpayer convenience and compliance in the filing of tax returns and in other phases of tax administration; and (4) avoiding duplicative taxation. [*US Steel Corp v Multistate Tax Comm*, 434 US 452, 456; 98 S Ct 799; 54 L Ed 2d 682 (1978).[4]]

Michigan adopted the Compact provisions, effective in 1970, through enactment of 1969 PA 343.

---

[3] The legislation, which was never enacted, was introduced in the wake of *Northwestern States Portland Cement Co v Minnesota*, 358 US 450; 79 S Ct 357; 3 L Ed 2d 421 (1959), which held that there is no Commerce Clause barrier to the imposition of a direct income tax on a foreign corporation carrying on interstate business within a taxing state.

[4] The Compact was never approved by Congress, but it was upheld against constitutional challenges in *US Steel*, 434 US 452.

**Apportionment Formulas under the Compact and the MBT Act**

The present case, and others like it, concern two alternative methods of apportioning income for purposes of calculating MBT. Under the MBT Act, created by 2007 PA 36,[5] income is apportioned by applying a single factor apportionment formula based solely on sales. MCL 208.1301(2). In contrast, under the Compact's election provision, income may be apportioned using an equally-weighted, three-factor apportionment formula based on sales, property and payroll. The potential effect of electing "out" of the MBT Act's single-factor apportionment methodology is a reduction of the overall apportionment percentage for companies that do not have significant property and payroll located in Michigan.

**Decision in *IBM***

In *IBM*, 496 Mich 642, the Supreme Court considered the issue of whether MBT taxpayers must use a single-factor apportionment formula as mandated by the MBT Act or whether MBT taxpayers may elect to apply a three-factor apportionment formula under the Compact. The parties were asked by the Court to brief four issues:

> (1) whether the plaintiff could elect to use the apportionment formula provided in the Multistate Tax Compact, MCL 205.581, in calculating its 2008 tax liability to the State of Michigan, or whether it was required to use the apportionment formula provided in the Michigan Business Tax Act, MCL 208.1101 *et seq.*; (2) whether § 301 of the Michigan Business Tax Act, MCL 208.1301, repealed by implication Article III(1) of the Multistate Tax Compact; (3) whether the Multistate Tax Compact constitutes a contract that cannot be unilaterally altered or amended by a member state; and (4) whether the modified gross receipts tax component of the Michigan Business Tax Act constitutes an income tax under the Multistate Tax Compact. [*Int'l Business Machines v Dep't of Treasury*, 494 Mich 874; 832 NW2d 388 (2013).]

---

[5] For a history of business taxation in Michigan, see *IBM*, 496 Mich at 648-650.

In its decision, the Court determined that for tax years 2008 through 2010,[6] the Legislature did not repeal by implication the three-factor apportionment formula as set forth in MCL 205.581 *et seq.*, and concluded that the taxpayer was entitled to use the Compact's three-factor apportionment formula in calculating its 2008 taxes. The Court also concluded that both the business income tax base and the modified gross receipts tax base of the MBT are "income taxes" within the meaning of the Compact. The Court did not reach the third issue of whether the Compact constitutes a contract.[7] On November 14, 2014, the Michigan Supreme Court denied reconsideration. *Int'l Business Machines v Dep't of Treasury*, ___Mich___; 855 NW2d 512 (2014).

**Retroactive Repeal of the Compact Provisions by PA 282**

On September 11, 2014, 2013 SB 156 (SB 156) was enacted into law as PA 282, amending the MBT Act and expressly repealing the Compact provisions, as codified under MCL 205.581 to MCL 205.589. The Legislature gave the Act retroactive effect by providing as follows:

> Enacting section 1. 1969 PA 343, MCL 205.581 to 205.589, is repealed retroactively and effective beginning January 1, 2008. It is the intent of the legislature that the repeal of 1969 PA 343, MCL 205.581 to 205.589, is to express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and the intended effect

---

[6]The Legislature explicitly repealed the Compact apportionment provisions effective January 1, 2011, through enactment of 2011 PA 40.

[7] Thus, this Court is bound only by the Supreme Court's pre-PA 282 ruling that (1) the Compact's election provision under Article III(1) of the Compact was not implicitly repealed by enactment of the MBT Act in 2008, (2) the election provision properly applied to the modified gross receipts tax component of the MBT, and (3) IBM could elect to use the Compact's three-factor apportionment formula in calculating its 2008 MBT liability.

of that section to eliminate the election provision included within section 1 of 1969 PA 343, MCL 205.581, and that the 2011 amendatory act that amended section 1 of 1969 PA 343, MCL 205.581, was to further express the original intent of the legislature regarding the application of section 301 of the Michigan business tax act, 2007 PA 36, MCL 208.1301, and to clarify that the election provision included within section 1 of 1969 PA 343, MCL 205.581, is not available under the income tax act of 1967, 1967 PA 281, MCL 206.1 to 206.713.

PA 282 thus amended the MBT Act to express the "original intent" of the Legislature with regard to (1) the repeal of the Compact provisions, (2) application of the MBT Act's apportionment provision under MCL 208.1301, and (3) the intended effect of the Compact's election provision under MCL 205.581.[8] The effect of the amendments, as written, retroactively eliminates a taxpayer's ability to elect a three-factor apportionment formula in calculating tax liability under both the MBT Act and income tax act.

## PROCEDURAL SUMMARY

During the pertinent period, plaintiff was an out-of-state corporation with business activities in Michigan. Plaintiff, and other similar taxpayers, filed their MBT returns calculating tax by taking an election under Article III(1) of the Compact to apportion the MBT tax base using a three-factor apportionment formula. The returns reflected overpayments of tax, and taxpayers requested refunds of these amounts. The Department denied the refund claims, asserting that use of the three-factor apportionment was improper and that use of the single-factor apportionment was mandated by MCL 208.1301. In response, taxpayers paid the tax and filed actions in the Court of Claims.

---

[8] PA 282 also clarified that the Compact's election provision is not available under the income tax act of 1967, 1967 PA 281.

Pending the Supreme Court's resolution of *IBM*, this Court ordered this case and other similar cases held in abeyance. After the case was decided, the Court lifted its order holding the cases in abeyance and ordered the Department to brief the Court on why *IBM,* 496 Mich 642, should not control the disposition of these cases. After the Legislature enacted PA 282 that retroactively repealed the Compact provisions, the Court issued the show cause order concerning that legislation. Plaintiff also filed a motion for summary disposition. The Court now considers the arguments against retroactive application of PA 282.

**LEGAL ANALYSIS**

**I.     THE UNILATERAL REPEAL OF THE COMPACT PROVISIONS BY ENACTMENT OF PA 282 WAS A PERMISSIBLE EXERCISE OF THE LEGISLATURE'S SOVEREIGN AUTHORITY TO LEGISLATE**

The Court first considers whether the Legislature was authorized to unilaterally repeal the Compact provisions by enacting PA 282. This determination will depend on an analysis of (1) whether the Compact created a binding contract with Member States, (2) whether enactment of PA 282 impaired contractual obligations under the federal or state constitutional Contracts Clauses, and (3) under Michigan law, whether 1969 PA 343 could restrict subsequent legislatures from repealing the Compact provisions. For the following reasons, the Court concludes that the Legislature acted constitutionally and within its sovereign authority to legislate when it repealed the Compact provisions through enactment of PA 282.

**A.     THE COMPACT IS NOT A BINDING CONTRACT**

In evaluating whether repeal of the Compact by application of PA 282 unconstitutionally impairs a contract or whether a future legislature is bound to the provisions created by 1968 PA

-7-

343, there must first be a determination that a contract exists.  See *IBM*, 496 Mich at 681 (MᴄCᴏʀᴍᴀᴄᴋ, J., dissenting).

**1.      The Compact Lacks the "Classic Indicia" of a Binding Interstate Compact under Federal Compact Law**

The United State Supreme Court has recognized that not all interstate compacts are binding contracts that restrict future legislatures.  See *Northeast Bancorp, Inc v Bd of Governors*, 472 US 159; 105 S Ct 2545; 86 L Ed 2d 112 (1985).  While a Congressionally-approved interstate compact has the force of federal law and is binding on Member States,[9] an interstate compact that has not been approved by Congress, such as the Compact here, can be either a *binding* interstate compact or merely an *advisory* compact.[10]

The test for distinguishing between an advisory compact and a binding interstate compact is set forth in *Northeast Bancorp*, as further explained in *Seattle Master Builders Ass'n v Pacific Northwest Electric Power*, 786 F2d 1359, 1363 (CA 9, 1986).  The three "classic indicia" of a binding interstate compact are: (1) the establishment of a joint regulatory body, (2) the requirement of reciprocal action for effectiveness, and (3) the prohibition of unilateral modification or repeal.  *Northeast Bancorp*, 472 US at 175; *Seattle Master Builders*, 786 F2d at 1363.  Looking at the three indicia of a binding interstate compact, the Compact has none of these features and is more properly characterized as a non-binding advisory compact.

---

[9] The Compact Clause of the US Constitution, art I, §10, cl 3, provides, "No State shall, without the Consent of the Congress, . . . enter into any Agreement or Compact with another State . . . ."

[10] Advisory interstate compacts have no formal or regulatory enforcement mechanisms and are intended to study and make recommendations on interstate problems.  Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 13.

### a. The Compact did not establish a joint regulatory agency

A hallmark of an advisory compact, as opposed a binding contract, is that advisory compacts "cede no state sovereignty nor delegate any governing power to a compact-created agency." Broun, et al, The Evolving Use and the Changing Role of Interstate Compacts: A Practitioner's Guide (2006), p 14. When the Compact, through Article VI, established the Multistate Tax Commission (Commission),[11] no governing or regulatory powers were conferred. Enumerated in Article VI, the powers of the Commission are (1) to study state and local tax systems, (2) to develop and recommend proposals for greater uniformity, and (3) to compile information helpful to the states.[12] None of these purposes is regulatory, and it in no way indicates a delegation of sovereign authority to tax.

The conclusion that the Compact did not cede state authority or governing power to the Commission was expressly acknowledged by the Court in *US Steel Corp*:

> [The Compact] does not purport to authorize the Member States to exercise any powers they could not exercise in its absence. *Nor is there any delegation of sovereign power to the Commission; each State retains complete freedom to adopt or reject the rules and regulations of the Commission.* [Emphasis added.] [*US Steel Corp*, 434 US at 473.]

In summary, the Compact, by its terms, does not create a regulatory body.

### b. The Compact does not require reciprocal action

There is nothing reciprocal about the Compact's provisions. Each member state operates its respective tax systems independently from the tax systems of other Member States, and the

---

[11] MCL 205.581, Art VI.

[12] *Id*. at Art VI(3).

determination of tax in one state is generally independent of the determination in another state. With respect to apportionment formulas, in particular, Articles III(1) and IV's application in one member state has no bearing on another state. And the functionality of one member state's apportionment methodology does not hinge on whether another member state's apportionment methodology is reciprocal in nature. As the Supreme Court recognized in *Moorman Mfg Co v Bair*, 437 US 267, 274; 98 S Ct 2340; 57 L Ed 2d 197 (1978), "the States have wide latitude in the selection of apportionment formulas." Consistent with *Moorman*, a Member State's decision to allow or eliminate a certain apportionment formula is unaffected by the choice of formula that another member state has made.

### c.    The Compact allows unilateral withdrawal and modification

Under the express terms of the Compact, Member States are free to unilaterally withdraw at any time without notice to another member state. MCL 205.581, Art X(2) ("Any party state may withdraw from this compact by enacting a statute repealing the same.) See also *US Steel*, 434 US at 473 ("[E]ach State retains complete freedom to adopt or reject the rules and regulations of the Commission.") Thus unilateral *withdrawal* is clearly permitted under the Compact.

Whether unilateral *modification* is permitted under the Compact is less clear and is not directly addressed under the Compact. However, three factors lead to a conclusion that Member States did not intend to restrict their ability to vary terms of the Compact. First, as pointed out recently by the United States Supreme Court, "States rarely relinquish their sovereign powers, so when they do we would expect a clear indication of such devolution, not inscrutable silence." *Tarrant Regional Water Dist v Herrmann*, ___ US ___; 133 S Ct 2120, 2133; 186 L Ed 2d 153

(2013). Because there is no such "clear indication" under the terms of the Compact that states are prevented from asserting their sovereign powers to legislate and vary the Compact's terms, it is reasonable to conclude that the parties were free to unilaterally amend the Compact provisions, including Articles III(1) and IV.

Second, language in the Compact that it "shall be liberally construed as to effectuate the purposes thereof," supports an interpretation that flexibility in administering Compact provisions was contemplated. MCL 205.581, Art XII.

Third, the Member States' course of performance shows that unilateral amendments to or withdrawals from the Compact have long been accepted. As pointed out by the dissent in *IBM*, 496 Mich at 681-682, "[M]ember [S]tates did *not* view strict adherence to Articles III and IV as a binding contractual obligation, as Compact members have deviated without objection from other members."[13] Moreover,

> "It bears emphasizing that Compact members have not only refrained from bringing legal action against one another for deviating from Articles III and IV, they have endorsed the Commissioner's interpretation of the Compact: in the *Gillette* [*Co v Franchise Tax Bd*, 151 Cal Rptr 3d 106; 291 P3d 327 (2013)] litigation, all of the member states jointly filed an amicus brief urging the Supreme Court of California to reject the lower court's construction of the Compact as a binding contract. [*IBM*, 496 Mich at 682 n 7 (McCormack, J., dissenting).]

---

[13] As summarized in Hellerstein & Hellerstein, State Taxation (2014), the course of performance of states with regard to the Compact provisions generally, and the elective apportionment provisions specifically, shows that unilateral repeal and modifications to the Compact provisions have been widespread.

Because the Compact fails to create a regulatory body, contemplates no reciprocal actions, and contains no bar to unilateral deviations or repeal, the Court concludes that none of the "classic indicia" of a binding compact exist. Rather than a binding interstate contract, it is more properly interpreted as an advisory compact that did not act to bind future legislatures.

### 2. The Compact is not a Binding Contract under Michigan Law

Because it was not congressionally-approved, the Compact is governed by state law. See *Doe v Young Marines of The Marine Corps League*, 277 Mich App 391, 399; 745 NW2d 168 (2007) (finding that Michigan courts are not bound to follow a federal court's interpretation of state law.) See also *McComb v Wambaugh*, 934 F2d 474, 479 (CA 3, 1991) (finding that because a non-Congressionally approved compact does not express federal law, it must be construed as state law.) Michigan law therefore governs the interpretation of the Compact.

In Michigan, there is a "strong presumption that statutes do not create contractual rights." *Studier v Mich Pub Sch Employees' Retirement Bd*, 472 Mich 642, 661; 698 NW2d 350 (2005). "In order for a statute to form the basis of a contract, the statutory language must be plain and susceptible of no other reasonable construction than that the Legislature intended to be bound to a contract." *Id.* at 662 (quotation marks and citation omitted). As noted in the dissent in *IBM*, "[t]his presumption is grounded in the principle that 'surrenders of legislative power are subject to strict limitations that have developed in order to protect the sovereign prerogatives of state governments.' " *IBM*, 496 Mich at 682 (MCCORMACK, J., dissenting), quoting *Studier*, 472 Mich at 661.

There are no words in the Compact, as adopted by the Legislature under 1969 PA 343, that indicate that the state intended to be bound to the Compact, and specifically to Article III(1).

-12-

Therefore, the presumption must be that the state did not surrender its legislative power to require use of a particular apportionment formula. Such interpretation comports with the Supreme Court's recognition of "the basic principle[] that the States have wide latitude in the selection of apportionment formulas . . . ." *Moorman*, 437 US at 274. This interpretation is also consistent with the Court's recent acknowledgment that states "do not easily cede their sovereign powers . . . ." *Tarrant*, 133 S Ct at 2132. Because there is no clear indication under MCL 205.581 that the state contracted away its ability to either select an apportionment formula that differs from the Compact, or to repeal the Compact altogether, the Court concludes that no contractual obligation was created by enactment of 1969 PA 343 that would prohibit the enactment of PA 282.[14]

**B. REPEAL OF THE COMPACT BY PA 282 DOES NOT VIOLATE THE CONTRACTS CLAUSES OF THE STATE OR FEDERAL CONSTITUTIONS**

The United States Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." US Const, art I, § 10, cl 1. The Michigan Constitution provides: "No . . . law impairing the obligation of contract shall be enacted." Const 1963, art 1,

---

[14] Even if the Compact could somehow be construed as a binding contract under Michigan law, the Member States' course of performance supports a determination that Member States either waived or modified the Compact's terms under Articles III(1) and IV, or materially breached the terms under Articles III(1) and IV well before the repeal of the Compact provisions under PA 282. See n 12. In addition, as suggested in the dissenting opinion in *IBM*, taxpayers would have no standing to enforce the terms of any purported contract that was made with Member States.

> [I]t is not entirely clear to me why IBM has standing to enforce the Compact as a contract, given that IBM is neither a party to the Compact nor is it clear that they were intended as a third-party beneficiary. See *Schmalfeldt v North Pointe Ins Co*, 469 Mich 422; 670 NW2d 651 (2003); MCL 600.1405. In any event, because I conclude that no such contractual relationship was formed, I find it unnecessary to address this issue *sua sponte*. [*IBM* at 681 n 5 (MCCORMACK, J., dissenting).]

§10. "Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich 295, 307; 806 NW2d 683 (2011) (citation and quotation marks omitted). In addition, " '[t]he presumption of constitutionality is especially strong' " when tax legislation is concerned. *Id*. at 308 (citation omitted).

As discussed earlier, the Compact creates no binding contract, and therefore the Legislature's repeal of the Compact by PA 282 does not impair an obligation of contract in violation of the Michigan or United States Constitutions.

**C.** **BECAUSE LEGISLATURES CANNOT BIND SUBSEQUENT LEGISLATURES UNDER MICHIGAN LAW, 1969 PA 343 DOES NOT RESTRICT THE ABILITY OF A SUBSEQUENT LEGISLATURE TO CORRECT AN ERROR, EITHER PROSPECTIVELY OR RETROACTIVELY**

Generally, legislatures have the power to repeal legislation and are not bound by the acts of prior legislatures, so long as existing contractual obligations are not impaired. See, e.g., *Studier*, 472 Mich at 660; *LeRoux v Secretary of State*, 465 Mich 594, 615-616; 640 NW2d 849 (2002). See also *Atlas v Wayne Co Board of Auditors*, 281 Mich 596, 599; 275 NW 507 (1937) ("The power to amend and repeal legislation as well as to enact it is vested in the legislature, and the legislature cannot restrict or limit its right to exercise the power of legislation by prescribing modes of procedure for the repeal or amendment of statutes; nor may one legislature restrict or limit the power of its successors"). The principle that one legislature cannot bind a succeeding legislature is thus derived from the constitutional power of the Legislature to legislate. Const 1963, art 4, § 1. As discussed earlier, no contract was created by enactment of the Compact provisions. Thus, the Legislature's constitutional right to change, amend or repeal the law could not be restricted by enactment of 1969 PA 343. *Studier*, 472 Mich at 660. Therefore, the

-14-

Legislature, by enacting PA 282 to correct its drafting error contained in 2007 PA 36, acted within the scope of its legislative powers as vested in it by the Michigan Constitution.

Moreover, correcting the drafting errors from 2007 PA 36 by repeal of the Compact provisions through PA 282 is consistent with the intent of the Legislature in enacting 1969 PA 353. This is evidenced by the language of Article X of the Compact:

> Any party state may withdraw from this compact by enacting a statute repealing the same. No withdrawal shall affect any liability already incurred by or chargeable to a party state prior to the time of such withdrawal. [MCL 205.581, Art X(2).]

"When interpreting a statute, courts must ascertain the legislative intent that may reasonably be inferred from the words expressed in the statute." *Andrie Inc v Dep't of Treasury*, 496 Mich 161, 167; 853 NW2d 310 (2014) (quotation marks omitted). This requires the Court to consider "the plain meaning of the critical word or phrase as well as its placement and purpose in the statutory scheme." *Id*. (citations and quotation marks omitted).

It is clear from the language of Article X(2) that in 1969 the Legislature contemplated the possibility of future withdrawal from the Compact. Withdrawal from the Compact provisions by PA 282 is therefore consistent with the Legislature's intent. The Court rejects any argument that under Article X(2) repeal of the Compact can be prospective only. As made clear by the enacting provisions of PA 282, the repeal of the Compact provisions was intended to apply prospectively from January 1, 2008. Because it is this Court's duty to carry out the intent of the Legislature, repeal of the Compact provisions by PA 282 must be given effect.

**D.     CONCLUSION**

The Court concludes that the Compact did not create a binding contract with Member States, but it was merely an advisory compact. Because no contract was created under federal Compact or Michigan law, there was no impairment of contractual obligations and therefore no violations of the Contracts Clauses of the federal or state constitutions. Finally, inasmuch as there is no impairment of contractual obligations, the Legislature was free to amend or repeal 1969 PA 343. Thus this Court must give effect to and apply the intent of PA 282 as a valid expression of the Legislature's sovereign and constitutional authority to legislate.

**II.     THE RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE OTHER PROVISIONS OF THE STATE OR FEDERAL CONSTITUTIONS**

Other constitutional arguments against the retroactive application of PA 282 concern due process, separation of powers, the Commerce Clause, and the First Amendment's right to petition.[15] These arguments have no merit.

It is well settled that a tax act is not necessarily unconstitutional because it is retroactive. *Welch v Henry,* 305 US 134, 147; 59 S Ct 121; 83 L Ed 87 (1938). A statute is presumed constitutional unless there is a clear showing to the contrary. *Ammex, Inc v Dep't of Treasury*, 273 Mich App 623, 635; 732 NW 2d 116 (2007); *Gen Motors Corp v Dep't of Treasury*, 290

---

[15] Contracts Clause arguments are relevant in the context of whether a contract that was allegedly entered into vis-à-vis the adoption of the Compact, and for reasons discussed earlier, must fail. As to whether the retroactive application of a tax statute would generally implicate the Contracts Clauses of the Michigan or United States Constitutions, taxes are not considered contractual in nature, but are instead statutory. *Welch v Henry,* 305 US 134, 146; 59 S Ct 121; 83 L Ed 87 (1938). Any further discussion of whether PA 282 violates the Contracts Clauses is unnecessary.

Mich App 355, 369; 803 NW 2d 698 (2010). In addition, a taxing statute must be shown to "clearly and palpably violate the fundamental law before it will be declared unconstitutional." *Ammex*, 273 Mich App at 635-636 (citation and internal quotation marks omitted). For the following reasons, the presumption that PA 282 is constitutional remains intact.

## A. RETROACTIVE APPLICATION OF PA 382 DOES NOT VIOLATE DUE PROCESS

PA 282's retroactive application does not violate due process of law. First, taxpayers have no vested interests in tax laws, and therefore no valid claim that an interest in "life, liberty, or property" has been deprived by retroactive application of PA 282. Second, the Legislature had a legitimate purpose for giving retroactive effect to PA 282. And third, the period of retroactivity of PA 282 is rationally related to that purpose.

### 1. Taxpayers have No Vested Interests

"The due process clauses of the United States and Michigan Constitutions apply when government actions deprive a person of a liberty or property interest." *Edmond v Dep't of Corrections*, 143 Mich App 527, 533; 373 NW2d 168 (1985). To determine whether the Due Process Clause applies, courts look to the nature of the interest at stake. *Id*. A property interest must be a vested right to be protected under due process. *Detroit v Walker*, 445 Mich 682, 698-699; 520 NW2d 135 (1994).

In *United States v Carlton*, 512 US 26; 114 S Ct 2018; 129 L Ed 2d 222 (1994), the Supreme Court specifically rejected the argument that the taxpayer had a viable vested right in tax legislation. *Id.* at 33. It explained that "[t]ax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code." *Id*. The Michigan Court of Appeals has also made clear that a taxpayer "does not have a vested right in a tax statute or in the continuance of

-17-

any tax law." *Gen Motors Corp*, 290 Mich App at 371. See also *Walker*, 445 Mich at 703; *GMAC v Treasury Dep't*, 286 Mich App 365, 377-378; 781 NW2d 310 (2009). Similarly, no taxpayer has a vested right in a tax refund based on the continuation of the Compact election provisions, and any due process claim must fail.

> **2.    The Legislature had a Legitimate Purpose for Giving Retroactive Effect to PA 282**

Not only are taxpayers' rights not vested here, but there are no substantive due process violations implicated by the retroactive application of PA 282. The test for determining whether due process has been violated by retroactive tax legislation was set forth by the Supreme Court in *Carlton*, 512 US 26. Under *Carlton*, a statute's retroactive application satisfies due process if: (1) it is supported by a legitimate legislative purpose, and (2) it is rationally related to that legislative purpose. *Carlton*, 512 US at 30.

In enacting PA 282 and giving it retroactive effect, the Legislature had a legitimate purpose: to protect state revenues. The potential ramifications of not giving retroactive effect to PA 282 were made clear in the Senate Fiscal Agency's legislative analysis of SB 156:[16]

> The first enacting section of the bill would retroactively repeal the State's enactment of the Multistate Tax Compact, effective January 1, 2008. As a result, taxpayers filing under the MBT would not be allowed to use alternative apportionment calculations provided under the Compact when computing a

---

[16] Although legislative bill analyses are not official statements of legislative intent, they nonetheless can have probative value. See, e.g., *North Ottawa Community Hosp v Kieft*, 457 Mich 394, 406 n 12; 578 NW2d 267 (1998); *Nemeth v Abonmarche Dev, Inc*, 457 Mich 16, 27-29; 576 NW2d 641 (1998); *People v Grant*, 455 Mich 221, 240-241; 565 NW2d 389 (1997); *Travis v Dreis & Krump Mfg Co*, 453 Mich 149, 164-166, 551 NW2d 132 (1996) (opinion by BOYLE, J.).

Michigan tax base. While the Department of Treasury has not allowed taxpayers to use these alternative calculations, the Michigan Supreme Court's recent decision in *IBM Corp. v Department of Treasury* may enable certain taxpayers to use these calculations, and the Department estimates that approximately $1.1 billion in refunds would be paid as a result. Because MBT revenue is directed to the General Fund, these refunds would reduce General Fund revenue, and *the bill would prevent a reduction in General Fund revenue of $1.1 billion.* [Senate Legislative Analysis, SB 156, September 10, 2014, p 5. (Emphasis added.)]

Furthermore, as was recognized by the Court in *Gen Motors*, 290 Mich App at 373, a legislature's purpose to "mend a leak in the public treasury or tax revenue" is legitimate. See also *Carlton*, 512 US at 32 (finding a legitimate governmental purpose where the Internal Revenue Code was retroactively amended for purposes of correcting a legislative error that would have "created a significant and unanticipated revenue loss.")

Here, PA 282 served the legitimate governmental purpose of fixing a legislative error and preventing the potential loss of over $1 billion of MBT revenues in the form of tax refunds from overpayments.

**3. Retroactive Application of PA 282 is a Rational Means of Furthering this Legitimate Purpose**

In addition to having a legitimate legislative purpose of preventing a catastrophic fiscal shortfall, the retroactive application of PA 282 is also a rational means of furthering this legitimate purpose. In *Gen Motors*, 290 Mich App at 375, the Court of Appeals found that whether a retroactive tax law met the rational means prong of *Carlton* includes a consideration of whether the retroactive period is "modest" as tested against the "totality of circumstances." In determining that a five-year look back period was a rational means of accomplishing the prevention of revenue loss, the Court looked to whether (1) the retroactive amendment created a "wholly new tax," (2) the taxpayer acted in reliance on an expectation its activity would not be

-19-

taxed, (3) how promptly the Legislature acted to correct the problem leading to loss in revenue, and (4) the period of time to which the amendment retrospectively applies.

Applying the "totality of circumstances" here, the retroactive application of PA 282 does not exceed the modest limitation of the Due Process Clause and is a rational means of accomplishing the Legislature's purpose of stemming revenue losses.

First, PA 282 does not reach back in time to assess a "wholly new tax" on long-concluded transactions, but rather it confirmed that single-factor apportionment under the MBT was mandatory and that an election to use a three-factor apportionment formula could not be made.

Second, as a matter of law, there can be no valid claim that an MBT taxpayer acted in reliance on an expectation that for the MBT its income would be apportioned by the three-factor apportionment provision. As the Supreme Court recognized in *Moorman*, 437 US 267, the states have wide latitude in the selection of an apportionment methodology. Moreover, it is also well established that a taxpayer does not have a vested right in a tax statute or in the continuance of any tax law. *Walker*, 445 Mich at 703; *Ludka v Dep't of Treasury*, 155 Mich App 250; 399 NW2d 490 (1986). And as *Carlton*, 512 US at 33, made clear, even where a taxpayer has detrimentally relied on a tax statute, this does not result in a constitutional violation:

> Although Carlton's reliance is uncontested—and the reading of the original statute on which he relied appears to have been correct—his *reliance alone is insufficient to establish a constitutional violation. Tax legislation is not a promise, and a taxpayer has no vested right in the Internal Revenue Code.* [Emphasis added.]

Because taxpayers do not, as a matter of law, have a reliance interest in any particular apportionment formula a state chooses in dividing the income of multistate taxpayer, this Court

-20-

rejects any assertion that a taxpayer would have changed its behavior or structured its affairs differently had it known that the Compact's elective provision was no longer available.

Third, the Legislature acted promptly in correcting its error. Not until July 14, 2014, when the Court decided *IBM*, was it made clear to the Legislature that 2007 PA 36 was defective. SB 156, H-1, which added the retroactive repeal of the Compact, provisions, was introduced on September 9, 2014, and was enacted into law on September 11, 2014.

Fourth, the period of time to which the amendment applies was modest, particularly in light of the time frames of other retroactive legislation that Michigan courts and those of other jurisdictions have held were within the modesty limits of the Due Process Clause. For example, in *Gen Motors*, 290 Mich App 355, the Court concluded that a five-year retroactive period (eleven years as applied to the specific taxpayer's tax years) was modest. In *GMAC*, 286 Mich App 365, the Court upheld a law with a seven-year retroactive period. See also *Enterprise Leasing Co v Arizona Dep't of Revenue*, 221 Ariz 123; 211 P3d 1 (Ariz Ct App, 2008) (six year period); *King v Campbell Co*, 217 SW3d 862 (Ky Ct App, 2006) (upholding 2005 legislation that denied refunds of taxes overpaid since 1986 under 2004 judicial decision); *Miller v Johnson Controls, Inc*, 296 SW3d 392 (Ky, 2009) (upholding 2000 legislation retroactively ratifying 1988 tax-agency policy that a 1994 judicial decision overruled); *Zaber v City of Dubuque*, 789 NW2d 634 (Iowa, 2010) (five-and-one-half years); *Licari v Comm'r*, 946 F2d 690 (CA 9, 1991) (four years); *Tate & Lyle, Inc v Comm'r of Internal Revenue*, 87 F3d 99 (CA 3, 1996) (six years); *Montana Rail Link, Inc v United States*, 76 F3d 991 (CA 9, 1996) (four years).

All of these factors lead to the conclusion that the Legislature's means of stemming the loss of revenues, by giving retroactive effect to PA 282, was a rational means of furthering a legitimate governmental purpose.

**B.      RETROACTIVE APPLICATION OF PA 282 DOES NOT VIOLATE PRINCIPLES OF SEPARATION OF POWERS**

In addition to being a rational means of achieving a legitimate purpose, PA 282 does not violate the principle of separation of powers under the Michigan Constitution. The Separation of Powers Clause is set forth in Const 1963, art 3, § 2:

> The powers of government are divided into three branches; legislative, executive and judicial. No person exercising powers of one branch shall exercise powers properly belonging to another branch except as expressly provided in this constitution.[17]

With respect to retroactive legislation, the Legislature is permitted to retroactively change legislation, so long as it does not "not reverse a judicial decision or repeal a final judgment." *GMAC*, 286 Mich App at 380; *Romein v Gen Motors Corp*, 436 Mich 515, 536-537; 462 NW2d 555 (1990), aff'd 503 US 181; 112 S Ct 1105; 117 L Ed 2d 328 (1992). See also *Wylie v City Comm'n of Grand Rapids*, 293 Mich 571; 292 NW 668 (1940). Furthermore, a legislature is

---

[17] As expressly provided in the Constitution, the legislative power is vested in a senate and a house of representatives, Const 1963, art 4, § l; the executive power is vested in the governor, Const 1963, art 5, § l Sec. 1; and the judicial power is vested exclusively in the courts, Const 1963, art 6, § 1. Pursuant to these powers, it is the legislature's duty to state what the law is, it is the judiciary's role to interpret this law, and it is and it is the executive branch's obligation to enforce the law as written and as interpreted by the judiciary. 1 Official Record, Constitutional Convention 1961, pp 601-602 ("[H]e who makes a law shall not enforce it, nor sit in judgment upon it; that he who enforces a law shall not make or change it nor shall he judge of its violation; and he who sits in judgment shall have neither made the law nor enforced it.")

entitled to correct its own mistakes though retroactive legislation. See *Gen Motors*, 290 Mich App at 373.

By enacting PA 282, the Legislature acted within its authority to legislate by correcting a mistake made clear to it by the Court in *IBM*. PA 282 did not purport to overturn the *IBM* decision, nor did it repeal the final judgment as it applied to the plaintiff. The Court's holding in *IBM* was limited to a finding that there was no *implicit* repeal of the Compact apportionment provisions through enactment of 2007 PA 36, and PA 282 does not conflict with or disturb this ruling. Through enactment of PA 282, the Legislature took steps to retroactively repeal the Compact provisions *explicitly,* clarifying its original intent in enacting the MBT. Such action did not impinge upon the judiciary's functions in violation of the separations of powers.

Although *IBM* left unresolved the issue of whether the retroactive repeal of the Compact provisions would be constitutional, both the majority and the concurring opinions suggest that an explicit, retroactive repeal of the Compact provisions, effective January 1, 2008, could have led to a different result.[18] Rather than deviating from the Court's opinion, PA 282's explicit, retroactive repeal of the Compact provisions is consistent with the language in *IBM* suggesting that retroactive repeal would be an appropriate legislative response to the challenges being made.

_____

[18] Discussing 2011 PA 40, which retroactively repealed the Compact apportionment provisions effective January 1, 2011, the majority stated that "[t]here is no dispute that the Legislature specifically intended to retroactively repeal the Compact's election provision for taxpayers subject to the [MBT] beginning January 1, 2011. *The Legislature could have—but did not— extend this retroactive repeal to the start date of the* [*MBT*]." *IBM*, 496 Mich at 659. (Emphasis added.) See also concurring opinion of Justice Zahra, noting that "the [MBT's] exclusive apportionment method remains in conflict with the election provision of the Compact. *This conflict, in my view, is easily resolved because the Legislature in 2011 also expressly supplemented the Compact*." *Id*. at 669. (Emphasis added.)

The Legislature did not violate the separation of powers doctrine when it passed the retroactive amendments under PA 282.

## C.    PA 282 DOES NOT VIOLATE THE COMMERCE CLAUSE

PA 282 does not violate the Commerce Clause[19], which prohibits state laws that (1) facially discriminate against interstate commerce, (2) have a discriminatory effect, or (3) are enacted for a discriminatory purpose. *Caterpillar Inc v Dep't of Treasury*, 440 Mich 400, 422-425; 488 NW2d 182 (1992). Under the dormant Commerce Clause, states may not discriminate against interstate commerce by "unduly burden[ing] interstate commerce." *Quill Corp v North Dakota*, 504 US 298, 312; 112 S Ct 1904; 119 L Ed 2d 291 (1992) (citations omitted). PA 282 neither discriminates against, nor unduly burdens, interstate commerce.

First, PA 282 is not facially discriminatory. Facial discrimination requires an "explicit discriminatory design to the tax." *Amerada Hess Corp v Dir*, 490 US 66, 75; 109 S Ct 1617; 104 L Ed 2d 58 (1989). The text of PA 282 makes clear, on its face, that no taxpayer, regardless of location, can elect the three-factor apportionment.

Second, PA 282 has no discriminatory effect. The effect of PA 282 is that no taxpayer, whether in-state or out-of-state, can make an election to apply a three-factor apportionment for MBT purposes. As the United States Supreme Court made clear in *Moorman*, 437 US 267, requiring a single-factor apportionment formula does not have the effect of discriminating against an out-of-state taxpayer.

---

[19] US Const, art I, § 8, cl 3.

In addition, PA 282 was not enacted for a discriminatory purpose, but rather sought to clarify the original intent of the 2007 Legislature with respect to all taxpayers, both in-state and out-of-state. Any claims made that PA 282 violates the Commerce Clause of the United States Constitution must therefore fail.

**D.     PA 282 DOES NOT VIOLATE THE FIRST AMENDMENT PETITION CLAUSE**

Neither does PA 282, by retroactively revoking taxpayers' right to petition the Department and appeal to a court for a refund of tax, violate their First Amendment right to petition the government.

The right of citizens to petition the government for redress of grievances is specifically guaranteed by the United States and Michigan Constitutions. US Const Amend I; Const 1963, art 1, § 3. This right is not unlimited, however, and "may be circumscribed to the extent necessary to achieve a valid state objective." *Jackson Co Ed Ass'n v Grass Lake Community Sch Bd of Ed*, 95 Mich App 635, 641-642; 291 NW2d 53 (1979).

The Supreme Court has long made clear that the First Amendment does not require the government to listen to individuals or to respond to individual grievances. In *Bi-Metallic Investment Co v State Bd of Equalization*, 239 US 441; 36 S Ct 141; 60 L Ed 372 (1915), the Court responded to a real estate owner's argument that it had no opportunity to be heard in opposition to a legislative tax valuation increase by stating:

> Where a rule of conduct applies to more than a few people it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. Generally statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. *Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.* [*Id*. at 445 (emphasis added).]

See also *Smith v Arkansas State Highway Employees*, *Local 1315*, 441 US 463, 464-465; 99 S Ct 1826; 60 L Ed 2d 360 (1979) (finding that the Arkansas Highway Commission did not have an affirmative obligation under the First Amendment "to listen, to respond or, in this context, to recognize the association and bargain with it.")

The Supreme Court's analysis in *Bi-Metallic Investment* applies here. There is no merit to any argument that the retroactive application of PA 282 violates a taxpayers's First Amendment right to petition the government. Taxpayers' First Amendment rights on matters of tax legislation—whether prospective or retroactive—are properly protected by taxpayers' power over those who "make the rule[s]"—that is, the Legislature. *Bi-Metallic Investment*, 239 US at 445. While the Court has an obligation, within jurisdictional limits, to respond to taxpayers' grievances with respect to individual overpayments of tax, it is under no constitutional obligation under the First Amendment to answer to taxpayers about general validity of the legislation itself. Thus application of PA 282 does not violate a taxpayer's First Amendment rights.

Moreover, to the extent that PA 282 may impact taxpayers' procedural rights of petitioning the court for a refund of tax, these rights are properly safeguarded under rights of due process, which "affirmatively require[s] the government to provide meaningful procedural opportunities in response to judicial petitions, far and above any required by the First Amendment standing alone." Andrews, *A Right of Access to Court Under the Petition Clause of the First Amendment: Defining the Right*, 60 Ohio St L J 557, 634 (1999). And as the Court has already discussed, plaintiff's constitutional rights of due process have been satisfied with respect to the application of PA 282.

**III.    THERE WERE NO PROCEDURAL VIOLATIONS THAT BAR APPLICATION OF PA 282**

**A.    THE TITLE-OBJECT CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED**

PA 282 satisfies the Title-Object Clause of the Michigan Constitution.  This clause states:

No bill shall be altered or amended on its passage through either house so as to change its original purpose as determined by its total content and not alone by its title.  [Const 1963, art 4, § 24.]

PA 282 is titled as follows:

AN ACT to amend 2007 PA 36, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, reporting, payment, and enforcement of taxes on certain commercial, business, and financial activities; to prescribe the powers and duties of public officers and state departments; to provide for the inspection of certain taxpayer records; to provide for interest and penalties; to provide exemptions, credits, and refunds; to provide for the disposition of funds; to provide for the interrelation of this act with other acts; and to make appropriations," by amending sections 111, 305, 403, and 433 (MCL 208.1111, 208.1305, 208.1403, and 208.1433), sections 111 and 305 as amended by 2012 PA 605, section 403 as amended by 2008 PA 434, and section 433 as amended by 2007 PA 215, and by adding section 508; and to repeal acts and parts of acts.

The three different challenges that may be brought against a statute on the basis of the Title-Object Clause are: (1) a multiple-object challenge, (2) a title-body challenge, and (3) a change of purpose challenge.  *Ray Twp v B & BS Gun Club*, 226 Mich App 724, 728; 575 NW2d 63 (1997); *HJ Tucker & Assoc, Inc v Allied Chucker & Engineering Co*, 234 Mich App 550, 556-557; 595 NW2d 176 (1999).  In assessing the validity of these challenges, the constitutional requirements under the Title-Object clause are to be construed reasonably.  *Mooahesh v Dep't of Treasury*, 195 Mich App 551, 563; 492 NW2d 246 (1992).  See also *Gen Motors Corp*, 290 Mich App at 388.

-27-

### 1.    Multiple-Object Challenge

With respect to the multiple-object challenge, the body of the law, as well as its title, must be examined to determine whether the act embraces more than one object or purpose. *Ray Twp*, 226 Mich App at 731.  The object of the legislation must be determined by examining the law as enacted, not as originally introduced.  *People v Kevorkian*, 447 Mich 436, 456; 527 NW2d 714 (1994).  A bill that is enacted into law may include all matters germane to its object, as well as all provisions that directly relate to, carry out, and implement the principal object. *City of Livonia v Dep't of Social Servs*, 423 Mich 466, 497; 378 NW2d 402 (1985).  "The purpose of the single-object rule is to avoid bringing into one bill diverse subjects that have no necessary connection."  *Mooahesh*, 195 Mich App at 564.

In determining whether PA 282 violated the single object rule, *Mooahesh* is instructive. *Mooahesh* involved a title-object challenge to 1988 PA 136, which (1) amended the Individual Income Tax Act to provide that lottery winnings are taxable, and (2) repealed a section from the Lottery Act that had previously exempted lottery winnings from taxation.[20]  The Court first determined that the general purpose of the act as found in the title ("to meet deficiencies in state

---

[20] The title of 1988 PA 516 provided, in pertinent part:

> An act to amend sections . . . of the Public Acts of 1967, entitled "An act to meet deficiencies in state funds by providing for the imposition, levy, computation, collection, assessment, and enforcement by lien and otherwise of taxes on or measured by net income; to prescribe the manner and time of making reports and paying the taxes, and the functions of public officers and others as to the taxes; to permit the inspection of the records of taxpayers; to provide for interest and penalties on unpaid taxes; to provide exemptions, credits and refunds of the taxes; to prescribe penalties for the violation of this act; to provide an appropriation; and to repeal certain acts and parts of acts. . . ." [Emphasis added.]

-28-

funds") was to raise revenues, and that "[a] statute may authorize the doing of all things that *are*

*in furtherance of the general purpose of act* without violating the one-object limitation of art 4, §

24." *Mooahesh*, 195 Mich App at 564 (emphasis added). It further stated that "[t]he object of

'meet[ing] deficiencies in state funds' may reasonably be found to include the repeal of a tax

exemption, even if that exemption does not appear in any act specifically devoted to taxation."

*Mooahesh*, 195 Mich App at 566. In addition, acknowledging that "it might have been 'better

draftsmanship,' to have provided for a separate amendment to the Lottery Act," the Court

determined that "the inclusion of the repeal of the tax exemption provision in an act amending

the income tax laws does not render the act in violation of the single-object requirement." *Id*.

(internal citations omitted.)

Just as the statute considered in *Mooahesh* had as its general purpose the raising of

revenues, so too was the general purpose of PA 282. And just as it might have been "better

draftsmanship" to have provided for a separate amendment repealing § 34 of the Lottery Act, the

Legislature in enacting PA 282 might have been better advised to repeal the Compact provisions

in a separate act. But like the choice to amend the ITA and repeal a section of the Lottery Act in

one act, the choice to include the repeal of the Compact and amend the MBT in one act is not a

violation of the single-object requirement.[21]

---

[21] As repeated by the Court in *Mooahesh*, 195 Mich App at 564:

> There is . . . no constitutional requirement that the legislature do a tidy job in
> legislating. It is perfectly free to enact bits and pieces of legislation in separate
> acts or to tack them on to existing statutes even though some persons might think
> that the bits and pieces belong in a particular general statute covering the matter.
> The constitutional requirement is satisfied if the bits and pieces so enacted are
> embraced in the object expressed in the title of the amendatory act and the act

## 2. Title-Body Challenge

With respect to a title-body challenge, the title of an act must express the general purpose or object of the act. *Ray Twp*, 226 Mich App at 728. " '[T]he title need not serve as an index of all that the act contains.' " *Midland Twp v Mich State Boundary Comm'n,* 401 Mich 641, 653; 259 NW 2d 326 (1977) (quoting *People v Milton*, 393 Mich 234, 246-247; 224 NW2d 266 (1974)). It is sufficient if the title " 'is a descriptive caption, directing attention to the subject matter which follows . . . or if it be expressive of the purpose and scope of the enactment.' " *Mooahesh*, 195 Mich App at 556-557, quoting *People ex rel Wayne Prosecuting Atty v Sill*, 310 Mich 570, 574; 17 NW2d 756 (1945). The test under a title-body challenge is whether the title "gives fair notice to the legislators and the public of the challenged provision." *H J Tucker & Assocs*, 234 Mich App at 559. "The notice aspect is violated where the subjects are so diverse in nature that they have no necessary connection." *Mooahesh*, 195 Mich App at 569.

Here, as discussed earlier, the Legislature's broad purpose of PA 282 was to raise revenue through the imposition of tax. The title adequately expressed this object and gave notice of this general purpose. To withstand scrutiny under Const 1963, art 4, § 24, it was not necessary for the Legislature to provide in the title "an index of all that the act contains," *Midland Twp*, 401 Mich at 653. In addition, the subjects within the title all had a nexus to the purpose of raising revenue and were not "so diverse in nature that they [had] no necessary connection" to this purpose. *Mooahesh,* 195 Mich App at 569. There was no violation of the title-body rule under PA 282.

---

being amended. [*Id.* quoting *Detroit Bd of Street R Comm'rs v Wayne Co*, 18 Mich App 614, 622-623; 171 NW2d 669 (1969).]

### 3. Change-of-Purpose Challenge

Finally, a change of purpose challenge to PA 282 on the ground that its purpose changed during passage through the Legislature, is tested as to whether "the change represents an amendment or extension of the basic purpose of the original, or the introduction of entirely new and different subject matter." *Anderson v Oakland Co Clerk*, 419 Mich 313, 328; 353 NW2d 448 (1984) (LEVIN, J., concurring) (internal quotation marks omitted). See also *Kevorkian*, 447 Mich at 461 ("[T]he test for determining if an amendment or substitute changes a purpose of the bill is whether the subject matter of the amendment or substitute is germane to the original purpose.")

Here, as discussed earlier, the general purpose of SB 156 as originally introduced was to raise revenues. This original purpose of SB 156 did not change under Substitute H-1, as introduced and later enrolled as PA 282.

As originally introduced, SB 156 amended the MBT by (1) allowing an adjustment to the modified gross receipts tax base for amounts attributable to the taxpayer pursuant to a discharge of indebtedness, (2) revising the calculation of the investment credit with respect to the recapture of revenue when property previously subject to the credit is sold, (3) revising the calculation of the credit for a taxpayer located and conducting business in a renaissance zone before December 1, 2002, and, (4) revising a provision concerning a dock sale, for purposes of apportionment. See Senate Legislative Analysis, SB 156, March 19, 2013. The original bill stated that the act was "curative and intended to clarify the original intent of the Legislature." *Id.* Substitute H-1, as enrolled as PA 282, retained the original proposed amendments, and added, in pertinent part, (1) a requirement that a taxpayer claim a refund in 2015 if as a result of the amendments, there

was an overpayment for a tax year between 2010 and 2014, and (2) a provision that the bill would retroactively repeal the Compact provisions under Public Act 343 of 1969 to January 1, 2008, and express legislative intent regarding the single-factor apportionment formula and the elimination of the Compact's election provision. See Senate Legislative Analysis, SB 156, September 10, 2014.

Substitute H-1, as enrolled as PA 282, was "an extension of the basic purpose of the original," rather than "the introduction of the entirely new and different subject matter" that would otherwise violate the change-of-purpose rule. *Anderson*, 419 Mich at 327. The general purpose of both the bill as originally enacted, and substitute H-1, as enrolled as PA 282, was also to raise revenues. Because the general purpose of the bills did not change or introduce new and different subject matter, a change-in-purpose challenge to PA 282 must fail.

In conclusion, given the presumption that PA 282 is constitutional, and in light of the fact that the Title-Object Clause is to be liberally construed, the Court concludes that PA 282 does not violate the Title-Object Clause of the Constitution.

**B. THE "FIVE-DAY RULE" UNDER THE MICHIGAN CONSTITUTION WAS NOT VIOLATED**

The issue whether PA 282 violates the Title-Object Clause is integrally related to the "five-day rule" of art 4, § 26 of Const 1963 which states, in pertinent part, that no bill can be

passed until it has been printed or reproduced and in the possession of each house for at least five days.[22]  This rule was not violated by passage of PA 282.

Whether the five-day rule has been violated depends on whether (1) the bill was in the possession of both houses for five days, and (2) whether there has been a change in purpose. *Anderson*, 419 Mich at 339 (LEVIN, J., concurring).  Here, SB 156 was before both the House and Senate for at least 5 days.[23]  And as discussed earlier, SB 156 as finally passed served the original bill's general purpose of raising revenues.  The Court therefore concludes that enactment of PA 282 did not violate Const 1963, art 4, § 26.

**C.**     **THE TAX-TITLE CLAUSE OF THE MICHIGAN CONSTITUTION WAS NOT VIOLATED**

PA 282 does not violate the "tax-title" clause of art 4, § 32 of the Michigan Constitution. That provision, also known as the "distinct-statement" clause, requires that "[e]very law which imposes, continues or revises a tax shall distinctly state the tax." *Id*.  The purpose of this clause is " 'to prevent the Legislature from being deceived in regard to any measure for levying taxes, and from furnishing money that might by some indirection be used for objects not approved by the Legislature.' "  *Dawson v Sec of State*, 274 Mich App 723, 747; 739 NW2d 339 (2007). (Citation omitted.)

---

[22] As explained by the Court in *Anderson*, 419 Mich at 329-330, "The five-day rule and the change of purpose provision were contained in the same article and section of the Constitution of 1908.  Const 1908, art 5, § 22.  It is clear that the function of the change of purpose provision, both in the Constitution of 1908 and as modified in the Constitution of 1963, is to fulfill the command of the five-day rule."
[23] See 2013 Senate Journal 9; 2014 Senate Journal 61.

Both the title and the body of PA 282 make clear that the act related distinctly to tax, and there is no language within SB 156, enrolled as PA 282, that would have caused the Legislature to be "deceived in regard to any measure for levying taxes." *Dawson*, 274 Mich App at 747. There is no merit to any claim that PA 282 violates Const 1963, art 4, § 32.

## IV. CONCLUSION

The passage of PA 282 is a valid, constitutional act by the Legislature that provided clarity to taxpayers as to the original intent of the MBT Act.[24] It also prevented the significant fiscal harm to the state that would have resulted if taxpayers had been permitted to elect apportionment provisions under the Compact. The Legislature's choice in PA 282 to retroactively repeal the Compact provisions was within the boundaries of the Michigan and United States Constitutions and stayed true to the Legislature's original intent to require single-factor apportionment under the MBT Act. Application of PA 282 to the disposition of this case, and others like it, is appropriate;[25] failure to do so would otherwise provide taxpayers with a windfall that the Legislature did not mean to provide. See Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation*, 73 Harv L Rev 692, 705 (1960).

---

[24] PA 282 also clarified that the Compact's election provision is not available under the Income Tax Act, MCL 206.1, *et seq*.

[25] Similar claims brought under the Income Tax Act, MCL 206.1, *et seq*., would likewise fail; PA 282 would apply and negate the basis for the plaintiff's claim.

-34-

IT IS HEREBY ORDERED that plaintiff's motion for summary disposition is DENIED, and summary disposition is GRANTED in favor of the Department pursuant to MCR 2.116(I)(2).

This order resolves the last pending claim and closes the case.

Dated:  December 19, 2014

_____
Hon. Michael J. Talbot
Chief Judge, Court of Claims